# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **EMILY PINON, GARY C. KLEIN, KIM BROWN, JOSHUA FRANKUM, LACRESHA EARLEY, and TODD BRYAN,** *on behalf of themselves and all others similarly situated,* | **CIVIL ACTION FILE** |
| **Plaintiffs,** | **NO. 1:18-CV-3984-MHC** |
| **v.** | |
| **DAIMLER AG and MERCEDES BENZ USA, LLC,** | |
| **Defendants.** | |

## ORDER

This case comes before the Court on Defendants' Motion to Dismiss Second

Amended Complaint ("Motion to Dismiss") [Doc. 18].

## Table of Contents

Part I:      Background……………………………………………………...4

    A.   Pinon's 2015 Mercedes C250…………………………………...5

    B.   Klein's 2014 E-350 Mercedes………………………………...6

    C.   Brown's 2011 Mercedes C300………………………………..8

D.     Frankum's 2014 Mercedes GLK 250 Bluetec…………………………..8

E.     Earley's 2014 Mercedes C250……………………………………..9

F.     Bryan's 2013 Mercedes SLK 250………………………………...10

G.     General Allegations………………………………………………11

Part II:     Legal Standard……………………………………………………19

Part III:     Discussion………………………………………………………...21

A.     Breach of Express Warranty (Count One)…………………………..21

B.     Breach of Implied Warranty (Count Two)…………………………..25

    1.     Earley's Purchase in Louisiana………………………..26

    2.     Brown's Purchase in Arkansas………………………...30

    3.     Klein's Purchase in Florida…………………………...32

C.     Violation of the Magnuson-Moss Warranty Act (Count Four)……...35

D.     Unjust Enrichment (Count Five)……………………………………36

E.     Fraud and Suppression (Count Six)…………………………………38

    1.     Fraud and Suppression Generally…………………………38

    2.     Economic Loss Rule as to Klein……………………………43

    3.     Fraudulent Concealment……………………………………46

    4.     Fraudulent Misrepresentation………………………………52

        a.     Defendants' Procedures for Testing Paint……………..54

2

b.      Defendants' TSBs…………………………………...57

c.      Complaints Made to Mercedes Dealerships…………...63

d.      Complaints Made to NHTSA…………………………65

e.      Complaints on Internet Forums………………………..66

F.    Violation of the Florida Unfair and Deceptive Trade Practices Act
      (Count Seven)…………………………………………………….73

G.    Violation of the Alabama Deceptive Trade Practices Act
      (Count Eight)…………………………………………………...75

H.    Violation of the Tennessee Consumer Protection Act
      (Count Nine)…………………………………………………...81

I.    Violation of the Louisiana Unfair Trade Practices and Consumer
      Protection Act (Count Ten)…………………………………….83

J.    Violation of the Arkansas Deceptive Trade Practices Act
      (Count Eleven)………………………………………………91

K.    Violation of the North Carolina Unfair and Deceptive Trade
      Practices Act (Count Twelve)…………………………….……93

L.    Equitable and Injunctive Relief (Count Three)……………...….100

Part IV:    Conclusion………………………………………...……..102

I.    **BACKGROUND**[1]

Plaintiffs Emily Pinon ("Pinon"), Gary C. Klein ("Klein"), Kim Brown ("Brown"), Joshua Frankum ("Frankum"), LaCresha Earley ("Earley"), and Todd Bryan ("Bryan") (collectively, "Plaintiffs"),[2] bring this punitive class action individually and on behalf of all others similarly situated asserting claims against Defendants Daimler AG ("Daimler") and Mercedes Benz USA, LLC ("MBUSA") (collectively, "Defendants") for the design, manufacturing, and sale of Mercedes vehicles with defective paint. Second Am. Class Action Compl. ("Second Am. Compl.") [Doc. 16] ¶¶ 1-2. Plaintiffs allege that the Class Vehicles[3] are all painted with 590 Mars Red paint which has a latent defect that causes the exterior surfaces

---

[1] Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in the Second Amended Complaint. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

[2] Nancy Pearsall voluntarily dismissed her claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on June 17, 2019. See Notice of Dismissal Without Prejudice of Pl. Nancy Pearsall [Doc. 20].

[3] The Class Vehicles are those 2009-2015 Mercedes C-Class, 2013-2015 Mercedes CLA-Class, 2003-2009 and 2011-2015 Mercedes CLS-Class, 2012-2016 Mercedes E-Class, 2011-2015 Mercedes GLK-Class, 2014-2015 Mercedes G-Class, 2014-2016 Mercedes SL-Class, and 2012-2016 Mercedes SLK-Class vehicles that are painted in Mars Red. Second Am. Compl. ¶ 3.

of the vehicles to microblister, peel, and bubble without being exposed to any external or environmental stimuli.  See id. ¶ 4.

### A.   Pinon's 2015 Mercedes C250

In November 2016, Pinon purchased a 2015 Mercedes C250 in Mars Red with 9,747 miles on it from a dealership in Hoover, Alabama.  Id. ¶¶ 38-39. Pinon's vehicle had not been wrecked or repainted when she bought it; it has the original Mercedes Mars Red paint from the factory.  Id. ¶ 43.  Pinon had no reason to know or expect that the paint on her vehicle was defective; had she known, she would not have bought her vehicle or would have paid less for it.  Id. ¶ 45.

In early 2018, Pinon observed a spot on her vehicle's hood that looked as though the clear coat was bubbling and peeling.  Id. ¶ 46.  In February 2018, after the Mars Red paint and clear coat continued to deteriorate, Pinon took her vehicle to the Mercedes dealership in Hoover, Alabama.  Id. ¶ 47.  The dealership acknowledged that the paint was defective and that it was aware of multiple other Mars Red vehicles having the same problem, but it declined to help Pinon in any way.  Id. ¶¶ 47-48.

In June 2018, Pinon notified Defendants via the "Mercedes Me" app that her paint was unrepaired and she was unsatisfied.  See id. ¶ 49.  Pinon was instructed to take her car to the Irondale Mercedes dealership twenty-six miles away.  Id.

During her visit to the dealership, a Mercedes representative acknowledged multiple problems with other Mars Red Mercedes vehicles.  Id. ¶ 50.  The representative also stated that Pinon's vehicle would need to be sanded to the raw metal and repainted and that doing so was "major body work," would take four to six weeks, and would substantially depreciate the value of the car.  Id.  To repair and repaint her vehicle, Pinon would have to pay approximately $7,000.00.  Id. ¶ 53.

**B.    Klein's 2014 E-350 Mercedes**

On June 30, 2016, Klein purchased a 2014 E-350 Mercedes in Mars Red from Mercedes Benz of North Palm Beach, an authorized dealer.  Id. ¶ 60.  Klein's vehicle was "Mercedes Certified" pre-owned and had 6,761 miles on it.  Id. ¶¶ 61-62.  Klein opted to purchase a Mercedes extended limited warranty.  Id. ¶ 61.  Klein's vehicle has never been involved in a wreck nor been repainted; it has the original Mercedes Mars Red factory paint.  Id. ¶ 65.  Klein had no reason to know or expect that the paint on his vehicle was defective; had he known, he would not have bought his vehicle or would have paid less for it.  Id. ¶ 76.

In early September 2018, Klein learned from his car detailing attendant that the Mars Red paint was beginning to chip and peel.  Id. ¶ 68.  While the car was still under warranty, Klein notified his local Mercedes dealer of these problems via

its online portal.  Id. ¶ 69.  The dealer responded that it could not help Klein and that he must contact a body shop at another Mercedes dealer.  Id.

A Mercedes dealership employee took pictures of Klein's vehicle and notified Defendants in writing that Klein was unhappy with his paint and considered it defective.  Id. ¶¶ 71-72.  The employee admitted that she had personally seen at least eight other Mercedes cars in Mars Red with the same paint problems.  Id. ¶ 70.  After receiving a response from Defendants, the employee called Klein and stated that Defendants admitted that Klein's vehicle's Mars Red paint was defective, and they agreed to repaint the car.  Id. ¶ 72.  Plaintiffs allege that this remedy is insufficient because (1) the new paint is not Mars Red but a lesser quality, different looking red, (2) repainting the vehicle substantially decreases its value, (3) the repainting is done by hand rather than by robots in a sterile environment at the factory so the finish is not the same, (4) the bumpers are not repainted so they do not match the new color, (5) repainting takes at least one month, (6) Klein would be substantially inconvenienced, and (7) Klein would be unable to sell his vehicle at fair market value if it was  repainted.  Id. ¶ 73.  Klein expressed his unhappiness with this solution to Defendants via the online portal and in person.  Id. ¶ 74.

### C.    Brown's 2011 Mercedes C300

In August 2017, Brown purchased a 2011 Mercedes C300 in Mars Red in Arkansas.  Id. ¶ 77.  Brown's vehicle currently has 66,000 miles on it.  Id. ¶ 78. Brown's vehicle has not been repainted; it has the original Mercedes Mars Red paint from the factory.  See id. ¶ 84.  Brown had no reason to know or expect that the paint on her vehicle was defective; had she known, she would not have bought her vehicle or would have paid less for it.  Id. ¶ 86.

At the end of 2018, Brown began noticing that her paint was peeling, flecking, bubbling, and developing a haze underneath the clear coat.  Id. ¶ 81. Brown notified Defendants of these paint issues and received a response stating that they had never seen these paint issues before.  Id. ¶ 82.  Brown informed Defendants to log her dissatisfaction in its customer relation software and to ensure that it was recorded therein in writing.  Id.

### D.    Frankum's 2014 Mercedes GLK 250 Bluetec

In October 2018, Frankum purchased a 2014 Mercedes GLK 250 Bluetec in Mars Red with approximately 67,000 miles on it.  Id. ¶ 87.  Frankum's vehicle has not been repainted; it has the original Mercedes Mars Red paint from the factory. See id. ¶¶ 89, 94.  Frankum had no reason to know or expect that the paint on his

8

vehicle was defective; had he known, he would not have bought his vehicle or would have paid less for it.  Id. ¶ 95.

Within a few weeks of purchase, Frankum noticed issues with the paint, including peeling, flecking, bubbling, a haze developing underneath the clear coat, and in certain places, the clear coat lifting and detaching from the color paint coat. Id. ¶ 88.  Frankum notified Defendants of the defect and received a response and quote that it would cost him over $7,000.00 to repaint the vehicle.  Id. ¶ 93. Frankum would be without the use of his vehicle for several weeks and his local dealership already was repainting one other Mars Red Class Vehicle.  Id.  Frankum notified Defendants that he was not satisfied with this solution.  Id.

### E.      Earley's 2014 Mercedes C250

In early January 2015, Earley purchased a certified pre-owned 2014 Mercedes C250 in Mars Red with approximately 12,000 miles on it from Mercedes of Greenway.  Id. ¶ 106.  On or about November 27, 2018, Earley noticed a large spot on the right passenger side top of her vehicle that was missing the clear coat and the surrounding clear coat was flaking and bubbling.  Id. ¶ 107.  Earley had no reason to know or expect that the paint on her vehicle was defective; had she known, she would not have bought her vehicle or would have paid less for it.  Id. ¶ 113.  Plaintiffs allege that Defendants refused to correct and cannot adequately

9

correct the paint defect on Earley's vehicle.  Id. ¶ 112.  Earley has received estimates ranging from $8,000.00 to $10,000.00 to sand, repaint, and apply another clear coat to her vehicle.  Id. ¶ 112.

### F.    Bryan's 2013 Mercedes SLK 250

In October 2017, Bryan purchased a 2013 Mercedes SLK 250 in Mars Red with approximately 37,000 miles from Bob Mills Mitsubishi in Jacksonville, North Carolina.  Id. ¶ 114.  Bryan's vehicle has not been repainted; it has the original Mercedes Mars Red paint from the factory.  Id. ¶ 115.  Bryan had no reason to know or expect that the paint on her vehicle was defective; had she known, she would not have bought her vehicle or would have paid less for it.  Id. ¶ 122.

In October 2018, Bryan noticed issues with the paint, including peeling, flecking, bubbling, and a haze developing underneath the clear coat.  Id. ¶ 116. Bryan called Defendants to raise this issue, but the person she spoke to on the telephone stated that they were unaware of the issue and would not help in any way.  Id. ¶ 117.  Plaintiffs allege that Defendants refused to correct and cannot adequately correct the paint defect on Bryan's vehicle.  Id. ¶ 118.  Bryan received an estimate of $2,200.00 to fix this issue.  Id.

**G.     General Allegations**

Defendants designed, manufactured, marketed, distributed, sold, leased, and warranted the Class Vehicles.  Id. ¶ 19.  Daimler engaged in the business of designing and manufacturing the Class Vehicles and was solely responsible for their design, including their defective exterior surfaces.  Id. ¶ 20.  Plaintiffs allege that MBUSA is a wholly owned subsidiary of Daimler and has been and acted as Daimler's agent and is subject to Daimler's control.  Id. ¶¶ 16-17, 24-25.  Daimler exercised control over MBUSA's work, including the design of the Class Vehicles, the marketing of the Class Vehicles, the scope of written warranties, the scope of repairs to be covered under warranty, and representations made and facts withheld from consumers and the public about the defective Mars Red paint.  Id. ¶ 22.

Plaintiffs allege that each Class Vehicle "is a luxury vehicle" that "is superior to others in looks, drivability, fit, and finish."  Id. ¶ 123.  Plaintiffs purchased their vehicles in Mars Red intentionally after seeing and relying on Defendants' advertising.  Id.  Mars Red is a "particularly unique color that gives the cars a luxurious look that other colors do not replicate."  Id.  The condition of the exterior paint is an important aspect of the Class Vehicles' value that is considered by first and secondary purchasers and often determines whether a car will sell at fair market value.  Id. ¶ 124.  The defects in the Mars Red paint have

affected the resale and value of the Class Vehicles.  Id. ¶ 125.  Defendants

advertise the quality of their paint and seriously discount their offers for any

buybacks or secondary purchases of Class Vehicles.  Id.  Defendants no longer

offer vehicles painted Mars Red.  Id. ¶ 54.

     For each Class Vehicle, Defendants issued a new vehicle limited warranty

("NVLW") which covered the vehicle.  Id. ¶ 132.  This NVLW was a material

factor in Plaintiffs' decisions to purchase their vehicles.  Id. ¶ 133.  The NVLWs

applicable to the Class Vehicles state:

> DEFECTS: Mercedes-Benz USA, LLC (MBUSA) warrants to the
> original and each subsequent owner of a new Mercedes-Benz vehicle
> that any authorized Mercedes-Benz Center will make any repairs or
> replacements necessary to correct defects in material or workmanship
> arising during the warranty period.

Mercedes-Benz, Service and Warranty Information 2015 ("2015 NVLW")

[Doc. 18-2] at 11; Mercedes-Benz, Service and Warranty Information 2014 ("2014

NVLW") [Doc. 19] at 11; Mercedes-Benz, Service and Warranty Information 2013

("2013 NVLW") [Doc. 18-4] at 11; Service and Warranty Information 2011

("2011 NVLW") [Doc. 18-5] at 11.  The "warranty period" "is for 48 months or

50,000 miles, whichever occurs first."  2015 NVLW at 11; 2014 NVLW at 11;

2013 NVLW at 11; 2011 NVLW at 11.  Warranty repairs "will be made at no

charge for parts and labor."  2015 NVLW at 12; 2014 NVLW at 12; 2013 NVLW

at 12; 2011 NVLW at 12.

> Our intention is to repair under warranty, without charge to you,
> anything that goes wrong with your vehicle during the warranty period
> which is our fault.  All we ask is that you properly maintain and care
> for the vehicle and that you have warranty repairs performed by an
> authorized Mercedes-Benz Center.
>
> Please note the difference between "defects" and "damage" as used in
> the warranty.  Defects are covered since we, the distributor, are
> responsible.  Conversely, we have no control over damage caused by
> things including, but not limited to, collision, misuse, and lack of or
> improper maintenance.  Therefore, damage for whatever reasons is not
> covered by the warranty.

2015 NVLW at 18; 2014 NVLW at 18; 2013 NVLW at 16; 2011 NVLW at 16.

However, "[p]arts made from . . . paint . . . which may have been affected by

airborne fallout, such as chemical and tree sap, or by road salt, hail, windstorm or

other environmental factors are not covered by this warranty."  2015 NVLW

at 16; 2014 NVLW at 16; 2013 NVLW at 15; 2011 NVLW at 15.  The NVLWs

further state:

> **Paint and Other Appearance Items.**  Defects in paint, trim or other
> appearance items are normally taken care of during our new vehicle
> preparation or by the authorized Mercedes-Benz Center during new
> vehicle inspection.  We suggest that if you find any paint or appearance
> problems that you advise your authorized Mercedes-Benz Center as
> soon as possible since deterioration due to use and exposure is not
> covered by the warranty.

> **The instructions in your Operator's Manual regarding the care of paint, upholstery, trim items and convertible tops, as applicable, must be followed explicitly to maintain your warranty coverage.**

2015 NVLW at 20; 2014 NVLW at 19; 2013 NVLW at 17; 2011 NVLW at 17.

Defendants' marketing materials describe the various Class Vehicles as "state-of-the-art, luxury, fine craftsmanship, and the most advanced vehicles on the road." Second Am. Compl. ¶ 140 (internal quotation marks omitted). Defendants' website states:

> Because of high volumes built each day, it is paramount that we achieve high quality levels expected of Mercedes as well as implementing measures to continuously improve. Paint is not just about color. The paint also protects the body. This means protecting it from corrosion and sealing it from the environment.

Id. ¶ 141. Defendants' Vehicle Care Guide, "which was provided to all Plaintiffs prior to completing their purchases," states that "the emotional experience that results from the visual presence of [Mercedes] vehicles is why every visible surface has been crafted with the finest materials and coatings to ensure the best appearance and durability" and that "as you might expect, aside from its visual attractiveness, the appearance of your Mercedes-Benz is a main component of its high resale value[] (a long-standing additional ownership benefit)." Id. ¶ 148 (alteration accepted, internal quotation marks omitted).

14

Defendants further represented that their vehicles were "manufactured with one of the most advanced paint finishes in the automotive industry. Scratch Resistant Clearcoat (SRC) uses 'nano-paint technology' comprised of microscopic ceramic particles that make it extremely durable and remarkably protective of the clear coat beneath." Id. ¶ 149. In describing the paint technology, Defendants stated that "[a] quality standard has been achieved which gives vehicles greater luster and longer protection than ever before. . . . New synthetic resin and two component polyurethane paints are considerably more resistant than cellulose paints and ensure maximum quality." Id. ¶ 150. Defendants also described the process undertaken "to ensure the best possible paint job" and state that they "take[] great care in delivering only the best quality." Id. ¶ 151.

When Plaintiffs purchased their vehicles, they relied upon Defendants' representations "that the cars had been inspected and any paint defects were 'take[n] care of' prior to placing the vehicles on the market," "that their vehicles would 'achieve the high quality levels expected of Mercedes[,]' and that if Mercedes had knowledge of a defect it would 'implement measures to continuously improve.'" Id. ¶¶ 145-46 (alterations accepted). Defendants' "advertisements and marketing related to the paint" led Plaintiffs "to form a reasonable belief and expectation that the paint used on the Class Vehicles was of

high quality, would endure, and positively impact the value of the Vehicles." Id.

¶ 152. Plaintiffs "are unaware of . . . the true names and identities of the specific

individuals" responsible for concealing the paint defect while touting the quality

and durability of the Class Vehicles "but upon information and belief understand

them to be employees within the sales and marketing division of Defendants." Id.

¶ 211(a).

Plaintiffs allege that Defendants knew or should have known about the

defects in the Mars Red paint but continued to advertise and sell the defective

vehicles and failed to issue an appropriate recall. See id. ¶¶ 127-28, 136, 138,

156-57. "Prior to a new paint and/or paint system being used on a vehicle,

automakers such as Mercedes typically employ multiple standards and test

protocols to ensure long life and film integrity of the paint system as well as the

underlying substrates." Id. ¶ 158. Defendants developed "tests relating to the

performance of the paint used on its vehicles, including the Class Vehicles, in

simulated real-world conditions" and "[t]he development of the paint and the paint

system, including the testing performed in connection therewith, would have

revealed the Paint Defect." Id. ¶ 160. Plaintiffs identify five specific test

procedures and allege that Defendants "performed several of [them]." Id.

¶¶ 159-60.  Defendants have "exclusive custody and control" over the details of paint testing and the results of that testing.  Id. ¶ 161.

On June 12, 2014, Defendants issued a Technical Service Bulletin ("TSB") [Doc. 15-3][4] citing issues with the "exterior clearcoat" of "vehicles with 590 – Mars Red only" "peeling, flaking, or exhibit[ing] bubbles under the surface."  Id. ¶¶ 164-66.  On February 3, 2017, Defendants issued a version of the TSB telling dealers that if the labor required was more than thirty hours, the warranty policy required that dealers submit to Defendants photos of the affected areas and paint thickness measurements.  See id. ¶ 170.  Many Class Vehicle owners complained directly to Mercedes dealerships and to Defendants about the paint issues they experienced.  Id. ¶ 175.  The employees whom Plaintiffs spoke with about their vehicles' paint issues recognized that there was a broader issue with the Mars Red paint.  See id. ¶ 176.  In addition, National Highway Traffic and Safety

---

[4] "A Technical Service Bulletin is a document disseminated internally that informs Mercedes technicians how to diagnose and repair the identified problem." Suddreth v. Mercedes-Benz, LLC, No. 10-CV-05130 (DMC-JAD), 2011 WL 5240965, at *1 n.3 (D.N.J. Oct. 31, 2011).  Plaintiffs attached the TSB as Exhibit A to the proposed Second Amended Complaint [Doc. 15-2] but the Clerk inadvertently did not attach it to the docketed Second Amended Complaint.  See Order Granting Joint Stip. Regarding Pl.'s Proposed Second Am. Compl. [Doc. 17].

Administration ("NHTSA") manufacturer communication data indicates that consumers made complaints about clearcoat flaking, bubbling, and peeling on Mercedes vehicles.  Id. ¶ 184.  Plaintiffs allege that federal law requires Defendants to be in close contact with the NHTSA regarding potential auto defects and that automakers monitor NHTSA databases for consumer complaints.  Id. ¶¶ 181-82.  Many Class Vehicle owners also posted complaints about the Mars Red paint defects on public online vehicle owner forums.  Id. ¶ 186.  Plaintiffs allege that Defendants were or should have been aware of these complaints because Defendants track the sites on which these complaints were posted.  Id. ¶ 187.

Plaintiffs bring claims for breach of express warranty (Count One), breach of implied warranty (Count Two), equitable and injunctive relief (Count Three), violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. (Count Four), unjust enrichment (Count Five), fraud and suppression (Count Six), violation of Florida's Unfair and Deceptive Trade Practices Act (Count Seven), violation of Alabama's Deceptive Trade Practices Act (Count Eight), violation of Tennessee's Consumer Protection Act (Count Nine), violation of Louisiana's Unfair Trade Practices and Consumer Protection Law (Count Ten), violation of

Arkansas's Deceptive Trade Practices Act (Count Eleven), and violation of North

Carolina's Unfair and Deceptive Trade Practices Act (Count Twelve).  Id.

¶¶ 217-370.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief."  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed

for failure to state a claim upon which relief can be granted if it does not plead

"enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007).  The Supreme Court has explained this

standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.  The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a

claim will survive a motion to dismiss only if the factual allegations in the pleading

are "enough to raise a right to relief above the speculative level."  Twombly, 550

U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

Under Federal Rule of Civil Procedure 9(b), a complaint alleging fraud "must state with particularity the circumstances constituting fraud."

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir.

2001)).  "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint."

Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

However, Rule 9(b) also provides that "[m]alice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  FED. R. CIV. P.

9(b).  Thus, Rule 9(b) "does not require a plaintiff to allege specific facts related to

the defendant's state of mind when the allegedly fraudulent statements [or

omissions] were made."  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th

Cir. 2008).  Instead, it is sufficient to plead "the who, what, when, where, and

how" of the allegedly fraudulent statements or omissions and then allege generally

that those statements or omissions were made with the requisite intent.  Id.

## III.  DISCUSSION

### A.  Breach of Express Warranty (Count One)

Defendants contend that Plaintiffs' breach of express warranty claims fail as

a matter of law because, *inter alia*, the Second Amended Complaint does not allege

facts showing that Plaintiffs complied with the NVLW's notice requirements.

Defs.' Mem. of Law in Supp. of Mot. to Dismiss Second Am. Compl. ("Defs.'

Mem.") [Doc. 18-1] at 10.  Defendants contend that Plaintiffs were required to

provide "direct written notification" of the alleged defect by mail to MBUSA.  Id.

The NVLWs include a section titled "Warranty Enforcement Laws (Lemon Laws)"

which states:

> Laws in many states and federal law permit owners and/or lessees to obtain a replacement vehicle or a refund of the purchase or lease price under certain circumstances.  The provisions of these laws vary from state to state and vary from the federal law.  To the extent allowed or not prohibited by applicable law, Mercedes–Benz USA, LLC requires that you first provide us with direct written notification of any alleged unrepaired defect or malfunction, or any other dissatisfaction you have experienced with your vehicle so that we have the opportunity to cure the problem or dissatisfaction ourselves.  Giving MBUSA itself this direct notice and opportunity to cure enables us to supplement prior efforts by our authorized dealers so any ongoing problem can be resolved or the dissatisfaction addressed by us.  In states that have not enacted Lemon Laws, we also require, without constituting any liability beyond the Mercedes–Benz new vehicle warranty, that you give us direct written notice of any service difficulty you have experienced. Written notifications, either required under an applicable Lemon Law or other written notifications should be sent to us, not one of our dealers, at Mercedes–Benz USA, LLC, Customer Assistance Center, One Mercedes Drive, Montvale, New Jersey, 07645–0350.

2015 NVLW at 65 (emphasis added); 2014 NVLW at 58 (emphasis added); 2013

NVLW at 54 (emphasis added); 2011 NVLW at 56 (emphasis added).

The Second Amended Complaint does not allege that Brown, Frankum,

Earley, and Bryan provided any written notice to MBUSA.  Although it alleges

that Pinon and Klein communicated with "Mercedes personnel" via the "Mercedes

Me" app and "Mercedes provide[d] online/app portal," see Second Am. Compl.

¶¶ 49, 69, it does not allege that Pinon and Klein sent a written notification to

MBUSA's Customer Assistance Center at the address listed in the NVLWs.

Plaintiffs do not contend that applicable law prohibits MBUSA from

requiring direct written notification of any alleged unrepaired defect or

malfunction.  See Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am.

Compl. ("Pls.' Opp'n") at 5-9.  However, Plaintiffs do contend that the written

notification provision in the NVLWs is inapplicable because Plaintiffs are not

asserting lemon law claims or seeking to revoke acceptance of their vehicles under

state law.  Pls.' Opp'n at 6-8, 7 n.7.  A court in this district previously rejected the

argument asserted by Plaintiffs and dismissed breach of express warranty claims:

> Plaintiffs contend that this section of the NVLW requires written notice
> to be given directly to MBUSA only in the context of claims brought
> under state lemon laws.  However, the section also requires such notice
> in "states that have not enacted Lemon Laws."  Therefore, the [c]ourt
> holds that the NVLW requires that written notice be given directly to
> MBUSA before a claim can be brought for breach of the NVLW.
> Plaintiffs do not allege that they gave such notice, providing an
> additional reason for the [c]ourt to dismiss their express-warranty
> claims.

McCabe v. Daimler AG, 948 F. Supp. 2d 1347, 1359-60 (N.D. Ga. 2013) (citation

omitted); see also Lewis v. Mercedes-Benz USA, LLC, No. Civ.A.1:03CV4000-

JOF, 2004 WL 3756384, at *4 (N.D. Ga. Sept. 13, 2004) ("While the parenthetical

subtitle of this section is Lemon Laws, there is nothing in the text of the

23

enforcement provision that restricts the meaning of this paragraph to only those causes of actions expressly brought under Lemon Laws. . . .").  This Court finds McCabe's reasoning persuasive.[5]

In addition, the statement included in the NVLWs that "[g]iving MBUSA itself this direct notice and opportunity to cure enables us to supplement prior efforts by our authorized dealers," shows that MBUSA contemplated the importance of the written notice and intended for customers to take the extra step beyond presenting their problems to a local dealership.  See generally 2015 NVLW at 65; 2014 NVLW at 58; 2013 NVLW at 54; 2011 NVLW at 56.  Thus, contrary to Plaintiffs' contention, presenting their vehicles to an authorized Mercedes-Benz center or dealer could not have been the only method to present a claim under the NVLW.  See generally Pls.' Opp'n at 5-6.

---

[5] Plaintiffs attempt to distinguish McCabe as a case "requiring direct written notice for 'states that have not enacted Lemon laws.'"  Pls.' Opp'n at 16.  Plaintiffs' parenthetical description of McCabe is misleading, because the McCabe court was responding to the contention of the plaintiffs that "this section of the NVLW requires written notice to be given directly to MBUSA only in the context of claims brought under state lemon laws."  McCabe, 948 F.2d at 1360.  In fact, the court found that the limitation also applied in "states that have not enacted Lemon Laws."  Id.  In other words, because the requirement of written notice applied both to states that enacted Lemon Laws and those that did not enact Lemon Laws, the written notice provision could not reasonably be limited only to those claims brought under Lemon Laws.

Because Plaintiffs were required to provide MBUSA with written notice, but the Second Amended Complaint does not allege that they did so, the express warranty claims fail as a matter of law.  See McCabe, 948 F. Supp. 2d at 1360; see also Lewis, 2004 WL 3756384, at *4.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to Plaintiffs' breach of express warranty claims (Count One).

## B. Breach of Implied Warranty (Count Two)

The Second Amended Complaint asserts a breach of implied warranty claim on behalf of all Plaintiffs.  Second Am. Compl. ¶ 224.  However, Pinon, Frankum, and Bryan now "disclaim and abandon their claims for breach of implied warranty" and do not respond to Defendants' contention their breach of implied warranty claims fail as a matter of law.  Pls.' Opp'n at 13 n.12.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect Pinon's, Frankum's, and Bryan's breach of implied warranty claims.  See Kramer v. Gwinnett Cty., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed").

Defendants contend that Plaintiffs' breach of implied warranty claims fail because the Second Amended Complaint does not allege that Plaintiffs' vehicles

25

were unmerchantable at the time of sale.  Defs.' Mem. at 16.  Defendants contend

that under the laws of each Plaintiff's state, a vehicle is not unmerchantable if it

has "an alleged cosmetic defect, with no allegation that it affects the operation of

the[] vehicle[] in any way."  Id.  Plaintiffs contend that "[t]he law governing

Plaintiffs Earley, Brown, and Klein, cover[s] implied warranties for vehicles

beyond mere 'transportation.'"  Pls.' Opp'n at 14.

### 1.    Earley's Purchase in Louisiana

Although not specified in the Second Amended Complaint, the parties

apparently agree that Earley either purchased or received delivery of her Mercedes

in Louisiana.[6]  See Second Am. Compl. ¶ 106.  Louisiana law states:

> The seller warrants the buyer against redhibitory defects, or vices, in
> the thing sold.

---

[6] The Second Amended Complaint states that Earley purchased her vehicle "from
Mercedes of Greenway" but does not state that this location was in Louisiana.  See
Second Am. Compl. ¶ 106.  It appears from an Internet search that this dealership
actually is located in Houston, Texas.  See MERCEDES-BENZ OF HOUSTON
GREENWAY, https://www.mercedesbenzgreenway.com (last visited Nov. 1, 2019).
Nevertheless, Plaintiffs assert that Louisiana law applies to Earley, see Pls.' Opp'n
at 12, and it appears that Defendants do not dispute this assertion because both
parties cite Louisiana law when discussing Earley's implied warranty claims.  See
id. at 15; Defs.' Mem. at 16-17; Defs.' Reply Br. in Supp. of Their Mot. to Dismiss
Second Am. Compl. ("Defs.' Reply") at 12 & n.7.  Consequently, at this stage of
the litigation, this Court will apply Louisiana law as to Earley's implied warranty
claim although this may change in the later stages of this litigation depending upon
the facts as developed.

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect.  The existence of such a defect gives a buyer the right to obtain rescission of the sale.

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price.  The existence of such a defect limits the right of a buyer to a reduction of the price.

LA. CIV. CODE ANN. art. 2520.

Plaintiffs contend that the paint defects on Earley's vehicle are redhibitory because Earley would not have purchased her vehicle had she known of the paint defect and the vehicle's value to her "specifically comprised display, enjoyment, and resale value and further value due to the [certified pre-owned] warranty."  Pls.' Opp'n at 15 (citing Second Am. Compl. ¶ 113).  Plaintiffs cite to Sabbath v. Martin, No. 44,862-CA, 2009 WL 3449096, at *2 (La. Ct. App. Oct. 28, 2009), contending that it "affirmed a lower court's ruling in favor of the plaintiff for minor redhibitory defects (broken window, air conditioning, and 'strange car noises') even though the vehicle was not undriveable."  Pls.' Opp'n at 15 n.13.  In Sabbath, the plaintiff's redhibitory defect claim arose from the fact that, after the repairs of a number of defects (including a broken alternator), the car still "broke down on the interstate."  Sabbath, 2009 WL 3449096, at *1.  The Court of Appeal

27

of Louisiana affirmed "the trial court's rescission of the sale and the return of a

portion of the price to Sabbath" because "in the absence of testimony by a

mechanic, the repeated problems with the vehicle after the sale which prevented

Sabbath's use circumstantially allow for the conclusion of redhibitory defects." Id.

at *3 (emphasis added).

In this case, there is no allegation of any defect which prevented Earley's

use of the vehicle.  "In general, the intended purpose of an automobile is

transportation." Stuck v. Long, 909 So. 2d 686, 692 (La. Ct. App. 2005) (citing

Guillory v. Morein Motor Co., 322 So. 2d 375 (La. Ct. App. 1975)), cert. denied,

925 So. 2d 546 (La. 2006).   Sabbath does not stand for the proposition that a

defect in the painting of a car, by itself, constitutes a redhibitory defect.  See id.

at *1, 3; see also Fidele v. Crescent Ford Truck Sales, Inc., 786 So. 2d 147, 153

(La. Ct. App. 2001) ("[M]inor defects alone do not constitute redhibitory

defects.").

However, a defect also can be redhibitory when, "without rendering the

thing totally useless, it diminishes  . . . its value so that it must be presumed that a

buyer would still have bought it but for a lesser price."  LA. CIV. CODE ANN.

art. 2520.

> Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, <u>or its use so</u> <u>inconvenient and</u> <u>imperfect that it must be supposed that the buyer</u> <u>would not have purchased it, had he known of the vice</u>.  To prevail in such a proceeding, the plaintiff must also prove that the defect existed at the time of sale, and that he afforded the seller an opportunity to repair the thing.
>
> ***
>
> A reduction in price may be awarded a purchaser where, although not warranting rescission, the thing purchased contains defects which diminish its value.  There must be evidence in the record to support a reduction of price. The burden of establishing the amount of any reduction in the purchase price to which a buyer is entitled because of a redhibitory vice is upon the buyer.

<u>Ford Motor Credit v. Laing</u>, 705 So. 2d 1283, 1285-86 (La. Ct. App. 1991)

(emphasis added, citations and footnote omitted); <u>see also</u> <u>Pardue v. Ryan</u>

<u>Chevrolet, Inc.</u>, 719 So. 2d 623, 626 (La. Ct. App. 1998) (holding that a defect is

redhibitory when, without rendering the thing totally useless, it diminishes its value

so that it must be presumed that a buyer would still have bought it but for a lesser

price).  The issue of whether a defect is redhibitory because of a diminution in

value is a question of fact.  <u>Ford Motor Credit</u>, 705 So. 2d at 1286.

Plaintiffs allege that the defect was present when Earley purchased her

Mercedes, that had she known of the defect she would have not bought the car or

paid less for it, and that Defendants refused to correct the defect.  Second Am.

Compl. ¶¶ 106-113, 126.  At his stage of the litigation, there remains a question of

29

fact as to whether Earley can establish whether the alleged defect is redhibitory under Louisiana law.  Consequently, Defendants' motion to dismiss Earley's breach of implied warranty claim in Count Two is **DENIED**.

### 2.    Brown's Purchase in Arkansas

Brown purchased her Mercedes in Arkansas.  Second Am. Compl. ¶ 77. Under Arkansas law, "[u]nless excluded or modified (§ 4-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  ARK. CODE ANN. § 4-2-314(1). "Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used."  Id. § 4-2-314(2)(c).

> To recover for breach of an implied warranty of merchantability, the plaintiff must prove that (1) he has sustained damages; (2) the product sold to him was not merchantable, *i.e., not fit for the ordinary purpose for which such goods are used*; (3) this unmerchantable condition was a proximate cause of the damages; and (4) he was a person whom the defendant might reasonably expect to use or be affected by the product.

F.L. Davis Builders Supply, Inc. v. Knapp, 853 S.W.2d 288, 290 (Ark. App. 1993) (emphasis added, citation omitted); see also Lakeview Country Club, Inc. v. Superior Prods., 926 S.W.2d 428, 431 (Ark. 1996) (citation omitted).[7]

---

[7] Plaintiffs cite F.L. Davis for the proposition that "a 'particular purpose' may differ from an ordinary purpose in that it envisages a specific use by the buyer[.]" See Pls.' Opp'n at 16 (citing F.L. Davis, 853 S.W.2d at 292).  However, that

While neither party cites any authority determining the ordinary purpose of a motor vehicle under Arkansas law, the law requiring insurance for motor vehicles has been interpreted to apply only to those vehicles that are used primarily for transportation.  See Cousins v. Dennis, 767 S.W.2d 296, 314 (Ark. 1989) ("[I]f we limited the construction of § 21–9–303(a) [the act requiring political subdivisions to carry liability insurance on motor vehicles] to require political subdivisions to carry liability insurance on all motor vehicles meeting the definition found in § 27–19–206, a self-propelling riding lawn mower would qualify, thereby requiring the school district to include its mowers under liability coverage.  This same rationale would include any self-propelled vehicle even though it is not designed or used primarily for transportation of persons or property.") (exempting motor vehicles not used for transportation purposes from registration).  This is consistent with others states that have found transportation to be the primary purpose of automobiles.  See generally Bussian v. DaimlerChrysler Corp., 411 F.

language comes from the portion of F.L. Davis that addressed a breach of implied warranty of fitness for a particular purpose, which arises under ARK. CODE ANN. § 4-2-315.  See F.L. Davis, 853 S.W. 2d at 291-92.  That warranty is not at issue here.  See Second Am. Compl. ¶¶ 225, 227 (alleging that Defendants warranted that the Class Vehicles were "merchantable, fit for their ordinary use" and discussing "implied warranty of merchantability"); see also Defs.' Br. at 15-16 (citing only ARK. CODE ANN. § 4-2-314(3)).

Supp. 2d 614, 623 (M.D.N.C. 2006) (citations omitted) ("In the context of

automobiles, courts have held that the 'ordinary purpose' of an automobile is to

provide transportation.  Where an automobile provides safe, reliable transportation,

it is generally considered merchantable."); Stuck, 909 So. 2d at 692 ("In general,

the intended purpose of an automobile is transportation."); DaimlerChrysler Corp.

v. Morrow, 895 So. 2d 861, 865 (Ala. 2004) (citation omitted) ("In our opinion,

Morrow's extensive use of the truck since its delivery precludes Morrow's claim

that the truck was not fit for the ordinary purposes for which such trucks are

used.").

Based upon the absence of authority suggesting that the defective Mars Red

paint was a breach of Arkansas's implied warranty of merchantability and

Plaintiffs' failure to allege that the paint defects prevented Brown from using her

vehicle for transportation, the Court concludes that the Second Amended

Complaint fails to state a claim for breach of Arkansas's implied warranty of

merchantability and **GRANTS** Defendants' Motion to Dismiss Brown's breach of

implied warranty claim in Count Two.

### 3.    Klein's Purchase in Florida

Klein purchased his Mercedes in Florida.  See Second Am. Compl. ¶ 60.

Under Florida law, "[u]nless excluded or modified (§ 672.316), a warranty that the

goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." FLA. STAT. § 672.314(1). "Goods to be merchantable must be at least such as . . . [a]re fit for the ordinary purposes for which such goods are used." Id. § 672.314(2)(c). "To state a claim for breach of the implied warranty of merchantability, a consumer must demonstrate that a good sold by a merchant is "fit for the ordinary purposes for which such goods are used." Tershakovec v. Ford Motor Co., No. 17-21087-CIV-MORENO, 2018 WL 3405245, at *9 (S.D. Fla. July 12, 2018) (citing U.C.C. § 2-314(2)(c)). At least one Florida court has recognized that "an automobile's primary purpose is for transportation." See Hurd v. State, 229 So. 3d 876, 879 (Fla. Dist. Ct. App. 2017).

Plaintiffs contend that Klein's breach of implied warranty of merchantability claim survives because the Second Amended Complaint alleges that Klein purchased his vehicle also for display, enjoyment, and resale value, and Defendants advertised that this was a purpose for the Class Vehicles. See Pls.' Opp'n at 13-14 (citing Tershakovec, 2018 WL 3405245). In Tershakovec, plaintiffs were "a group of self-proclaimed 'track enthusiasts'" who alleged that their Shelby Mustang GT350s' "powertrain system [wa]s designed defectively in that it overheat[ed] prematurely and enter[ed] 'Limp Mode' without providing any warning or communication to the driver. When the vehicles enter[ed] Limp Mode,

33

they rapidly decelerate[d], and a driver c[ould] become disoriented and lose control, thereby increasing the risk of an accident." Tershakovec, 2018 WL 3405245 at *1, 9. Plaintiffs alleged that the vehicles were "unfit for their ordinary purpose of driving on public roadways" and for driving on closed racetracks. Id. at *9.

> Indeed, [p]laintiffs allege that Limp Mode occurs not only in a track environment, but also on a busy, public roadway . . . . Plaintiffs further allege that when Limp Mode occurs, they are forced to pull their vehicles over to the side of the road or highway and wait for the vehicle to cool down, which hampers the reliability and operability of the vehicles, and makes them unfit for their ordinary purpose of driving on public roadways. Thus, because the [s]econd [a]mended [c]omplaint plausibly alleges that the vehicles were not fit for the ordinary purpose of being used on a public roadway or a racetrack, Ford's Motion is [denied] as to the implied warranty of merchantability claims generally.

Id.

Here, unlike in Tershakovec, the Second Amended Complaint does not allege that Klein's vehicle was unfit for the ordinary purpose of driving on public roadways (or on a racetrack). Plaintiffs cite no authority indicating that the defects in the Mars Red paint are a breach of Florida's implied warranty of

34

merchantability.  Thus, the Second Amended Complaint fails to state a claim for breach of Florida's implied warranty of merchantability.[8]

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to Earley's breach of implied warranty claim in Count Two and **GRANTED** with respect to Brown's and Klein's breach of implied warranty claims in Count Two.

### C.   Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. (Count Four)

The Magnuson-Moss Warranty Act "does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1200 n.14 (N.D. Ga. 2005) (citations omitted).  With the exception of Earley's claim for breach of an implied warranty in Louisiana, the Second Amended Complaint fails to state any breach of warranty claims.  See supra parts III.A-B. Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to Brown's and Klein's Magnuson-Moss Warranty Act claims in Count Four and

---

[8] Plaintiffs also imply that FLA. STAT. § 672.314(3) somehow supports their claim for breach of implied warranty.  See Pls.' Opp'n at 14-15.  This statute provides that "[u]nless excluded or modified (§ 672.316) other implied warranties may arise from course of dealing or usage of trade."  FLA. STAT. § 672.314(3).  No "other implied warranties" are at issue in this case.  See supra n.7.

**DENIED** with respect to Earley's Magnuson-Moss Warranty Act claim in Count

Four.  See Fedrick, 366 F. Supp. 2d at 1200 n.14 ("Absent viable breach of

warranty claims, [p]laintiff's claim for damages under the Warranty Act also

fails."); McCabe, 948 F. Supp. 2d at 1364 ("Because [p]laintiffs' state-law breach-

of-warranty claims will be dismissed, and because [p]laintiffs have not alleged a

violation of the MMWA independent of those claims, their MMWA claims must

also be dismissed.").

### D.    Unjust Enrichment (Count Five)

Defendants contend that Plaintiffs' unjust enrichment claims should be

dismissed because "the warranties underlying their claims provide an adequate

remedy at law."  Defs.' Mem. at 21.  Plaintiffs respond that they "plead their unjust

enrichment claims in the alternative and lack an adequate remedy at law *if* their

warranty claims fail."  Pls.' Opp'n at 18.

Unjust enrichment is an equitable remedy and is not available when the

damages sought are covered by an express contract.  See Tuohey v. Chenal

Healthcare, LLC, 173 F. Supp. 3d 804, 813 (E.D. Ark. 2016); David v. Am. Suzuki

Motor Corp., 629 F. Supp. 2d 1309, 1324 (S.D. Fla. 2009); White v. Microsoft

Corp., 454 F. Supp. 2d 1118, 1133 (S.D. Ala. 2006); Metro. Gov't of Nashville and

Davidson Cty. v. Cigna Healthcare of Tenn., Inc., 195 S.W. 3d 28, 32 (Tenn. Ct.

App. 2005); <u>Brown v. Coleman Invs., Inc.</u>, 993 F. Supp. 432, 438 (M.D. La. 1998);

<u>Booe v. Shadrick</u>, 369 S.E. 2d 554, 556 (N.C. 1988).  "Typically[,] a party may

plead unjust enrichment as an alternative to a breach of contract claim, even

though it may not recover under both theories." <u>Techjet Innovations Corp. v.

Benjelloun</u>, 203 F. Supp. 3d 1219, 1234 (N.D. Ga. 2016) (citing <u>Clark v. Aaron's,

Inc.</u>, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012)).  However, "courts have held

that a plaintiff may not plead an unjust enrichment claim in the alternative to a

claim for breach of contract when it is undisputed (or when the court has found)

that a valid contract exists." <u>Clark</u>, 914 F. Supp. 2d at 1310 (citations omitted).

Here, it is undisputed that express contracts—the NVLWs—govern the

subject-matter of this dispute.  Plaintiffs do not dispute that the NVLWs exist and

do not challenge their validity or enforcement.  Indeed, had Plaintiff provided

MBUSA with the required notice, they may have succeeded in their breach of

express warranty claim.  But Plaintiffs' failure to comply with the terms of the

NVLWs does not give them a "fallback" position of maintaining a claim for unjust

enrichment.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** with

respect to Plaintiffs' unjust enrichment claims (Count Five).

### E.      Fraud and Suppression (Count Six)

Plaintiffs contend that Mercedes concealed and suppressed facts concerning

the Mars Red paint defect, had a duty to disclose those defects to Plaintiffs, and

that Plaintiffs were misled as to the vehicles' true condition.  Second Am. Compl.

¶¶ 263-68.  Defendants contend that Plaintiffs' fraud and suppression claims fail

for multiple reasons.  The Court considers Defendants' arguments *seriatim*.

### 1.      Fraud and Suppression Generally

Defendants first contend that the Second Amended Complaint does not

allege with the particularity required by Federal Rule of Civil Procedure 9(b) that

Plaintiffs "were aware of or actually relied on" the "statements allegedly made in

Defendants' marketing materials."  Defs.' Mem. at 25.  The Second Amended

Complaint alleges that Defendants' marketing materials describe the various Class

Vehicles as "state-of-the-art, luxury, fine craftsmanship, and the most advanced

vehicles on the road."  Second Am. Compl. ¶ 140 (internal quotation marks

omitted).   Defendants' website states:

> Because of high volumes built each day, it is paramount that we achieve
> high quality levels expected of Mercedes as well as implementing
> measures to continuously improve.  Paint is not just about color.  The
> paint also protects the body.  This means protecting it from corrosion
> and sealing it from the environment.

Id. ¶ 141.

Defendants marketed that "the purpose of the clear coat is to protect the color from damage due to the outside elements and UV damage."  Id. ¶ 142 (alteration accepted).  Defendants informed consumers in the NVLWs that "defects in paint . . . are normally taken care of during our new vehicle preparation or by the authorized Mercedes-Benz Center during new vehicle inspection."  Id. ¶ 144 (alteration accepted); see also 2015 NVLW at 20; 2014 NVLW at 19; 2013 NVLW at 17; 2011 NVLW at 17.  Defendants' Vehicle Care Guide, "which was provided to all Plaintiffs prior to completing their purchases," states that "the emotional experience that results from the visual presence of [Mercedes] vehicles is why every visible surface has been crafted with the finest materials and coatings to ensure the best appearance and durability" and that "as you might expect, aside from its visual attractiveness, the appearance of your Mercedes-Benz is a main component of its high resale value[] (a long-standing additional ownership benefit)."  Compl. ¶ 148 (alteration accepted, internal quotation marks omitted).

Defendants further represented that their vehicles were "manufactured with one of the most advanced paint finishes in the automotive industry.  Scratch Resistant Clearcoat (SRC) uses 'nano-paint technology' comprised of microscopic ceramic particles that make it extremely durable and remarkably protective of the clear coat beneath."  Id. ¶ 149.  In describing the paint technology, Defendants

39

stated that "[a] quality standard has been achieved which gives vehicles greater luster and longer protection that ever before. . . . New synthetic resin and two component polyurethane paints are considerably more resistant than cellulose paints and ensure maximum quality." Id. ¶ 150. Defendants also described the process undertaken "to ensure the best possible paint job" and state that they "take[] great care in delivering only the best quality." Id. ¶ 151.

The Second Amended Complaint alleges that when Plaintiffs purchased their vehicles, they relied upon Defendants' representations "that the cars had been inspected and any paint defects were 'take care of' prior to placing the vehicles on the market" and "that their vehicles would 'achieve the high quality levels expected of Mercedes' and that if Mercedes had knowledge of a defect it would 'implement measures to continuously improve.'" Id. ¶¶ 145-46 (alterations accepted). The Second Amended Complaint alleges that these representations were contained in the NVLWs and on Defendants' website, respectively. Id. ¶¶ 141, 144. The Second Amended Complaint also alleges that Defendants' "advertisements and marketing related to the paint" led them "to form a reasonable belief and expectation that the paint used on the Class Vehicles was of high quality, would endure, and positively impact the value of the Vehicles." Id. ¶ 152.

"Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents . . . (2) the time and place of each such statement and the person responsible for making . . . same, and (3) the content of such statements and the manner in which they misled the plaintiff . . . ." Ex rel. Clausen, 290 F.3d at 1310.  As discussed above, the Second Amended Complaint identifies the content of multiple statements made in the NVLWs, the Vehicle Care Guides, and on Defendants' website.  See Second Am. Compl. ¶¶ 141, 144-46; see also 2015 NVLW at 20; 2014 NVLW at 19; 2013 NVLW at 17; 2011 NVLW at 17.  It alleges that Plaintiffs "are unaware of . . . the true names and identities of the specific individuals" responsible for the statements "but upon information and belief understand them to be employees within the sales and marketing division of Defendants." Id. ¶ 211(a).  The Court finds that the Second Amended Complaint satisfies the heightened pleading standard under Rule 9(b) at least with respect to those statements contained in the NVLWs and on Defendants' website.[9]

---

[9] The Second Amended Complaint does not allege that Plaintiffs relied upon statements contained in the Vehicle Care Guides.  See Second Am. Compl. ¶ 148.

Defendants also contend that the representations alleged in the Second Amended Complaint "are inactionable puffery."[10]  Defs.' Mem. at 25 (citing Second Am. Compl. ¶¶ 140, 145).  Plaintiffs acknowledge that "it is conceivable that statements such as 'state-of-the-art' or 'the best' could be considered puffery . . . ."  Pls.' Opp'n at 25 (alteration accepted).  However, Defendants do not contend that the representations contained in the NVLWs, the Vehicle Care Guides, or their website are puffery.  See Defs.' Mem. at 25-26; Defs.' Reply at 15-16; see generally Second Am. Compl. ¶¶ 141, 144-46.  Even if Defendants' statements in their advertisements are inactionable puffery, the Court finds that the representations discussed in the Second Amended Complaint contained in the NVLWs, the Vehicle Care Guides, or Defendants' website are not.  Consequently, Defendants' Motion to Dismiss Plaintiffs' fraud claims based upon a failure to comply with Rule 9(b) is **DENIED**.

---

[10] "Statements made to puff goods are not actionable in misrepresentation even if untrue on the theory that no reasonable person would rely on general claims of superiority made by a salesman."  Mfr. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982); see also Atlanta Allergy and Asthma Clinic v. Allergy & Asthma of Atlanta, LLC, 685 F. Supp. 2d 1360, 1380 (N.D. Ga. 2010) (internal quotation marks omitted) (quoting Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997)) ("Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under [the Lanham Act].")

### 2.    Economic Loss Rule as to Klein

Defendants contend that Klein's fraud claim is barred by the economic loss rule.  Defs.' Mem. at 33.  "Simply put, the economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses."  Tiara Condo. Ass'n v. Marsh & McLenna Cos., 110 So. 3d 399, 401 (Fla. 2013) (citation omitted).  Under Florida law, "where the fraud complained of relates to the performance of the contract, the economic loss rule will limit the parties to their contractual remedies."  Mt. Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc., 188 F. App'x 966, 969 (11th Cir. 2006) (citations omitted).

Defendants contend that since Klein "does not allege that he suffered any personal injuries or damage to any property other than his vehicle," his fraud claim is barred by the economic loss rule.  See Defs.' Mem. at 33-34.  Plaintiffs contend that the economic loss rule does not bar recovery because Klein "adequately plead [sic] all the elements of fraud" and his claim is not solely based on a contract.  See Pls.' Opp'n at 37.

In Tiara, the Supreme Court of Florida held that "the economic loss rule applies only in the products liability context."  Tiara, 110 So. 3d at 407.

> In doing so, the court noted several exceptions to the economic loss
> rule, including "fraudulent inducement, and negligent
> misrepresentation, or free-standing statutory causes of action."
> However, the fraudulent inducement and negligent misrepresentation
> cases to which the court cited were outside of the products liability
> context. These exceptions were irrelevant to the decision reached in
> Tiara.

In re Takata Airbag Prods. Liab. Litig., 193 F. Supp. 3d 1324, 1338 (S.D. Fla.

2016) (quoting Tiara, 110 So. 3d at 406). Although Tiara did not expressly hold

that the economic loss rule bars fraudulent inducement and fraudulent concealment

claims, several district courts in the Eleventh Circuit "have concluded that

Florida's Supreme Court did not intend to allow such products liability claims to

survive." Id. at 1339 (citing Aprigliano v. Am. Honda Motor Co., 979 F. Supp. 2d

1331, 1337–39 (S.D. Fla. 2013); Burns v. Winnebago Indus., No. 8:13-cv-1427-T-

24 MAP, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013); In re Atlas Roofing

Corp. Chalet Shingle Prods. Liab. Litig., No. 14-CV-3179-TWT, 2015 WL

3796456, at *3 (N.D. Ga. June 18, 2015)); Koshi v. Carrier Corp., 347 F. Supp. 3d

1185, 1198 (S.D. Fla. 2017) (citations omitted); Melton v. Century Arms, Inc., 243

F. Supp. 3d 1290, 1302 (S.D. Fla. 2017) (citing In re Takata Airbag, 193 F. Supp.

3d at 1338-39); see also Miller v. Samsung Elecs. Am., 2015 WL 3965608, at *9-

10 (D.N.J. June 29, 2015) (citing Burns, 2013 WL 4437246, at *2-4) ("[I]t appears

that Defendant's contention that Tiara eliminated any exception to the economic-

loss doctrine for claims of fraudulent inducement or misrepresentation is not supported by the relevant law.  However, such claims may be barred by the economic-loss doctrine when they sound in products liability.").  But see In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 965 (N.D. Cal. 2014) (stating that Tiara maintained the fraudulent inducement exception to the economic loss rule).

Klein's fraud claims sound in products liability.  The damage he claims is to his Mars Red Mercedes vehicle—the product at issue in this litigation.  See Second Am. Compl. ¶¶ 60-76, 254-71.  Klein's claims stem from manufacturing defects with the Mars Red paint and how it was applied to his vehicle.  "Here, the relevant representations—whether express or implied by the Defendant[s'] silence—are certainly related to the Defendant[s]' obligation under the contract . . . ."  In re Atlas Roofing Corp., 2015 WL 3796456, at *3.  Consequently, the economic loss rule applies.  See Tiara, 110 So. 3d at 407; In re Takata Airbag, 193 F. Supp. 3d at 1339; Burns, 2013 WL 4437246, at *4; see also S. Wind Aviation, LLC v. Cessna Aircraft Co., No. 6:12-cv-1376-Orl-22DAB, 2014 WL 12570958, at *4 (M.D. Fla. July 15, 2014) (concluding that economic loss rule did not apply because "[p]laintiffs' claims stem from issues regarding services and repairs rendered by [d]efendant and not manufacturing defects of the product").  Defendants' Motion

to Dismiss is **GRANTED** with respect to Klein's fraud and suppression claim in Count Six.

### 3. Fraudulent Concealment

Defendants contend that the Second Amended Complaint fails to adequately allege fraudulent concealment because "Plaintiffs fail to allege a relationship with Defendants that could give rise to a duty to disclose." Defs.' Mem. at 26. Under the laws of Plaintiffs' states, "[t]o establish a prima facie case of fraudulent concealment of a material fact, a plaintiff must show . . . that the defendant had a duty to disclose a material fact . . . ." See Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So. 2d 1288, 1293 (Ala. 1993); see also Hobson v. Entergy Ark., Inc., 432 S.W. 3d 117, 125 (Ark. Ct. App. 2014) (citation omitted) ("Fraud-based liability for nondisclosure, as opposed to an affirmative misrepresentation, arises in special circumstances where there is a duty to communicate a concealed material fact or where one party knows another is relying on misinformation to his detriment."); La. St. Univ. Sys. Research & Tech. Found. V. Qyntessa Biologics, L.L.C., 168 So. 3d 468, 474 (La. Ct. App. 2014) ("To find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information."); Homestead Grp., LLC v. Bank of Tenn., 307 S.W.3d 746, 754 (Tenn. Ct. App. 2009) ("To hold [defendant] liable under a theory of fraudulent concealment, [plaintiff] had to

show that [defendant] had a duty to [plaintiff] to disclose the matter in question."); Harton v. Harton, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986) (citations omitted) ("A cause of action for fraud is based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose.").

"A duty to disclose may arise from the particular circumstances of the case, from a confidential relationship, or from a request for information." Dodd, 626 So. 2d at 1293. "Such liability may occur where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances." Hobson, 432 S.W.3d at 125 (citations omitted). "[T]he duty to disclose exists where the parties stand in some confidential or fiduciary relation to one another. . . . [T]he defining characteristic of the latter is a special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." La. St. Univ. Sys., 168 So. 3d at 474. "Generally one party to a transaction has no duty to disclose material facts to the other unless there is a showing of a previous definite fiduciary relationship between the parties, that [plaintiff] expressly reposed a trust and confidence in [defendant] or that the transaction was intrinsically fiduciary." Homestead Grp., 307 S.W.3d at 754.

47

> A duty to disclose arises in three situations.  The first instance is where a fiduciary relationship exists between the parties to the transaction. . . . The two remaining situations in which a duty to disclose exists arise outside a fiduciary relationship, when the parties are negotiating at arm's length.  The first of these is when a party has taken affirmative steps to conceal material facts from the other. . . .  A duty to disclose in arm's length negotiations also arises where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

Harton, 344 S.E.2d at 119.

Defendants contend that they are neither in a fiduciary relationship with Plaintiffs nor negotiated with Plaintiffs in arms-length transactions.  Defs.' Reply at 17.  Defendants contend that because Pinon, Brown, Frankum, and Bryan transacted "only with unaffiliated dealerships" and Earley "transacted with Mercedes-authorized dealerships," Plaintiffs did not transact with Daimler or MBUSA.  Id. at 17-18.  However, Plaintiffs contend that the requisite "special relationship" exists because "Defendants and their authorized dealers claim explicit responsibility through the NVLW for any defects with the paint issues" and "Defendants' authorized dealerships were their agents for repair issues."  Pls.' Opp'n at 30.

The Second Amended Complaint does not specifically allege that any dealerships were agents of MBUSA or Daimler.  It alleges that: (1) Pinon purchased her vehicle from "a dealership" and took it to "the Mercedes dealership

48

in Hoover, Alabama" and "the Irondale Mercedes dealership" for repairs;

(2) Brown purchased her vehicle "in Arkansas;" (3) Earley purchased her vehicle

from "Mercedes of Greenway;" and (4) Bryan purchased his vehicle from "Bob

Mills Mitsubishi in Jacksonville, North Carolina." See Second Am. Compl.

¶¶ 38, 47, 49-50, 69, 106, 114.  The Second Amended Complaint does not allege

where or from whom Frankum purchased his vehicle.  Id. ¶ 87.

Although MBUSA warrants the vehicle, the NVLWs also state that "[a]ny

authorized Mercedes-Benz Center" will perform the warranty repairs or

replacements.  2015 NVLW at 11; 2014 NVLW at 11; 2013 NVLW at 11; 2011

NVLW at 11.  This language suggests that Mercedes-Benz Centers are MBUSA's

agent for repair issues, and Defendants cite no authority to the contrary.  Plaintiffs'

fraud and suppression claims arise from Defendants' alleged concealment of the

paint defect prior to and at the time of sale or lease of the Class Vehicles.  See

Second Am. Compl. ¶¶ 255-71.  Accepting the allegations in the Second Amended

Complaint and all reasonable inferences from them as true, Earley purchased her

vehicle from an authorized Mercedes-Benz Center.  However, although Pinon,

Brown, Bryan, and Frankum later brought their vehicles to a Mercedes-Benz

Center for repairs, they did not engage in any sales transaction with a Mercedes-

Benz Center.  Accordingly, these Plaintiffs' fraudulent concealment claims fail

49

because they did not engage in any sales transaction with Defendants.  See Taylor

v. Am. Honda Motor Co., 555 F. Supp. 59, 64 (M.D. Fla. 1982) (dismissing

fraudulent concealment claim because "the plaintiffs' complaint is deficient, if for

no other reason, because it fails to allege any sales transaction whatever between

Taylor and American Honda") see also Dodd v. Nelda Stephenson Chevrolet, Inc.,

626 So. 2d 1288, 1289, 1294 (Ala. 1993) (affirming trial court's grant of summary

judgment on fraudulent concealment claim against Hembree Motors where

plaintiff purchased from Stephenson Chevrolet a vehicle that Stephenson Chevrolet

had obtained from Hembree Motors because, "[a]lthough [plaintiff] presented

substantial evidence that Hembree Motors knew of the Camaro's paint problems,"

plaintiff "cite[d] no authority for the proposition that Hembree Motors, as opposed

to Stephenson Chevrolet, had any obligation to disclose facts to him or that he is

entitled to bring an action based on the failure of Hembree Motors to disclose those

facts to Stephenson Chevrolet.").

Defendants also contend that Plaintiff's fraudulent concealment claims fail

because the Second Amended Complaint does not allege facts showing that

Plaintiffs were harmed by Defendants' nondisclosure.  Defs.' Mem. at 27.  In other

words, the Second Amended Complaint does not allege that had Defendants

disclosed the allegedly concealed information, Plaintiffs "would have been aware

of it and would have acted differently." Id. at 27.  The Court disagrees.  The

Second Amended Complaint specifically alleges that had Earley known that the

paint was defective, she would not have purchased her Class Vehicle or would

have paid less for it.  Second Am. Compl. ¶ 113.  Defendants contend that

Plaintiffs must allege that they "would have been in the position *at the point of*

*purchase* to receive a disclosure from Defendants had one been made."  Defs.'

Mem. at 28 (quoting Ehrlich v. BMW of N. Am., LLC, 801 F. Supp. 2d 908, 919

(C.D. Cal. 2010) ("Plaintiff does not allege that, before he bought his [vehicle], he

reviewed any brochure, website, or promotional material that might have contained

a disclosure of the [alleged] defect.")).  Even if Ehrlich was persuasive authority,[11]

the Second Amended Complaint alleges facts indicating that Earley would have

been in a position to receive a disclosure from Defendants and that Earley relied

upon the statements contained in the NVLWs and on Defendants' website when

she purchased her vehicle.  See Second Am. Compl. ¶¶ 141, 144-46.  Earley has

adequately alleged causation.

---

[11] The portion of Ehrlich that Defendants rely upon granted a motion to dismiss
fraud-based claims arising under California's Consumer Legal Remedies Act and
California's Unfair Competition Law.  See Ehrlich, 801 F. Supp. 2d at 914, 920.
No Plaintiff purchased a Class Vehicle in California, and these California statutes
are inapplicable to this case.

Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to

Pinon's, Brown's, Bryan's, and Frankum's fraudulent concealment claims in

Count Six, and **DENIED** with respect to Earley's fraudulent concealment claims in

Count Six.[12]

### 4.    Fraudulent Misrepresentation

Defendants also contend that the Second Amended Complaint fails to state

fraud claims because it does not allege facts "showing that Defendants knew of the

alleged paint issue at the time Plaintiffs purchased their vehicles."  Defs.' Mem.

at 29.  Under the laws of Plaintiffs' states, a defendant is liable for fraud if it

asserts as true something that it knows is false.  See PNC Multifamily Capital

Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d

525, 548 (Tenn. Ct. App. 2012) (citation omitted) ("In order to establish a claim

for fraudulent or intentional misrepresentation, a plaintiff must show . . . the false

representation was made either knowingly or without belief in its truth or

recklessly . . . ."); Becnel v. Grodner, 982 So. 2d 891, 894 (La. Ct. App. 2008)

(citation omitted) ("To recover under a cause of action in delictual fraud, a plaintiff

---

[12] As discussed in part III.E.2 above, Defendants' Motion to Dismiss is
**GRANTED** with respect to the entirety of Klein's fraud and suppression claim in
Count Six.

must prove . . . a misrepresentation of material fact . . . made with the intent to deceive . . . ."); RD & J Props. v. Lauralea-Dilton Enters., 600 S.E.2d 492, 499 (N.C. Ct. App. 2004) (citations omitted) ("The required scienter for fraud is not present without both knowledge and an intent to deceive, manipulate, or defraud . . . . a defendant cannot be liable for misrepresenting a fact that it has no knowledge is false."); O'Mara v. Dykema, 942 S.W.2d 854, 858 (Ark. 1997) (citation omitted) ("Representations are considered fraudulent when the one making them either knows them to be false or, not knowing, asserts them to be true."); Dodd, 626 So. 2d at 1291 (citation and internal quotation marks omitted) ("Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge . . . constitute legal fraud.").

Defendants acknowledge that the Second Amended Complaint "rel[ies] on five sources of information to attempt to establish Defendants' knowledge": (1) Defendants' procedures for testing paint; (2) Defendants' TSBs; (3) complaints made to Mercedes dealerships; (4) complaints collected by the NHTSA; and (5) complaints posted to online public forums. Defs.' Mem. at 29 (citing Second Am. Compl. ¶¶ 156-88). However, Defendants contend that none of these alleged

sources are "sufficient to meet Plaintiffs' pleading burden." Id. The Court considers these sources *seriatim*.

### a.    Defendants' Procedures for Testing Paint

The Second Amended Complaint alleges that "[p]rior to a new paint and/or paint system being used on a vehicle, automakers such as Mercedes typically employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrates." Second Am. Compl. ¶ 158. It identifies five specific test procedures and alleges that Defendants "performed several of [them]." Id. ¶¶ 159-60. It also alleges that Defendants developed "tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world conditions" and that "[t]he development of the paint and paint system, including the testing performed in connection therewith, would have revealed the Paint Defect." Id. ¶ 160. Defendants have "exclusive custody and control" over the details of paint testing and the results of that testing. Id. ¶ 161.

Defendants contend that "Plaintiffs do not allege that [Daimler] or MBUSA actually performed such tests on Mars Red paint." Defs.' Mem. at 30. However, the Second Amended Complaint (1) states that automakers "typically" test the paint prior to using it on a vehicle, (2) lists five specific tests, and (3) asserts that

54

"on information and belief, [Defendants] performed several of the above-described . . . test procedures."  Second Am. Compl. 158-60.  The Second Amended Complaint further states that this testing "would have revealed the Paint Defect."  Id. ¶ 161.  Since the defect is only with Mars Red paint, it is a reasonable inference from the above factual allegations that Defendants tested the Mars Red paint prior to using it on Mercedes vehicles.

Defendants further contend that "Plaintiffs offer no facts to support" the allegation that the testing "would have revealed the Paint Defect."  See Defs.' Mem. at 30 (citing Second Am. Compl. ¶ 161).  "They do not explain why the alleged symptoms occur or under what conditions, much less why the alleged testing would have replicated them."  Id. at 30.  Plaintiffs purchased their vehicles used.  See Second Am. Compl. ¶¶ 38, 60, 77, 87, 106, 114.  Pinon's, Brown's, Frankum's, and Bryan's vehicles had not been repainted and had the original Mercedes paint from the factory.  Id. ¶¶ 43, 84, 89, 115.  Accepting the factual allegations in the Second Amended Complaint as true, Defendants tested the Mars Red paint before it was used on a vehicle.  If the testing revealed any issues, Defendants would have known about them well before Plaintiffs purchased their vehicles used.

Defendants rely upon <u>Kirsopp v. Yamaha Motor Co. Ltd.</u>, No. CV 14-00496 BRO (VBKx), 2015 WL 11197829 (C.D. Cal. Jan. 7, 2015), for the proposition that "these allegations require the [c]ourt to draw the inference that [d]efendant's *opportunity* to learn about this alleged defect before selling their engines to the public necessarily means that they *did* learn about the defect." <u>Kirsopp</u>, 2015 WL 11197829, at *11.  In <u>Kirsopp</u>, plaintiffs contended that the manufacturer knew of an alleged presale defect in its outboard motors because it "had exclusive access to data and research conducted prior to and during the design and manufacture of the Four Stroke Outboards." <u>Id.</u> at *10.  The court stated that, without specific allegations about the defendant's knowledge during the time when the plaintiff purchased one of the defective motors, the allegation that the defendant should have known about the defect because it had access to the data and research was speculative. <u>Id.</u>

Defendants correctly point out that the Second Amended Complaint does not allege which specific tests Defendants conducted or what the results of those tests were.  <u>See</u> Defs.' Mem. at 30.  This is unsurprising, as Defendants have "exclusive custody and control" over the details of paint testing and the results of that testing. <u>See</u> Second Am. Compl. ¶ 161.  The Court finds that the factual allegations in the Second Amended Complaint are more than speculative.  The Second Amended

Complaint asserts that "[p]rior to a new paint and/or paint system being used on a vehicle, automakers such as Mercedes typically employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate," identifies five specific paint-related test procedures, and asserts that Defendants performed several of the tests.  See Second Am. Compl. ¶¶ 158-60.  The Second Amended Complaint also asserts that the paint-related tests "often run over the course of two-to-five years before a vehicle using the paint system is brought to market."  Id. ¶ 158.  The Court finds that, at this early stage in the proceedings, it is reasonable to infer that Defendants performed several of the identified paint-related tests on the Mars Red paint before using it on Mercedes vehicles.  Although, standing alone, these factual allegations and inferences may not indicate that Defendants actually knew of the paint defect before Plaintiffs purchased their vehicles, as explained below, the Second Amended Complaint also relies upon other sources to demonstrate Defendants' knowledge.

### b.    Defendants' TSBs

The Second Amended Complaint alleges that Defendants issued a TSB on June 12, 2014, that cited issues with the "exterior clearcoat" of "[a]ll vehicles with 590 – Mars Red only" "peeling, flaking, or exhibit[ing] bubbles under the surface."  Id. ¶¶ 164-66; TSB at 1.  The TSB identifies "improper adhesion of clearcoat" as

the cause.  Second Am. Compl. ¶ 167; TSB at 1.  Attached to the TSB is a twenty-eight-page table "identifying every vehicle, including variation and model year of that vehicle containing the paint defect."  Second Am. Compl. ¶ 171; TSB at 1-28.

Defendants contend that "many courts have held" that a TSB "is not a basis for imposing liability."  Defs.' Mem. at 31.  This overstates and oversimplifies the caselaw.  In <u>Garick v. Mercedes-Benz USA, LLC</u>, No. 17-cv-12042-IT, 2019 WL 3815178 (D. Mass. Mar. 29, 2019), the court found that a bulletin stating that "some vehicles may produce 'humming/buzzing noises or [a] noticeable harsh engagement during gentle acceleration . . . that <u>may</u> be caused by' one of several potential issues, including a problem with the radiator causing glycol to leak into the automatic transmission fluid" did not establish that the manufacturer knew that a particular vehicle's radiator and transmission were defective.  <u>Garrick</u>, 2019 WL 3815178, at *1, 3 (emphasis added).  In <u>Alban v. BMW of N. Am.</u>, No. 09-5398 (DRD), 2011 WL 900114 (D. N.J. Mar. 15, 2011), the court found that a TSB issued in 2007 for all E46, E65, and E66 vehicles produced up to 2007 stating that an "'unpleasant odor *may* be noticed . . . smelling similar to a solvent or wax crayon . . . . This is due to excessive amounts of solvent being present in and around the rear parcel shelf insulation . . . .'" did not establish that the manufacturer (1) actually knew, in 2003, that its sound insulation in its E46

58

vehicles "was certain to emit a burnt crayon odor," or (2) knew that "all or substantially all E46, E65, and E66 Class vehicles were affected by the burnt crayon odor." Alban, 2011 WL 900114, at *11-12.

Similarly, in Erlandson v. Ford Motor Co., No. 08-CV-1137-BR, 2009 WL 3672898 (D. Or. Oct. 30, 2009), the court stated that a TSB recommending a repair method for Windstars experiencing problems with moisture entering the powertrain control module "does not constitute an admission by Defendant that a defect exists in all Windstars" or in plaintiff's specific Windstar. Erlandson, 2009 WL 3672898, at *4. In Am. Honda Motor Co. v. Super. Ct., 132 Cal. Rptr. 3d 91 (Cal. Ct. App. 2011), the court found that a TSB which "state[ed] that the 'probable cause' of the problem may be attributed to a 'faulty 3rd gear synchronizer or 3–4 shift sleeve'" was not sufficient on its own to show a product liability case was proper for class action treatment in part because the TSB did not "state[] [that] the synchronizer or shift sleeve was the common cause of every complaint." Am. Honda, 132 Cal. Rptr. 3d at 100.

This case is distinguishable from Garrick, Alban, Erlandson, and Am. Honda. The TSBs at issue in those cases either discussed problems with some vehicles in a particular class, identified possible causes of those problems, or both. The TSB at issue here is not so equivocal. It identifies, without any qualifying

59

language, the specific cause of the exact problem that Plaintiffs experienced.  See

TSB at 1.  It states that the problem affects "all vehicles" with Mars Red paint and

includes a twenty-eight-page table listing the vehicle models and years affected.

See id.  Unlike the facts in Garrick, Alban, Erlandson, and Am. Honda, this Court

does not need to infer that the issue with Plaintiffs' vehicles was caused by the

problem identified in the TSB.  The TSB directly states that "peeling, flaking, or

exhibit[ing] bubbles under the surface" of the clearcoat on "all vehicles with 590 –

Mars Red only" was caused by "improper adhesion of the clearcoat."  See TSB

at 1.

Furthermore, although Defendants correctly note that "[a]n automobile's

paint may become damaged for any number of reasons, including exposure to the

elements or accidents," see Defs.' Mem. at 31, the Second Amended Complaint

alleges that (1) each of the Plaintiffs' vehicles "was not exposed to any airborne or

environmental influences which would have adversely affected its paint" and

(2) other vehicles of the same model and year not painted Mars Red from the

factory do not have the identified paint issues.  Second Am. Compl. ¶¶ 44, 66, 85,

92, 111, 121.  Plaintiffs allege that each of their vehicles had not been repainted

and had the original Mars Red paint from the factory.  Id. ¶¶ 43, 65, 84, 89, 97.

They also allege that Earley's vehicle is garaged when not being driven and

Pinon's vehicle has never been in a wreck.  Id. ¶¶ 43, 111.  Accepting these factual

allegations as true and construing them in the light most favorable to Plaintiffs, the

Second Amended Complaint pleads facts establishing that the paint issues were not

caused by exposure to the elements or accidents.

It is true that the Alban court was "hesitant to view technical service

bulletins, or similar advisories, as potential admissions of fraudulent concealment

of a defect" because doing so "may discourage manufacturers from responding to

their customers in the first place." See Alban, 2011 WL 900114, at *12.  The Am.

Honda court also stated:

> A TSB is not and cannot fairly be construed by a trial court as an
> admission of a design or other defect, because TSB's are routinely
> issued to dealers to help diagnose and repair typical complaints.  If a
> TSB standing alone were sufficient to show a product liability case is
> proper for class action treatment, then there would be a class action
> every time a TSB is issued.

Am. Honda, 132 Cal. Rptr. 3d at 100.  This Court does not disagree with the

reservations expressed in Alban and Am. Honda.  Here, however, the TSB before

this Court unequivocally states the cause of Plaintiffs' vehicles' paint issues.  Other

courts have relied on TSBs that acknowledge a defect to find that an automaker

had knowledge of that defect.  See, e.g., In re Gen. Motors Air Cond. Mktg. and

Sales Practices Litig., No. 18-md-02818, 2019 WL 4201474, at *12 (E.D. Mich.

Sept. 5, 2019) (finding that General Motors had knowledge of an air conditioning defect in part because on October 6, 2014, it issued a TSB informing "authorized service technicians to pervasive issues affecting particular models and model years" "concerning cracks in the air conditioning system components causing the system to blow warm air instead of producing cold air," and on May 29, 2015, it issued a second TSB related to this defect); MacDonald v. Ford Motor Co., 37 F. Supp. 3d 1087, 1093-94 (N.D. Cal. 2014) (finding that TSBs "detailing problems that Ford had with the coolant pump, one from 2005—before the [p]laintiffs' purchases—and two others from July and November of 2008, post-dating their purchases"—"taken together support the inference that Ford knew of the alleged . . . defect at the time [p]laintiffs purchased their vehicles"); Falco v. Nissan N. Am., No. CV 13-00686 DDP (MANx), 2013 WL 5575065, at *6 (C.D. Cal. Oct. 10, 2013) (citation omitted) (finding that "plaintiffs had alleged sufficient facts to support their claim that the defendants knew of the defect at the time of sale" where "defendants allegedly provided their dealers with a technical service informational bulletin acknowledging the headlight defect and noting the availability of replacement parts"). Just as importantly, as discussed below, the TSB is but one indication that Defendants had knowledge of the paint issues.

### c.    **Complaints Made to Mercedes Dealerships**

The Second Amended Complaint alleges that "[u]pon information and belief," Defendants "collect[], review[], and analyze[] detailed information about repairs made on vehicles at its dealerships and service centers, including the type and frequency of such repairs." Second Am. Compl. ¶ 179.  During Pinon's February 2018 visit to a Mercedes dealership, "Mercedes personnel acknowledged that the Mars Red paint was defective and that they were aware of multiple other Mars Red vehicles having the same problem." Id. ¶ 48.  In late June 2018 and early July 2018, Defendants acknowledged "that the Irondale Mercedes dealership alone had been involved personally in repainting at least six Mars Red Mercedes for the same defect Pinon experienced." Id. ¶ 52.  An employee of the dealership where Klein brought his vehicle "admitted that she had seen 'a number of incidences' of the Mars Red paint defects similar to Klein's.  In fact[,] she admitted that she personally had seen at least eight other Mercedes cars in Mars Red with the same paint problems." Id. ¶ 70.  Sometime after Frankum purchased his vehicle in October 2018, Defendants notified him that repainting would mean he "would be without the use of his vehicle for several weeks" and "his local dealership already had one Mars Red Class Vehicle ahead of him being repainted." Id. ¶ 93.

The TSB issued on February 3, 2017, instructed dealers that if the repairs required more than thirty hours of labor, the warranty policy required submitting photos of affected areas and paint thickness measurements.  Id. ¶ 170.  "Upon information and belief, and given that Plaintiffs have been informed that it will take weeks to repaint their Class Vehicles, the labor required to complete the above TSB remedy on Class Vehicles was greater than 30 hours."  Id.  As Defendants point out, Mercedes dealership employees made the above statements to Pinon, Klein, and Frankum after they had purchased their vehicles.  See Defs.' Mem. at 32.  Thus, these statements, standing alone, do not demonstrate that Defendants knew of the paint defects at the time when Pinon, Klein, and Frankum purchased their vehicles.

However, the dealership employees' statements do indicate that other vehicle owners previously experienced the same problem with the Mars Red paint on their vehicles, prior to at least some of the purchases here.  The TSB instructing dealers to submit to Defendants photos and paint measurements of vehicles under warranty that they repainted was issued on February 3, 2017.  Id. ¶ 170.  In February, June, July, and October 2018, Mercedes dealership employees told Pinon, Klein, and Frankum that they were aware of the paint defect and had repainting other vehicles.  See id. ¶¶ 48, 52, 70, 93.  Brown, Frankum, and Bryan

64

did not purchase their vehicles until after May 2017, three or more months after Defendants issued the TSB.  See id. ¶¶ 77, 87, 114.  It is reasonable to infer that, at least before May 2017, Mercedes dealership employees should have submitted to Defendants photos of the defects and paint measurements on the vehicles that they repainted.  This indicates that Defendants had notice from Mercedes dealerships of the defects in the Mars Red paint before Brown, Frankum, and Bryan purchased their vehicles.  See generally In re MyFord Touch, 46 F. Supp. 3d at 957-58 ("Nevertheless, it is still reasonable to infer that, if Ford had issued four TSBs and two updates in 2012 alone, Ford should have known of problems with M[y]F[ord]T[ouch] by around 2011, i.e., before it could recommend what repairs or updates needed to be done.  Presumably, the TSBs and updates were proceeded by an accretion of knowledge by Ford.").

### d.    Complaints Made to the NHTSA

The Second Amended Complaint also alleges that Defendants "knew or should have known about the Mars Red paint defect based on manufacturer communications with the NHTSA."  Id. ¶ 180.  In a manufacturer communication dated June 12, 2014, the NHTSA communicated to Defendants regarding "[c]learcoat peeling / flaking / bubbling" on Mercedes model CLS550 vehicles years 2003-2009 and 2011-2015.  See id. ¶ 184.  This NHTSA communication

65

refers to "Manufacturer Communication Number L198.00-0-058914," the same "Topic Number" listed on the June 12, 2014, TSB. See id.; TSB at 1. This indicates that Defendants knew about the Mars Red paint issues on Mercedes model CLS550 vehicles years 2003-2009 and 2011-2015. Although no Plaintiff's vehicle is a Mercedes model CLS550, see Second Am. Compl. ¶¶ 38, 60, 77, 87, 96, 106, 114, nothing indicates that the Mars Red paint on the CLS500, or the method by which it was applied, is different from the Mars Red paint on Plaintiffs' vehicles. On the contrary, that the TSB describing the paint defect includes a table listing all of the affected vehicle models suggests that the CLS500 and Plaintiffs' vehicles experienced the same issue. Accordingly, the NHTSA manufacturer communication also suggests that Defendants knew about the paint defect on Plaintiffs' models of Mercedes vehicles.

### e. Complaints on Internet Forums

The Second Amended Complaint also alleges that Defendants were aware of the paint issues because of complaints made on internet forums. See Second Am. Compl. ¶¶ 173, 175. The Second Amended Complaint reproduces nine specific complaints from Mercedes vehicle owners about the Mars Red paint. See id. ¶ 175. These complaints were posted to mbworld.org in June 2010, November 2014, December 2014, August 2015, February 2016, and February 2017, and to

consumeraffairs.com in September 2016 and April 2017.  Id.  The Second

Amended Complaint also alleges that "many Class Vehicle owners posted

complaints about the Mars Red paint defect on public online vehicle owner

forums." Id. ¶ 186.  The Second Amended Complaint reproduces seven specific

additional complaints from Mercedes vehicle owners about the Mars Red paint.

See id.  These complaints were posted to mercedesforum.com in June 2007,

mbworld.org in June 2010, November 2014, and December 2015, and to

www.lemonlaw.com in January 2018.  Id.  The Second Amended Complaint

alleges that Defendants "undoubtedly track[] and ha[ve] tracked such sites." Id.

¶ 187.

     Defendants contend that "many courts have recognized" that "complaints on

third-party websites do not, by themselves, commute knowledge to a

manufacturer."  Defs.' Mem. at 32-33 (alteration accepted) (quoting Resnick v.

Hyundai Motor Am., Inc., No. CV 16-00593-BRO (PJWx), 2017 WL 6459931, at

*13 (C.D. Cal. Aug. 21, 2017)).  In Resnick, plaintiffs cited "five consumer

complaints made on carsurvey.org."  Resnick, 2017 WL 6549931, at *13.  "The

only new allegation regarding a consumer complaint that pertains to a model from

the putative class does not sufficiently allege knowledge because [p]laintiffs do not

allege how Hyundai would have been made aware of a widespread defect based on

this complaint." Id.  The court explained that "[c]omplaints on third-party

websites do not, by themselves, commute knowledge to a manufacturer." Id.

(emphasis added); see also Berenblat v. Apple, Inc., Nos. 08-4969 JF (PVT) & 09-

1649 JF (PVT), 2010 WL 1460297, at *9 (N.D. Cal. Apr. 9, 2010) (emphasis

added) ("[T]he complaints posted on Apple's consumer website merely establish

the fact that some consumers were complaining.  By themselves they are

insufficient to show that Apple had knowledge that the memory slot in fact was

defective and sought to conceal that knowledge from consumers.").

In Baba v. Hewlett-Packard Co., No. C 09-05946 RS, 2011 WL 317650

(N.D. Cal. Jan. 28, 2011), the complaint identified twenty-six consumer complaints

written before plaintiff's purchase, three of which appeared on a forum hosted on

the manufacturer's website.  Baba, 2011 WL 317650, at *3.  "Plaintiffs do not

allege that HP had knowledge of the contents of the complaints posted on non-HP

websites.  Nine of the twenty-six posts on non-HP sites, however, indicate that the

writer contacted HP to complain about the problem." Id.  "[O]nly three complaints

were posted on HP's website prior to Baba's transaction.  Awareness of a few

customer complaints, however, does not establish knowledge of an alleged defect."

Id.

Unlike plaintiffs' complaints in <u>Resnick</u> and <u>Baba</u>, here the Second Amended Complaint alleges how Defendants would have been made aware of a defect based on the complaints filed on third-party websites:  Defendants track complaints filed on those sites.  <u>See</u> Second Am. Compl. ¶ 187.  Earley was the first Plaintiff to purchase her vehicle, doing so in January 2015.  <u>See</u> <u>id.</u> ¶ 106.  Eight of the complaints reproduced in the Second Amended Complaint were posted to mbworld.org before January 2015.  <u>See</u> <u>id.</u> ¶¶ 175, 186.  Six of those complaints also indicate that the vehicle owner notified a Mercedes dealer of the issue.  <u>See</u> <u>id.</u> ¶¶ 175, 186.  One complaint posted in December 2014 states that, "[a]ccording to the [Mercedes dealer's] service manager, Mercedes corp[orate] didn't even hesitate because they knew this was an issue."  <u>Id.</u> ¶ 175.  Accepting the factual allegations in the Second Amended Complaint as true and construing them in the light most favorable to Plaintiffs, the content and timing of the complaints filed on mbworld.org—a website site that Defendants monitor— indicates that Defendants knew about paint issues before Plaintiffs purchased their vehicles.  The Court does not disagree with <u>Resnick</u>, <u>Berenblat</u>, and <u>Baba</u> that consumer complaints alone are insufficient to show that Defendants knew about

the paint defect.  However, in this case the consumer complaints are one of several

ways that the Defendants allegedly knew about the paint defect.[13]

In summary, although each individual piece of information that Plaintiffs

rely upon may not, standing alone, demonstrate that Defendants knew of the issues

with the Mars Red paint before Plaintiffs purchased their vehicles, the Court finds

that they do so collectively.  See Catalano v. BMW of N. Am., LLC, 167 F. Supp.

3d 540, 559 (S.D.N.Y. 2016) ("Catalano alleges that BMW was aware of the

defects described in the [complaint] through numerous complaints made to the

NHTSA and on consumer forums, and based on repair invoices, warranty claims

and, most significantly, Technical Service Bulletins that BMW itself issued to

dealers describing the defects in question.  These allegations, taken together, are

sufficient to support an inference of BMW's knowledge of the alleged defects at

this stage."); Tomassini v. FCA U.S. LLC, No. 3:14-cv-1226 (MAD/DEP), 2015

WL 3868343, at *7 (N.D.N.Y. June 23, 2015) ("Plaintiff has pled facts specifically

---

[13] Defendants contend that if these complaints were sufficient to notify Defendants
of the alleged defect, they would also be sufficient to notify Plaintiffs and so
cannot support a claim for fraudulent concealment.  Defs.' Mem. at 33 (citing
Taylor, 555 F. Supp. at 64-65).  However, the Second Amended Complaint does
not allege facts indicating that Plaintiffs saw the complaints or reviewed the third-
party websites on which they were posted.

indicating that numerous consumers complained directly to [d]efendant, that

[d]efendant's representatives acknowledged the defect as a common problem, that

a governmental traffic safety organization initiated investigation into a potential

defect, and that hundreds of consumers filed complaints with the NHTSA–

ODI . . . . Plaintiff's pleadings provide sufficient factual detail to plausibly allege

[d]efendant's knowledge of the defect."); Mui Ho v. Toyota Motor Corp., 931 F.

Supp. 2d 987, 998 (N.D. Cal. 2013) (holding that complaint alleging that

automaker "had non-public, internal data about the Class Vehicles' headlamp

problems, including 'pre-release testing data, early consumer complaints about the

defect to [d]efendants' dealers who are their agents for vehicle repairs, dealership

repair orders, testing conducted in response to those complaints, and other internal

sources'" supported the claim that defendants had knowledge of the headlamp

issue); Grodzitsky v. Am. Honda Motor Co., No. 2:12-cv-1142-SVW-PLA2013

WL 2631326, at *6-7 (C.D. Cal. June 12, 2013) (holding that complaint alleging

that (1) consumers filed NHTSA complaints about Window Regulators; (2) there

was "[a] 'sudden and significant increase' in Window Regulator failures beginning

in or around 1994 (when the Window Regulators at issue in this suit were first

installed);" (3) "[t]esting data from before [d]efendant began installing the

Window Regulator in its cars that 'would have revealed to [d]efendant that the

design and materials of the plastic shuttle/cable Window Regulator were

insufficient for the intended use;'" (4) Honda Service Centers submitted

information for in-warranty repairs throughout the Class period; (5) a "high

number of replacement Window Regulator parts" were ordered from Defendants,

and "sudden[ly] increased" in or around 1994; (6) complaints were made directly

to [d]efendant; and (7) complaints were posted about the Window Regulator

Defect on "public online vehicle owner forums," beginning as early as 2003,

indicated that defendants had knowledge of the Window Regulator Defect); Woods

v. Maytag Co., 807 F. Supp. 2d 112, 126 (E.D.N.Y. 2011) (alterations accepted)

(holding that complaint alleging that "(1) the Maytag authorized repairman

represented that he himself had 'addressed numerous other similar consumer

complaints'; (2) Whirlpool, on behalf of Maytag, told the [p]laintiff 'not to proceed

filing safety issue & personal injury' and; (3) Whirlpool, on behalf of Maytag,

advised its employees not to list the gas igniter as the cause of the malfunction"

indicated that defendants "had specific knowledge of a defect in the [ov]en's

igniting mechanism").  Accordingly, Defendants' Motion to Dismiss is **DENIED**

with respect to Pinon's, Brown's, Bryan's, Frankum's, and Earley's fraudulent

misrepresentation claims in Count Six.[14]

### F.    Violation of the Florida Deceptive and Unfair Trade Practices Act (Count Seven)

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

declares unlawful "unfair or deceptive acts or practices" committed "in the conduct

of any trade or commerce."  Fla. Stat. § 501.204(1).  "To state an FDUTPA claim,

[a plaintiff] must allege (1) a deceptive act or unfair trade practice; (2) causation;

and (3) actual damages."  Dolphin LLC v. WCI Communities, Inc., 715 F.3d 1243,

1250 (11th Cir. 2013) (citing Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla.

Dist. Ct. App. 2006)).  Plaintiffs contend that Defendants engaged in a number of

deceptive acts concerning the quality and benefits of the Mars Red paint which

caused damages.  Second Am. Compl. ¶¶ 277, 283.

Defendants contend that Klein's FDUTPA claim fails because "he does not

allege that he was exposed to any information from Defendants before he

purchased his vehicle."  Defs.' Mem. at 36.  "Where a plaintiff has not seen or

heard an allegedly deceptive advertisement, she cannot challenge it under the

---

[14] See supra n.12.

FDUTPA."  Resnick, 2017 WL 6549931, at *18 (alteration accepted, citation and internal quotation marks omitted).  Here, the Second Amended Complaint alleges that "prior to his purchase, Klein saw magazine and television ads touting that the Class Vehicles both new, certified pre owned, and used were reliable, endurable, of good finish, of high fit, and exceptional quality."  Id. ¶ 64.[15]

Defendants also contend that Klein's FDUTPA claim fails because "he does not allege facts showing that Defendants knew of the alleged defect at the time of purchase."  Defs.' Mem. at 37.  "Florida courts have recognized that a FDUTPA claim is stated where the defendant knowingly fails to disclose a material defect that diminishes a product's value."  Matthews v. Am. Honda Motor Co., No. 12-60630-CIV, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) (citation omitted).  Klein purchased his Mercedes on June 30, 2016.  Second Am. Compl. ¶ 60.  As discussed in part III.E.4 of this Order, Plaintiffs allege that Defendants knew about the Mars Red paint defects from paint testing completed before Klein's vehicle was manufactured, from the June 12, 2014, TSB, and from consumer complaints posted before June 30, 2016, to internet websites that Defendants monitored.

---

[15] As discussed in part III.E.1 of this Order, the Second Amended Complaint also alleges that Plaintiffs relied upon Defendants' statements in the NVLWs and on Defendants' website.

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to

Klein's violation of FDUTPA claim (Count Seven).

### G.   Violation of the Alabama Deceptive Trade Practices Act (Count Eight)

"The Alabama Deceptive Trade Practices Act ("Alabama DTPA"), Ala.

Code § 8–19–1 *et seq.*, is a consumer protection statute designed to punish persons

who engage in deceptive trade practices." Phillips v. Hobby Lobby Stores, Inc.,

No. 2:16-CV-00837-JEO, 2018 WL 4635734, at *8 (N.D. Ala. Sept. 27, 2018).

"In order for a plaintiff to recover under the A[labama] DTPA, he or she must

prove that (1) he or she is a 'consumer,' (2) made a pre-suit demand, and (3)

suffered monetary damages as a result of the Defendant's violation of the

A[labama] DTPA." In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.,

No. 1:13-MD-2495-TWT, 2018 WL 2929831, at *7 (N.D. Ga. June 8, 2018)

(footnotes omitted).  Plaintiffs assert that "Defendants marketing, sale and/or

distribution of the Class Vehicles and the Plaintiffs and the Alabama Subclass's

purchase of the Class Vehicles was a sale or distribution of goods to a consumer

within the meaning of the Alabama Deceptive Trade Practices Act" and that

Defendants engaged in false and deceptive marketing and advertising in violation

of the Alabama DTPA.  Second Am. Compl. ¶¶ 286-91.

Defendants contend that that Pinon's Alabama DTPA claim fails because the Second Amended Complaint alleges no facts showing that Pinon complied with the Alabama DPTA's pre-suit notice requirement. Defs.' Mem. at 34.

> At least 15 days prior to the filing of any action under this section, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be communicated to any prospective respondent by placing in the United States mail or otherwise. . . . The demand requirements of this subsection <u>shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state</u> . . . .

Ala. Code. § 8-19-10(e) (emphasis added). Plaintiffs contend that the pre-suit notice requirement does not apply because Defendants "do not maintain places of business nor keep assets in Alabama." Pls.' Opp'n at 38. Defendants do not respond to this argument, <u>see</u> Defs.' Reply at 20-21, indicating a lack of opposition to it. <u>See</u> <u>Kramer</u>, 306 F. Supp. 2d at 1221. Therefore, the Court finds that the pre-suit notice requirement does not apply.

Defendants next contend that the Alabama DTPA claim fails because the Second Amended Complaint does not allege "facts showing that Defendants knew of the alleged defect at the time [Pinon] purchased her vehicle." Defs.' Mem. at 35. "[T]he A[labama] DTPA is generally written to require some knowledge of false or deceptive conduct on the part of the wrongdoer." <u>Sam v. Beaird</u>, 685 So.

76

2d 742, 744 (Ala. Ct. App. 1996).  Pinon purchased her Mercedes vehicle in November 2016.  Second Am. Compl. ¶ 38.  As discussed in part III.E.4 of this Order, the allegations in the Second Amended Complaint, which must be taken as true at this stage of the proceedings, establish that Defendants knew about the Mars Red paint defects from paint testing completed before Pinon's vehicle was manufactured, from the June 12, 2014, TSB, and from consumer complaints posted before November 2016 to internet websites that Defendants monitored.

Defendants also contend that the Alabama DTPA claim fails because Pinon waived that claim by asserting the fraud and suppression claim.  See Defs.' Mem. at 35-36.  Under the Alabama DTPA, "[a]n election to pursue any civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under this chapter shall exclude and be a surrender of all rights and remedies available under this chapter."  Ala. Code. § 8-19-15.

"There is a split of authority on the question of whether a plaintiff can plead claims under both the A[labama] DTPA and common law—that is, on whether a plaintiff must make her 'election' under the savings clause at the pleading stage or may wait."  In re Atlas Roofing Corp., 2018 WL 2929831, at *5 n.60 (quoting In re

77

Gen. Motors LLC Ignition Switch Litig., 257 F. Supp. 3d 372, 405 (S.D.N.Y.

2017) (comparing cases interpreting this provision)).  This Court has reviewed

cases on both sides of this issue.  Compare Zeagler v. Custom Auto, Inc., 880 F.2d

1284, 1285 (11th Cir. 1989) (where the plaintiff sued for damages under Alabama

common law and the Alabama DTPA, "the [district] court ordered Zeagler to elect

a remedy under either one or the other theory, and the plaintiffs elected to proceed

under the A[labama] DTPA."); Carter v. L'Oreal USA, Inc., No. 2:16-CV-508-

TFM-B, 2019 WL 4786949, at *10 (S.D. Ala. Sept. 30, 2019) ("[P]ermitting

Plaintiffs to plead A[labama] DTPA in addition to their fraud claim would run

contrary to the plain language of the statute and enlarge a substantive right that is

limited by state law."); Phillips v. Hobby Lobby Stores, Inc., No. 2:16-CV-00837-

JEO, 2018 WL 4635734, at *8 (N.D. Ala. Sept. 27, 2018) ("A plaintiff cannot

pursue both a statutory or common law fraud claim together with a claim under

A[labama] DTPA."); with Barcal v. EMD Serono, Inc., No. 5:14-CV-01709-MHH,

2016 WL 1086028, at *5 (N.D. Ala. Mar. 21, 2016) ("Although the A[labama]

DPTA's savings clause would preclude Ms. Barcal from ultimately obtaining relief

under both the A[labama] DPTA and her common law claims, Federal Rule of

Civil Procedure 8 allows parties to plead alternative, even inconsistent, theories

. . . . Therefore, at this stage, the Court will allow Counts XXIV and XXVI to move forward as alternatively pled claims."); Collins v. Davol, Inc., 56 F. Supp. 3d 1222, 1227 n.2 (N.D. Ala. 2014) (alterations accepted, citation and internal quotation marks omitted) (Although the Alabama DTPA's savings clause provides for the plaintiff to make an election to sue for remedies under the A[labama] DTPA or the common law, "there is no prohibition against a plaintiff pleading two alternative, inconsistent and mutually exclusive claims although a plaintiff can recover under one of the remedies.")

This Court chooses to follow those cases in which the plaintiff was permitted to plead a violation of common law fraud and the Alabama DTPA alternatively, recognizing that, unless one or both the claims fall after motions for summary judgment, the plaintiff ultimately would have to make an election as to which claim to pursue.

> [A]lthough the options are "mutually exclusive," the provision explicitly allows a plaintiff to elect either of the two kinds of remedy. Thus, it makes no more sense to say that a plaintiff who pleads both kinds of claims has "procedurally waived" her claim under the A[labama] DPTA than to say that she has procedurally waived her claims under the common law.

In re Gen. Motors LLC, 257 F. Supp. 3d at 405 (citing Cheminova Am. Corp. v. Corker, 779 So. 2d 1175, 1183 (Ala. 2000) (noting that "the Act specifically states

that consumers are not prohibited from seeking redress under the common law or under other statutes for conduct that could be redressed under the Act")).  Indeed, "[a] party may state as many separate claims or defenses as it has, regardless of consistency."  FED. R. CIV. P. 8(d)(3).  It is well-settled that a plaintiff may pursue both a statutory and common law ground for relief from the same conduct.  See Pulliam v. Gulf Lumber Co., 312 F.2d 505, 507 (5th Cir. 1963)[16] (citations omitted, emphasis added) ("Clearly, unless and until it is either conceded or established that the parties are subject to the Alabama Workmen's Compensation Act, and hence that plaintiff has not substantive claim for damages for simple negligence, the plaintiff has a right to pursue both alternative claims.").

> Allowing [plaintiff] to *recover* on her A[labama] [DTPA] claim and her common law fraud claim would obviously enlarge her substantive rights contrary to the language of the Act's savings clause.  But the right to *plead* alternative, or even inconsistent, claims is not a matter of substance; it is a quintessential matter of procedure.  In short, while [plaintiff] will—at some point—need to make an "election" to pursue either her A[labama] [DTPA] claim or her common law fraud claims, the Court will not require her to do so now . . . .

In re Gen. Motors LLC, 257 F. Supp. 3d at 405-06.

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to Pinon's claim that Defendants violated the Alabama DTPA (Count Eight).

## H.   Violation of the Tennessee Consumer Protection Act (Count Nine)

In order to recover under the Tennessee Consumer Protection Act ("TCPA"), "a plaintiff must prove (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." Cloud Nine, LLC v. Whaley, 650 F. Supp. 2d 789, 797-98 (E.D. Tenn. 2009) (citation omitted).  "[T]he prima facie elements for a TCPA claim do not require that the deceptive act or practice be directed toward the plaintiff.  Instead, Tennessee courts have recognized that 'plaintiffs asserting claims under the TCPA are required to show that the defendant's wrongful conduct proximately caused their injury.'" Id. at 798 (citation omitted).

Defendants contend that Frankum's TCPA claim fails because the Second Amended Complaint does not plead facts showing that Defendants' wrongful conduct proximately caused their injury.  Defs.' Mem. at 37.  Defendants contend that the Second Amended Complaint does not indicate "that [Frankum] relied on any specific statements relating to the vehicles' Mars Red paint."  Defs.' Mem. at

38.  However, the Second Amended Complaint alleges that Frankum saw "ads touting that the Class Vehicles both new, certified pre-owned, and used were reliable, endurable, of good finish, of high fit, and exceptional quality" in newspapers, magazines, on social media, and on television, and "relied on Defendants' representations" in purchasing his vehicle.  Second Am. Compl. ¶¶ 91, 100.  It alleges that "[o]ne of the main and important reasons" that Frankum selected his vehicle "was the Mercedes Mars Red paint which [Defendants] touted extensively as a superior color and containing a clear coat which protected the vehicle."  Id. ¶¶ 90, 101.  It further alleges that had Frankum known that the paint on his Mercedes vehicles was defective, he "would not have bought" or "would have paid less for" his vehicle.  Id. ¶¶ 95, 104.[17]  These factual allegations indicate that Frankum relied upon Defendants' statements about the Mars Red paint.

In their Reply, Defendants also assert—for the first time—that Frankum's TCPA claim fails because "[t]he gravamen of [his] complaint is that Defendants breached their warranties by not providing adequate repairs for their vehicles."  See Defs.' Reply at 21.  "The Court will not consider these arguments raised for the first time in the reply."  Hoak v. Plan Admin. of Plans of NCR Corp., 389 F.

---

[17] See also supra n.15.

Supp. 3d 1234, 1246 n.5 (N.D. Ga. 2019) (citations omitted); see also United

States v. Ga. Dep't of Nat. Res., 897 F. Supp. 1464, 1471 (N.D. Ga. 1995)

(citations omitted) ("This court will not consider arguments raised for the first time

in a reply brief.").

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to

Frankum's claim that Defendants violated the TCPA.

## I.   Violation of the Louisiana Unfair Trade Practices and Consumer Protection Act (Count Ten)

The Louisiana Unfair Trade Practices and Consumer Protection Act

("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts

or practices in the conduct of any trade or commerce" and "authorizes private

lawsuits by anyone who suffers a loss of money or property 'as a result of the use

or employment by another person of an unfair or deceptive method, act, or practice

declared unlawful by [La. Stat. Ann. §] 51:1405.'"  Sistrunk v. Haddox, No. 18-

CV-00516, 2019 WL 4412439, at *3 (W.D. La. Sept. 12, 2019) (citing La. Stat.

Ann. § 51:1405(A)).  Defendants contend that Earley's violation of LUTPA fails

because it is time barred.  Defs.' Mem. at 38.

The LUTPA provides that, "[t]he action provided by this Section shall be

subject to a liberative prescription of one year running from the time of the

transaction or act which gave rise to this right of action."  La. Stat. Ann. § 51:1409

(2018).[18]  An amendment effective August 1, 2018, clarified that violations of

LUPTA are subject to "a liberative prescription" of one year.  See 2018 La. Sess.

Law Serv. Act 337 (West).

"The distinction is important because peremption means that the limitations

period cannot be suspended or interrupted.  In contrast, when claims are subject to

a prescriptive, rather than peremptive, period, prescription may be renounced,

interrupted, or suspended, and *contra non valentem* applies."  Tripp v. Pickens,

Civil Action No. 17-0542, 2018 WL 6072027, at *4 (W.D. La. Nov. 2, 2018)

(alterations accepted, citations omitted), report and recommendation adopted, 2018

WL 6072017 (W.D. La. Nov. 20, 2018); see also Trinity Med. Servs., L.L.C. v.

Merge Healthcare Sols., Inc., Civil Action No. 17-592-JWD-EWD, 2018 WL

3748399, at *8 (M.D. La. Aug. 7, 2018) (citations omitted) ("If the time limit

---

[18] "The statute [previously] did not specify whether the period was prescriptive or
peremptive.  In its 2002 decision in Tubos de Acero de Mexico, S.A. v. Am. Int'l
Inv. Corp., the Fifth Circuit held the period is peremptive.  In 2008, the Louisiana
Supreme Court, in Miller v. Conagra, Inc., explicitly refrained from deciding
whether the period is prescriptive or peremptive."  Jeanes v. McBride, Civil Action
No. 16-1259, 2019 WL 2387863, at *12 (W.D. La. June 4, 2019) (citing Tubos de
Acero de Mexico, 292 F.3d 471, 481-82 (5th Cir. 2002); Miller, 991 So. 2d 445,
456 (La. 2008)).

imposed by the statute is, in fact, a peremptive period, the doctrine of *contra non valentem* does not apply to LUPTA claims.  On the other hand, if the time limit imposed by La. R.S. § 51:1409(E) is a prescriptive period, as the statute itself indicates (and as the recent legislative changes to this statute indicate), then the doctrine of *contra non valentem* would apply to LUPTA claims.")

Earley purchased her vehicle in January 2015, discovered "a large spot on the right passenger side top that was missing the clear coat and the surrounding clear coat was flaking and bubbling" on November 27, 2018, and joined this lawsuit on January 31, 2019.  See Second Am. Compl. ¶¶ 106-07.  Defendants contend that the 2018 amendment does not revive Earley's LUTPA claim because the claim was extinguished when the preemptive period expired in January 2016. Defs.' Mem. at 39 n.12.  Plaintiffs contend that Earley's claim is not time barred because the 2018 amendment applies retroactively.  See Pls.' Opp'n at 39-40.

There is a split of authority on whether, prior to the 2018 amendment, the one-year period was peremptive or prescriptive, and on whether the 2018 amendment applies retroactively.  Compare Jeanes, 2019 WL 2387863, at *12 ("In this case, the legislative history of the 2018 LUTPA amendment sheds no light on whether the amendment was meant to have retroactive effect.  As a result, the [c]ourt follows the general principle that statutes regarding prescription and

peremption are procedural and have retroactive effect.  The [c]ourt hold[s] [that] the 2018 LUTPA amendment is interpretive and has retroactive effect.") and Tripp, 2018 WL 6072027, at *5 (citation omitted) ("[T]he 2018 amendment is procedural so, under Louisiana retroactivity principles, the clarified prescription period and related doctrine of continuing tort would apply to even claims that preexisted the amendment.") and Trinity Med. Servs., 2018 WL 3748399, at *9 ("Thus, the general rule of retroactive application for statutes contemplating prescriptive periods is appropriate in this case.  As a result, the analysis of the retroactivity of the amended statute weighs heavily in favor of considering the time period as a prescriptive one.  Therefore, the [c]ourt finds that La. R.S. § 51:1409(E) contemplates a one-year prescriptive period.") and Hunters Run Gun Club, LLC v. Baker, Civil Action 17-176-SDD-EWD, 2019 WL 3240044, at *5-6 (M.D. La. July 18, 2019) (agreeing with Trinity, Tripp, and Jeanes) and Congregation of Immaculate Conception Roman Catholic Church of Parish of Calcasieu v. Sam Istre Constr., Inc., 253 So. 3d 196, 201-02 (La. Ct. App. 2018) ("This suggests to us that the legislature always intended the time period to be prescriptive and that this amendment merely clarifies and interprets an existing law. . . . Further, as interpretive legislation does not establish new rights but merely determines the meaning of existing laws, it may be applied to facts occurring prior to its

86

promulgation.  Thus, we find the time period provided in La. R.S. 51:1409(E) for the filing of LUTPA claims to be prescriptive, rather than peremptive, and that the trial court did not err in so holding.") with CamSoft Data Sys., Inc. v. S. Elecs. Supply, Inc., 2019 CA 0730, 2019 WL 2865138, at *13 (La. Ct. App. July 2, 2019) (citations omitted) ("Although not specified by the statutory language, Louisiana jurisprudence has consistently held that the prescriptive period for a private action pursuant to LUTPA is peremptive.") (unpublished), rh'g denied, 2019 CW 0497 (La. Ct. App. Aug. 7, 2019) and Spurgeon v. Leleux, No. 6:11-CV-01807, 2019 WL 138388, at *12 (W.D. La. Jan. 8, 2019) ("The Court agrees with Defendants that the one-year period is peremptive."), appeal filed, Dennis Spurgeon v. Swift Grp., et al, No. 19-30028 (5th Cir. Jan. 11, 2019) and McDonald v. Orr Motors of Little Rock, Inc., 256 So. 3d 1132, 1337 (La. Ct. App. 2018) (citation omitted) ("Although the LUTPA states the action provided by the section 'shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action,' the language has been interpreted as creating a peremptive, rather than a prescriptive period.") and United States v. Cytogel Pharma, LLC, Civil Action No. 16-13987, 2018 WL 5297753, at *12 (E.D. La. Oct. 25, 2018) (citation omitted) ("Because the Louisiana Supreme Court has not ruled squarely on the issue, this Court is bound by the holding in Tubos that

LUTPA claims are subject to the peremptive period, but the continuing violation doctrine does apply.").

Given the plain language of the 2018 LUPTA amendment and the conflicting caselaw at the time it was enacted, this Court agrees with the decisions which hold that the legislature created a prescriptive period.  See 2018 La. Sess. Law Serv. Act 337 (West); Jeanes, 2019 WL 2387863, at *12; Tripp, 2018 WL 6072027, at *5; Congregation of Immaculate Conception Roman Catholic Church, 253 So. 3d at 201-02.  In addition, no binding authority holds that the 2018 amendment is not retroactive.  In the absence of a decision on this issue from the Supreme Court of Louisiana or the Fifth Circuit Court of Appeals, this Court is persuaded by the Louisiana Court of Appeal's reasoning in Congregation of Immaculate Conception Roman Catholic Church that "the legislature always intended the time period to be prescriptive and that this amendment merely clarifies and interprets an existing law" and "may be applied to facts occurring prior to its promulgation."  See Congregation of Immaculate Conception Roman Catholic Church, 253 So. 3d at 201-02; see also Jeanes, 2019 WL 2387863, at *12; Tripp, 2018 WL 6072027, at *5.

Earley brought her LUPTA claim just two months after discovering damage to her Mercedes' Mars Red paint.  See Second Am. Compl. ¶¶ 106-07.  Nothing

indicates that she could have, with reasonable diligence, discovered it earlier. "Consequently, the Court finds that Plaintiffs LUPTA claims have not prescribed under La. R.S. § 51:1409(E) due to the applicability of the discovery rule doctrine of *contra non valentem*." <u>Trinity Med. Servs.</u>, 2018 WL 3748399, at *10.  At this stage in the proceedings, this Court declines to find that Earley's LUTPA claim is time barred.

Defendants also contend that Earley's LUPTA claim fails because it does not meet Rule 9(b)'s heightened pleading requirements.  Defs.' Mem. at 40.  As discussed in part III.E.1 of this order, the Second Amended Complaint satisfies this heightened pleading standard at least with respect to those statements contained in the NVLWs and on Defendants' website.

Defendants further contend that Earley's LUPTA claim fails because "making misstatements or omissions about a vehicle's paint is not the kind of immoral or unscrupulous misconduct that amounts to a LUPTA violation."  <u>Id.</u> LUPTA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Stat. Ann. § 51:1405.

> It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition.  The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct "offends established public policy and is immoral,

unethical, oppressive, unscrupulous, or substantially injurious." . . .
[T]he range of prohibited practices under LUTPA is extremely narrow.

Cheramie Servs., Inc. v. Shell Deepwater Prods., Inc., 35 So. 3d 1053, 1059-60

(La. 2010) (alteration accepted, citations omitted).

> LUTPA does not prohibit sound business practices, the exercise of
> permissible business judgment, or appropriate free enterprise
> transactions. The statute does not forbid a business to do what everyone
> knows a business must do: make money. Businesses in Louisiana are
> still free to pursue profit, even at the expense of competitors, so long as
> the means used are not egregious. Finally, the statute does not provide
> an alternate remedy for simple breaches of contract. There is a great
> deal of daylight between a breach of contract claim and the egregious
> behavior the statute proscribes.

Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir. 1993) (citations

omitted). Defendants contend that because Earley's claims sound in breach of

warranty, Defendants' alleged misconduct does not give rise to a LUPTA claim.

Defs.' Mem. at 40.

Although Earley and the other Plaintiffs do allege that Defendants breached

the NVLWs, they also allege that Defendants engaged in fraud: Defendants knew

about the paint defect but concealed it and misrepresented the quality of the Class

Vehicles' Mars Red paint. See Second Am. Compl. ¶¶ 138-88, 207-13, 217-30,

254-71. Defendants' argument notwithstanding, the Second Amended Complaint

does not allege that Defendants merely made "misstatements" about the Class

Vehicles' paint.  The Second Amended Complaint alleges facts showing "unethical, . . .  unscrupulous, or substantially injurious" conduct that "offends established public policy."  See id.

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to Earley's LUPTA claim (Count Ten).

### J.     Violation of the Arkansas Deceptive Trade Practices Act (Count Eleven)

Plaintiffs assert that Defendants violated the Arkansas Deceptive Trade Practices Act ("Arkansas DPTA"), which outlaws "[t]he act, use, or employment by a person of any deception, fraud, or false pretense" and "[t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission[.]"  Ark. Code Ann. § 4-88-108.  Plaintiffs also claim that Defendants violated the catch-all provision of this statute by engaging in an unconscionable, false, or deceptive act or practice in business, commerce, or trade.  Second Am. Compl. ¶ 335 (citing Ark. Code Ann. § 4–88–107(a)(10)).

Defendants contend that Brown's Arkansas DTPA claim fails because it does not meet Rule 9(b)'s heightened pleading requirements.  Defs.' Mem. at 41. Defendants contend that the Second Amended Complaint "does not allege with

specificity that she relied on any particular misrepresentations about the Mars Red paint when she decided to purchase her vehicle." Id.  As discussed in part III.E.1 of this order, the Second Amended Complaint satisfies this heightened pleading standard at least with respect to those statements contained in the NVLWs and on Defendants' website.  The Second Amended Complaint also alleges that Plaintiffs relied upon the statements contained in the NVLWs and on Defendants' website. See Second Am. Compl. ¶¶ 141, 144-46.

Defendants also contend that Brown's Arkansas DTPA claim based on fraudulent concealment fails because, *inter alia*, the Second Amended Complaint does not adequately plead that Brown is in a "confidential or fiduciary" relationship with Defendants.  See Defs.' Mem. at 42.  Under Arkansas law, liability for fraud-based nondisclosure requires that the parties be in a special relationship.  See also White v. Volkswagon Grp. of Am., Inc., 2013 WL 685298, at *9 (W.D. Ark. Feb. 25, 2013) (citing Badger Capital, LLC v. Chambers Bank of N. Ark., 650 F.3d 1125, 1131 (8th Cir. 2011)) ("Arkansas courts appear to require the existence of some type of relationship or contact between the parties before they conclude that special circumstances exist.").  The Second Amended Complaint alleges only that Brown purchased her vehicle "in Arkansas."  Second Am. Compl. ¶ 77.  The 48-month warranty on Brown's 2011 Mercedes had

expired before her purchase in August 2017.  See 2011 NVLW at 11.  Nothing

indicates that Brown had a "relationship or contact" with Defendants at the time

she purchased her vehicle.

Accordingly, Defendants Motion to Dismiss Brown's violation of Arkansas

DPTA claim (Count Eleven) is **GRANTED IN PART and DENIED IN PART**.

The motion is **GRANTED** with respect to the dismissal of Brown's Arkansas

DTPA claim based on fraudulent concealment but in all other respects is **DENIED**.

### K.    Violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count Twelve)

Plaintiffs contend that Defendants violated the North Carolina Unfair and

Deceptive Trade Practices Act ("NCUDTPA") by engaging in a number of acts

constituting deceptive advertising and marketing which caused damages.  Second

Am. Compl. ¶¶ 362-68.  In order to state a claim under the NCUDTPA, a plaintiff

must allege: "(1) the defendant engaged in conduct that was in or affecting

commerce, (2) the conduct was unfair or had the capacity or tendency to deceive,

and (3) the plaintiff suffered actual injury as a proximate result of defendant's

deceptive statement or misrepresentation."  Robichaud v. Engage2Excel, Inc., No.

5:18-CV-00086-GCM, 2019 WL 2076561, at *2 (W.D.N.C. May 10, 2019)

(internal quotations omitted) (quoting Belk Inc., v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012)).

Defendants contend that Bryan's violation of NCUDTPA claim fails because it is based purely on an alleged economic loss and, thus, is barred by the economic loss rule.  Defs.' Mem. at 43.  "North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. . . . The courts have construed the term 'economic losses' to include damages to the product itself." Moore v. Coachmen Indus., Inc., 499 S.E. 2d 772, 780 (N.C. Ct. App. 1998) (citations omitted).  "[A]s recognized by the dissenting opinion in the Court of Appeals' Coker decision, the North Carolina appellate courts have not yet decided whether to extend the economic loss rule to claims based on frauds or unfair trade practices." Bussian, 411 F. Supp. 2d at 627 (citing Coker v. DaimlerChrysler Corp., 617 S.E.2d 306, 318 (N.C. Ct. App. 2005) (Hudson, J., dissenting), aff'd, 627 S.E.2d 461 (N.C. 2006)[19]); see also Ellis v. La.-Pac. Corp., 699 F.3d 778, 787 n.5 (4th Cir. 2012) (citation omitted) ("[T]he North Carolina courts have never addressed whether [NC]UDTPA claims are subject to the [economic loss rule].").

---

[19] The Coker court of appeals majority opinion "specifically decline[d] to address" whether the economic loss rule bars common law fraud or NCUDTPA claims.  See Coker, 617 S.E. 2d at 398.

94

"A few U.S. district courts in North Carolina have held that, while 'the economic loss rule may not bar *all* claims of unfair trade practices that allege only economic losses,' it does bar claims 'involving allegations of a defective product where the only damage alleged is damage to the product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims.'" Moodie v. Remington Arms Co., No. C13-0172-JCC, 2013 WL 12191352, at *12 (W.D. Wash. Aug. 2, 2013) (alterations accepted) (quoting Bussian, 411 F. Supp. 2d at 627); see Butcher v. DaimlerChrysler Co., No. 1:08CV207, 2008 WL 2953472, at *4 (M.D.N.C. July 29, 2008) ("It is clear from the pleadings that [p]laintiff's [NC]UDTPA claim is intertwined with allegations of a product defect, and he seeks damages only related to the product itself. . . . Plaintiff has pleaded no allegations that could stand separate and apart from the alleged product defect.  His [NC]UDTPA claim thus falls squarely within the [c]ourt's rationale in Bussian, and should be dismissed."); see also Duncan v. Nissan N. Am., Inc., 305 F. Supp. 3d 311, 326 (D. Mass. 2018) (citing Medeiros v. Lenovo (U.S.), Inc., No. 15-CV-10261-LTS, 2016 WL 500503, at *8 (D. Mass. Jan. 27, 2016)) ("[T]he sale of a product with some type of warranty agreement indicates that the parties have allocated the risk of defects in the product.  Moore

95

makes clear that where the parties have done so, the [NC]UDTPA does not provide

an additional remedy that would upset the balance struck by the parties.").

However, "[i]n the face of such uncertainty, [other] federal courts have

declined to extend the rule to bar [NC]UDTPA claims." Martin v. Bimbo Foods

Bakeries Dist., LLC, No. 5:15-CV-96-BR, 2015 WL 1884994, at *7 (E.D.N.C.

Apr. 24, 2015) (collecting cases); see also In re MyFord Touch, 46 F. Supp. 3d at

967 (citing Coker, 617 S.E. 2d at 319 (Hudson, J., dissenting)) ("[T]he consumer

protection statute here gives rise to a duty independent of the contract and therefore

should not be barred by the economic loss rule."); In re Chrysler-Dodge-Jeep

Ecodiesel Mktg., Sales Practice, and Prods. Liab. Litig., 295 F. Supp. 3d 927,

1020-21 (N.D. Cal. 2018) (citing In re MyFord Touch, 46 F. Supp. 3d at 967;

Coker, 617 S.E. 2d at 319 (Hudson, J., dissenting)) (holding that the economic loss

rule did not bar NCUDTPA claim); Moodie, 2013 WL 12191352, at *12 (same); In

re Caterpillar, Inc., C13 and C15 Engine Prods. Liab. Litig., No. 1:14-cv-3722

(JBS-JS), 2015 WL 4591236, at *36 (D.N.J. July 29, 2015) (citing Ellis, 699 F.3d

at 787; In re MyFord Touch, 46 F. Supp. 3d at 967) ("The Court agrees with the

courts in Ellis and In re MyFord Touch Consumer Litig. that this [c]ourt, sitting in

diversity, is not bound to find [p]laintiffs' North Carolina consumer protection

claims barred by the economic loss doctrine in the absence of clear direction from the North Carolina state courts.").

Defendants ask this Court to follow <u>Bussian</u> and apply the economic loss rule to bar Bryan's claim. <u>See</u> Defs.' Mem. at 44. However, the only North Carolina case that <u>Bussian</u> relied upon to conclude that the economic loss rule barred a NDUDTPA claim was the trial, not the appellate, court decision in <u>Coker</u>. <u>See</u> <u>Bussian</u>, 411 F. Supp. 2d at 626 (citing <u>Coker v. DaimlerChrysler Corp.</u>, No. 01 CVS 1264, 2004 WL 32676, at *3 n.3 (N.C. Super. Ct. Jan. 5, 2004)). The trial court's holding in <u>Coker</u> relied entirely on <u>Moore</u>, but <u>Moore</u> applied the economic loss rule only to negligence claims, not fraud claims. <u>See</u> <u>Coker</u>, 2004 WL 32676, at *3 (citing <u>Moore</u>, 499 S.E. 2d at 780); <u>see also</u> <u>Coker</u>, 617 S.E. 2d at 318 (Hudson, J., dissenting). Although the Court of Appeals of North Carolina and the Supreme Court of North Carolina affirmed the trial court's decision in <u>Coker</u>, the Court of Appeals did so on other grounds and specifically declined to address the economic loss rule. <u>See</u> <u>Coker</u>, 617 S.E. 2d at 314; <u>see also</u> <u>Bussian</u>, 411 F. Supp. 2d at 626 n.6. In the absence of a North Carolina appellate court decision so holding, this Court is hesitant to hold that the economic loss rule bars NCUDTPA claims in the products liability context. <u>See</u> <u>Ellis</u>, 699 F.3d at 787 n.5 (citation omitted) ("[I]n the absence of such direction, we are well-advised to rely on other

97

grounds."); <u>Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.</u>, 506 F.3d 304, 315 (4th Cir. 2007) ("[A]s a court sitting in diversity, we should not create or extend the North Carolina common law . . . .").

Furthermore, this Court is not persuaded that "the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims." <u>See generally</u> <u>Bussian</u>, 411 F. Supp. 2d at 627.  Bryan alleges that Defendants breached the NVLM and the implied warranty of merchantability by selling vehicles with defective paint and refusing to repair or repaint the vehicles without charge to the owners. <u>See</u> Second Am. Compl. ¶¶ 219, 221, 227.  Bryan alleges that Defendants violated the NCUDTPA "by failing to disclose and actively concealing the paint defect and, by marketing its vehicles as of high quality, and by presenting itself as a reputable manufacturer that stood behind their vehicles after they were sold." <u>Id.</u> ¶ 362.  Although the NCUDTPA and breach of warranty claims both relate to Mars Red paint on the Class Vehicles, the NCUDTPA claim arises from different actions—specifically, Defendants' concealment and marketing.  Bryan alleges more than a breach of warranty; he alleges conduct separate and distinct from any contractual duties.  Accordingly, at this stage in the proceedings the Court declines

to hold that Bryan's NCUDTPA claim is barred by the economic loss rule.  See
Bussian, 411 F. Supp. 2d at 627; In re MyFord Touch, 46 F. Supp. 3d at 967.

Defendants also contend that Bryan's NCUDTPA claim fails because the
Second Amended Complaint does not allege facts demonstrating proximate cause.
See Defs.' Mem. at 44 n.13.  "[U]nder North Carolina law 'what constitutes
proximate cause between a deceptive act and a plaintiff's damages remains
ambiguous.'  To be sure, however, proximate cause may be established by
evidence of reliance . . . ."  ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of
Pittsburgh, 472 F.3d 99, 126 (4th Cir. 2006) (quoting Gilbane Bldg. Co. v. Fed.
Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996)).  The Second
Amended complaint alleges that Bryan relied on Defendants' representations and
omissions.  See Second Am. Compl. ¶ 367.  It also alleges that Bryan relied upon
the statements contained in the NVLWs and on Defendants' website.  See id.
¶¶ 141, 144-46; see also 2015 NVLW at 20; 2014 NVLW at 19; 2013 NVLW at
17; 2011 NVLW at 17.  It specifically alleges that "[o]ne of the main and
important reasons" Bryan selected his vehicle was "the Mercedes Mars Red paint,
which Mercedes touted extensively as a superior color and containing a clear coat
which protected the vehicle" and that Bryan "relied on Defendants' representations
in making his purchase."  Id. ¶¶ 119-20.  Accepting these allegations and the

99

reasonable inferences from them as true, the Second Amended Complaint alleges

facts demonstrating proximate causation.

Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to

Bryan's violation of NCUDTPA claim (Count Twelve).

### L.    Equitable and Injunctive Relief (Count Three)

"In order to receive declaratory or injunctive relief, plaintiffs must establish

that there was a violation, that there is a serious risk of continuing irreparable

injury if the relief is not granted, and the absence of an adequate remedy at law."

Bolin v. Story, 225 F.3d 1234, 1242 (11th Cir. 2000) (citation omitted).  Plaintiffs

request that the Court order Defendants to, among other things, (1) repair the Class

Vehicles, (2) offer to repurchase the Class Vehicles, and (3) recall all vehicles with

the defective Mars Red paint.  Second Am. Compl. ¶ 232.  The requested

injunctive relief would flow from Plaintiffs' breach of warranty claims.  See id.

¶¶ 223, 230, 244, 247.  Plaintiffs also request injunctive relief for alleged violations

of Alabama's, Arkansas's, and North Carolina's consumer protection statutes.  See

id. ¶¶ 294(c), 354, 370(c).

Defendants contend that Plaintiffs' claims for equitable and injunctive relief

fail because (1) Plaintiffs have an adequate remedy at law as their injuries are

redressable by a damages award and (2) Plaintiffs have not alleged that they are

likely to be harmed in the future.  Defs.' Mem. at 45.  Plaintiffs respond that no

amount of money can redress the harm that the public will suffer if Defendants are

not ordered to repair all of the Class Vehicles, inform customers of the potential

defect with the Mars Red paint, recall the defective vehicles with the defective

paint, and stop marketing, advertising, selling, and leasing the Class Vehicles.

Pls.' Opp'n at 44-45 (citing Second Am. Compl. ¶¶ 232-33, 235).  Plaintiffs further

contend that they are likely to be harmed in the future because they currently own

and plan to keep defective vehicles and request a court order requiring their repair.

Id. at 45.

 The Court agrees with Defendants that Plaintiffs have an adequate remedy at

law.  Money damages can cover the cost of repairing the Class Vehicles,

repurchasing the Class Vehicles from Plaintiffs, and reimbursing Plaintiffs for their

leases.  The Court also agrees that Plaintiffs have not shown a serious risk of

continuing irreparable harm.  Defendants no longer offer vehicles painted Mars

Red.  Second Am. Compl. ¶ 54.  Nothing in the Second Amended Complaint

indicates that Defendants currently market, advertise, sell or lease vehicles painted

Mars Red.

 Accordingly, Defendants Motion to Dismiss is **GRANTED** with respect to

Plaintiffs' claims for equitable and injunctive relief (Count Three).

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss Second Amended Complaint [Doc. 18] is **GRANTED IN PART and DENIED IN PART**.  The motion is **GRANTED** with respect to the following claims, which are **DISMISSED**:

- Breach of Express Warranty (Count One);

- Breach of Implied Warranty (Count Two), except for the implied warranty claim brought by Plaintiff Lacresha Earley;

- Equitable and Injunctive Relief (Count Three);

- Violation of the Magnuson-Moss Warranty Act (Count Four), except for the implied warranty claim brought by Plaintiff Lacresha Earley;

- Unjust Enrichment (Count Five);

- Fraud and Suppression (Count Six), as to (1) Plaintiff Gary C. Klein, and (2) the fraudulent concealment claims of Plaintiffs Emily Pinon, Kim Brown, Todd Bryan, and Joshua Frankum; and

- Violation of the Arkansas Deceptive Trade Practices Act (Count Eleven), as to the fraudulent concealment claims.

The motion is **DENIED** with respect to the following claims:

- Plaintiff Lacresha Earley's claim for Breach of Implied Warranty in Count Two;

- Plaintiff Lacresha Earley's claim for violation of the Magnuson-Moss Warranty Act in Count Four;

- Fraud and Suppression (Count Six) as to (1) the fraudulent concealment claims of Plaintiff LaCresha Earley, and (2) the fraudulent misrepresentation claims of Plaintiffs Emily Pinon, Kim Brown, Joshua Frankum, LaCresha Earley, and Todd Bryan;

- Violation of Florida's Unfair and Deceptive Trade Practices Act (Count Seven);

- Violation of the Alabama Deceptive Trade Practices Act (Count Eight);

- Violation of the Tennessee Consumer Protection Act (Count Nine);

- Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (Count Ten);

- Violation of the Arkansas Deceptive Trade Practices Act (Count Eleven), as to all claims except for fraudulent concealment; and

- Violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count Twelve).

**IT IS SO ORDERED** this 4th day of November 2019.

_____

MARK H. COHEN
United States District Judge