## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **EMILY PINON, GARY C. KLEIN, KIM BROWN, JOSHUA FRANKUM, DINEZ WEBSTER, and TODD BRYAN, on behalf of themselves and all others similarly situated,**<br><br> **Plaintiffs,**<br><br> **v.**<br><br> **MERCEDES-BENZ USA, LLC, and DAIMLER AG,**<br><br> **Defendants.** | **CASE NO: 1:18-CV-03984-MHC** |

**DECLARATION OF PROFESSOR ROBERT KLONOFF IN SUPPORT OF OBJECTIONS BY ALEX ACUNA, BRIAN MADSEN, VANESSA MONTGOMERY, ROBERT MULL, HADIYA NELTHROPE, FREDRICK PARKER, ROBERT PONZIO, AND SAMUEL SALGADO TO THE CLASS ACTION SETTLEMENT PRELIMINARILY APPROVED BY THIS COURT ON MARCH 31, 2021**

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1. I have been asked by counsel for several objectors to opine on whether the proposed nationwide class settlement raises concerns regarding: (1) the underlying fairness of the settlement to members of the class under Fed. R. Civ. P. 23(e); (2) the adequacy of the class representatives under Fed. R. Civ. P. 23(a)(4); and (3) the adequacy of class counsel under Fed. R. Civ. P. 23(a)(4) and 23(g). I am offering my opinions for the Court's consideration based on my background and experience. I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II. QUALIFICATIONS

2. I have served as an expert in numerous class action cases.  I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014.  This is an endowed, tenured position at the rank of full professor.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time.  Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor.  Before joining the academy, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  For most of that time, I was an equity partner at the firm.  (I continued to work at Jones Day while I was employed at UMKC; my status with the firm during that period changed from partner to of counsel.)  While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center.  Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States.  Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit.  I received my law degree from Yale Law School.

3. In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure.

4. In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee").  The Advisory Committee considers and

recommends amendments to the Federal Rules of Civil Procedure.  Only one civil procedure professor in the United States is selected by the Chief Justice to serve in that role during any three-year term.  In May 2014, the Chief Justice reappointed me to serve a second three-year term on the Advisory Committee.  I completed that service in May 2017.  (The maximum period of service on the Advisory Committee is six years.)  I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23.  Those amendments—which are discussed in this Declaration—became effective on December 1, 2018.

5. I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*.  I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees. The ALI project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published by the American Law Institute in May 2010. It has been frequently cited by courts and commentators.[1]

---

[1] *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 71 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020); In *re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 331 (3d Cir. 2019); *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Keepseagle v. Perdue*, 856 F.3d 1039, 1069–70 (D.C. Cir. 2017) (Brown, J., dissenting); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 744, 749 (9th Cir. 2017); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1702 (2017); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Cabiness v. Educ. Fin. Solutions, LLC*, No. 16-cv-01109-JST, 2018 WL 3108991, at *8 n.4 (N.D. Cal. June 25, 2018); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Abbe R. Gluck &

6. I have more than 40 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court and numerous oral arguments in other federal and state appellate courts throughout the country, including oral arguments in eight federal circuits.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.

7. I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, Germany, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[2]

8. I co-authored the first casebook on class actions, and I am now the sole author of that book: *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017). I am also the sole author of the following texts: Robert H. Klonoff, *Federal Multidistrict Litigation*

---

Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. Rev. 1, 30 (2021); Myriam Gilles & Gary Friedman, *The Issue Class Revolution*, 101 B.U. L. Rev. 133, 139-140 (2021); Elizabeth Chamblee Burch & Margaret S. Williams, *Judicial Adjuncts in Multidistrict Litigation*, 120 Colum. L. Rev. 2129 , 2121-22 (2020); Brian T. Fitzpatrick, *Why Class Actions Are Something Both Liberals and Conservatives Can Love*, 73 Vand. L. Rev. 1147, 1153 (2020); Robert G. Bone, *In Defense of the Cy-Pres-Only Class Action*, 24 Lewis & Clark L. Rev. 571, 575 (2020); David L. Noll, *MDL As Public Administration*, 118 Mich. L. Rev. 403, 457 (2019); Andrew D. Bradt & D. Theodore Rave, *It's Good to Have the "Haves" on Your Side: A Defense of Repeat Players in Multidistrict Litigation*, 108 Geo. L.J. 73, 99 (2019); Richard Marcus, *Revolution v. Evolution in Class Action Reform*, 96 N.C. L. Rev. 903, 927–28, 933 n.161, (2018); Sergio J. Campos, *Mass Torts and Due Process*, 65 Vand. L. Rev. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 Tul. L. Rev. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. Cal. L. Rev. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 Colum. L. Rev. 599, 649–50 (2015).

[2] Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Exhibit A, p. 55).

*in a Nutshell* (West 1st ed. 2020); and Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 6th ed. 2020).  These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[3]  I am also the author of a chapter—focusing on the United States—for a textbook by Cambridge University Press on class actions throughout the world, entitled *The Cambridge Handbook on Class Actions* (Brian Fitzpatrick and Randall Thomas, editors, 1st ed. 2021).  In addition, I have authored or co-authored numerous scholarly articles on class actions and other topics.[4]  I have also served on the advisory board of the Class Action Litigation Report, a Bloomberg/BNA publication.

---

[3] *See, e.g.*, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing *Class Action Nutshell*); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing *Class Action Nutshell*); *LaRocque ex rel. Spang v. TRS Recovery Servs., Inc.*, 285 F.R.D. 139, 151 (D. Me. 2012) (citing *Class Action Nutshell*); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing *Class Action Nutshell*), *rev'd on other grounds*, 863 F.3d 1069 (8th Cir. 2017); Judge Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to Mdl Settlement*, 89 UMKC L. Rev. 971, 973-974 (2021) (citing *Federal Multidistrict Litigation Nutshell*); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. Rev. 280, 286 n.27, 291 n.65, 316 n.206 (2018) (citing casebook and *Class Action Nutshell*); Jaime Dodge, *Privatizing Mass Settlement*, 90 Notre Dame L. Rev. 335, 337 n.12 (2014) (citing casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 Loy. U. Chi. L.J. 445, 449 n. 17 (2012) (citing *Class Action Nutshell*); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 Harv. Envtl. L. Rev. 519, 521 n.10 (2003) (citing *Class Action Nutshell*).

[4] My writings have been frequently cited.  For example, my 2013 article, *The Decline of Class Actions*, 90 Wash. U. L. Rev. 729 (2013), has been cited dozens of times by courts and commentators.  *See, e.g.*, *Roland v. Annett Holdings, Inc.*, 940 N.W.2d 752, 769 (Iowa 2020); *McCreary v. Federal Bureau of* Prisons, 2020 U.S. Dist. Lexis 15310, at *46 (M.D. Pa. Jan. 29, 2020); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 & n.18 (3d Cir. 2018); *In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *LaRocque ex rel. Spang v. TRS Recovery Servs., Inc.*, 285 F.R.D. 139, 152 (D. Me. 2012); *Wendell H. Stone Co., Inc. v. PC Shield Inc.*, No. 18-cv-001135, 2018 WL 6065408, at *2 (W.D. Pa. Nov. 19, 2018); *In re Aetna UCR Litig.*, No. 07-cv-03541-KSH-CLW, 2018 U.S. Dist. LEXIS 111130, at *43 n.15 (D.N.J. June 30, 2018); *Dickens v. GC Services Limited Partnership*, 220 F. Supp. 3d 1312, 1324 (M.D. Fla. 2016), *vacated on other grounds*, 706

F. App'x 529 (11th Cir. 2017); *In re Kosmos Energy Ltd. Sec. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. Rev. 1, 60 (2021); Jason Iuliano, *The Student Loan Bankruptcy Gap*, 70 Duke L.J. 497, 538 (2020); Elysa M. Dishman, *Class Action Squared: Multistate Actions and Agency Dilemmas*, 96 Notre Dame L. Rev. 291, 311 (2020); Angela P. Harris & Aysha Pamukcu, *The Civil Rights of Health: A New Approach to Challenging Structural Inequality*, 67 UCLA L. Rev. 758, 800 (2020); Sunita Patel, *Jumping Hurdles to Sue the Police*, 104 Minn. L. Rev. 2257, 2262 (2020); Anne E. Ralph, *The Story of A Class: Uses of Narrative in Public Interest Class Actions Before Certification*, 95 Wash. L. Rev. 259, 278-79 (2020); Colin Crawford, *Access to Justice for Collective and Diffuse Rights: Theoretical Challenges and Opportunities for Social Contract Theory*, 27 Ind. J. Global Legal Stud. 59, 79 (2020); D. Brooks Smith, *Class Action and Aggregate Litigation: A Comparative International Analysis*, 124 Penn St. L. Rev. 303, 326-27 (2020); Daniel Wilf-Townsend, *Did Bristol-Myers Squibb Kill the Nationwide Class Action?*, 129 Yale L.J. Forum 205, 206 (2019); Pamela K. Bookman, *The Arbitration–Litigation Paradox*, 72 Vand. L. Rev. 1119, 1143 n.146 (2019); David C. Miller, *Abuse of Discretion and the Sliding Scale of Difference: Restoring the Balance of Power Between Circuit Courts and District Courts for Rule 23 Class Certification Decisions in Oil and Gas Royalty Litigation*, 103 Iowa L. Rev. 1811 *passim* (2018); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. Rev. 280, 297 n.101 (2018); Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. Rev. 1251, 1261 n.39, 1266 n.78, 1286 n.196 (2018); Joseph A. Seiner, *Tailoring Class Actions to the On-Demand Economy*, 78 Ohio St. L.J. 21, 25 n.14, 32 n.54 (2017); Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique*, 92 Notre Dame L. Rev. 1977, 1979 (2017); Deborah R. Hensler, *From Sea to Shining Sea: How and Why Class Actions Are Spreading Globally*, 65 Kan. L. Rev. 965, 965 n.2 (2017); Richard Marcus, *Bending in the Breeze: American Class Actions in the Twenty-First Century*, 65 DePaul L. Rev. 497, 497 & n.2 (2016); Maureen Carroll, *Class Action Myopia*, 65 Duke L.J. 843, 846 n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 Geo. Mason L. Rev. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. Rev. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 Geo. Wash. L. Rev. 651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 Colum. L. Rev. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 Wash. U. L. Rev. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 Emory L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 Emory L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. Pa. L. Rev. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 Fordham L. Rev. 2769, 2775 n. 38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. Rev. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 Vand. L. Rev. 1183, 1186 n.5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 Notre Dame L.

9. In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

10. I have testified as an expert (in person or by declaration) in numerous class action cases and in other cases raising civil procedure issues.  Between 2011 and the present, I testified in the following cases:

- *Rosas et al. v. Sarbanand Farms, LLC., et al,* No. 2:18-CV-0112-JCC (W.D. Wa.)(submitted expert declaration, dated 4/19/20, opining that a final fairness hearing under Fed. R. Civ. P. 23(e) can be conducted telephonically);

- *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) (submitted expert declaration on attorneys' fees on 10/29/19; submitted supplemental expert declaration on class settlement terms on 12/15/19), *aff'd in relevant part, In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 20-10249, 2021 WL 2250845 (11th Cir. June 3, 2021).

- *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices &Products Liability Litigation*, No. 3:17-md-02777-EMC (N.D. Cal.) (submitted expert declaration on settlement fairness dated 4/25/19);

- *The Doan v. State Farm General Insurance Co.*, No. 1-08-CV-129264 (Cal. Sup. Ct. Santa Clara Cnty.) (submitted expert declaration on settlement fairness, attorneys' fees, expenses, and incentive payments dated 1/16/19);

- *In re Syngenta AG MIR162 Corn Litigation*, No. 2:14-MD-02591-JWL-JPO (D. Kan.) (submitted expert declaration on attorneys' fees, expenses, and incentive payments dated 7/10/18; submitted supplemental declaration dated 8/17/18);

---

REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declarations on attorneys' fees issues dated 05/04/17 and 08/01/18);

- *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC (N.D. Cal.) (submitted expert declaration on class certification, settlement fairness, attorneys' fees, expenses, and incentive payments dated 1/19/18; submitted supplemental declaration dated 5/21/18);

- *Lynch v. Lynch*, No. F.D. 14-6239-006 (Pa. Ct. Comm. Pl., Allegheny Cnty.) (submitted expert declaration on the nature of class action law practice in the context of a divorce proceeding involving a class action attorney, dated 9/05/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements, dated 4/28/17);

- *State of Louisiana & Vermilion Parish School Board v. Louisiana Land & Exploration Co., et al.,* No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues dated 1/24/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 2.0-liter settlement, dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of U.S. federal appellate courts in the factfinding process, dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement, dated 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Ltd.*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law, dated 9/3/15);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments dated 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness dated 11/12/14);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness dated 2/13/13; submitted supplemental declaration dated 2/19/13; testified in court on 2/20/13);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("*Deepwater Horizon*") (submitted expert declarations on class certification, settlement fairness, and attorneys' fees for the economic and property damages settlement (Doc. No. 7104-3) and class certification, settlement fairness, and attorneys' fees for the personal injuries settlement (Doc. No. 7111-4), both dated 08/13/12; submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4: economic) and (Doc. No. 7728-2: medical), both dated 10/22/12);

- *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted expert declaration on attorneys' fees dated 2/20/12; gave deposition testimony on 3/7/12; testified in court on 4/11/2012); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litigation*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on settlement fairness (Doc. No. 163-3) and attorneys' fees and incentive payments (Doc. 164-1), both dated 03/08/11; testified in court on 3/10/11).

11.  Courts reviewing class action settlements and attorneys' fees issues have relied extensively on my testimony.  For example, in the *Deepwater Horizon* MDL litigation, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his two opinions analyzing class certification and fairness.[5]  In

---

[5] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages

a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in connection with a class settlement involving Transocean and Halliburton).[6]  In the *Volkswagen Clean Diesel* MDL litigation, Judge Charles Breyer repeatedly cited and quoted my two Declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant, Bosch.[7]  In the *Syngenta GMO Corn* MDL litigation, Judge John Lungstrum cited my two Declarations (on attorneys' fees issues) numerous times in his two opinions.[8]  Indeed, Judge Lungstrum credited my opinions on attorneys' fees over the contrary opinions of five experts retained by various objectors.[9]  In the *Equifax Data Breach* case, Judge Thrash considered various expert reports regarding the fairness of the class action settlement and the reasonableness of the attorneys' fees requested by class counsel; he noted that my report was "particularly helpful."[10]  In the *AT&T Mobility* MDL litigation, Judge Amy St.

---

settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[6] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17);   *available   at*   http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29.pdf (last visited July 7, 2018).

[7] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

[8] *See In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 26, 32 & n.11, 34 n.13 (D. Kan. Dec. 12, 2018) (Dkt. No. 3849) (granting final approval of class settlement and awarding total attorneys' fees); *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 9–11 & n.6 (D. Kan. Dec. 31, 2018) (Dkt. No. 3882) (allocating attorneys' fees among common benefit counsel and individually retained private attorneys).

[9] *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, slip op. at 9–11 (D. Kan. Dec. 31, 2018) (Dkt. No. 3882).

[10] *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part,* No. 20-10249, 2021 WL 2250845 (11th Cir. June 3, 2021)

Eve (now a Judge on the Seventh Circuit) cited and quoted my Declarations more than 20 times in approving a class settlement and awarding attorneys' fees.[11]  In the *Wells Fargo Unauthorized Accounts* litigation, Judge Vince Chhabria cited my testimony in ordering that objectors to the class settlement post an appeal bond.[12] And in *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[13]

12. I am being compensated at the rate of $985 per hour.  My fee is not contingent on the substance of my opinions.

13. Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Exhibit A, p. 55).

## III. MATERIALS RELIED UPON

14. In addition to relying upon cases and materials in other class actions, I have relied upon numerous documents in the instant case and in *Ponzio v Mercedes-Benz U.S., LLC*, Civil Action No. 18-12544 (D.N.J.).  *See* Exhibit B, p. 71 (listing those documents).

## IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT[14]

15. This Court is thoroughly familiar with the background of this litigation.  Thus, I focus only on those facts that bear on my opinions.  The factual statements in this Declaration are based

---

[11] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[12] *See Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, slip op. at 14 (N.D. Cal. June 14, 2018) (Dkt. No. 271), *available at* https://www.courthousenews.com/wp-content/uploads/2018/06/Wells-Fargo-settlement.pdf.

[13] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7, *available at* http://lawzilla.com/blog/janet-skold-et-al-vs-intel-corporation/.

[14] In citing docket entries, I cite to the page numbers assigned by the Court's CM/ECF system.

on the case-specific materials I have reviewed, which are listed in Exhibit B, as well as on additional publicly available materials that I have reviewed.

16. On August 8, 2018, a group of plaintiffs and class counsel brought a putative class action lawsuit in U.S. District Court in New Jersey alleging that defendant Mercedes Benz USA (Mercedes) sold various vehicles originally painted with 590 Mars Red paint, a product that allegedly has a propensity to blister, peel, and bubble, leading to rusting and corrosion. *Ponzio v. Mercedes-Benz U.S., LLC*, Civil Action No. 18-12544 (D.N.J. Aug. 8, 2018), *Ponzio* Doc. 1. The focus of the case was on the states of California, Florida, Kansas, New Jersey, New York, and North Carolina, with class representatives from those states. *Id.* Thirteen days later, the instant suit was brought in this Court. *Pinon* Doc. 1. The instant case alleges a nationwide class, with subclasses (and class representatives) from Alabama, Arkansas, Florida, Louisiana, North Carolina, and Tennessee. Doc 48-1 at 6.

17. Class counsel in the instant case maintain that they were unaware of the *Ponzio* suit at the time they filed the instant action. Doc. 48-1 ¶ 4, citing Garrison Decl. ¶ 8. Assuming that this is true, it suggests that these experienced class counsel did not even do a basic Internet search before filing a major lawsuit to determine if other cases had previously been filed raising the same or similar claims. Had they conducted such a search, they would have immediately discovered several reports of the previously-filed *Ponzio* case. *See, e.g.,* https://www.carcomplaints.com/news/2018/mercedes-benz-mars-red-paint-defect-lawsuit.shtml (detailed report of the *Ponzio* case, dated August 9, 2018); https://topclassactions.com/lawsuit-

settlements/lawsuit-news/854614-mercedes-benz-class-action-alleges-paint-defect-leads-corrosion/ (same).[15]

18. On October 24, 2018, plaintiffs filed their First Amended Complaint. Doc. 7.

19. On January 31, 2019, plaintiffs filed their Second Amended Complaint. Doc. 16. On November 4, 2019, this Court ruled on defendants' Motion to Dismiss the Second Amended Complaint. Doc. 25. Although the Court dismissed certain counts, it allowed numerous other counts to go forward, including fraud—a count that requires heightened pleading under Fed. R. Civ. P. 9(b).

20. Both *Ponzio* and the instant case went forward on discovery and motions practice.

21. On March 23, 2020, the Court in *Ponzio* appointed James Cecchi, Caroline Bartlett, Jason Alperstein, and Steve Calamusa as Interim Lead Counsel (hereafter *Ponzio* Interim Class Counsel) pursuant to Fed. R. Civ. P. 23(g). *Ponzio* Doc. 57 at 1. Among the responsibilities of *Ponzio* Interim Class Counsel was to "conduct settlement negotiations on behalf of Plaintiffs and the putative Classes[.]" *Id.*

22. On April 6, 2020, W. Lewis Garrison, Jr., James McDonough, III, and Taylor Bartlett of Henniger Garrison Davis, LLC sought appointment in the instant case as Interim Lead Class Counsel under Rule 23(g). In doing so, they limited their appointment to the classes "for which the *Ponzio* Action lacks standing or representation," and thus did not seek appointment for the

---

[15] Class counsel in *Ponzio* maintain not only that class counsel in the instant case knew about *Ponzio* when they filed the instant case, but that they copied much of the language from the *Ponzio* complaint (and that the degree of plagiarism increased with each successive amended complaint). Doc. 72 at 6. Class counsel in the instant case deny those accusations and accuse the *Ponzio* class counsel of plagiarism based on a pre-*Ponzio* case. Doc. 76 at 5-6. Resolution of this dispute is not essential to my Declaration, and I therefore offer no opinion on whether either side committed plagiarism.

classes involving California, Kansas, New Jersey, or New York.  Doc. 48-1 at 3.[16] Those attorneys "happily" promised—in seeking Rule 23(g) appointment—to "coordinate efforts with counsel for the *Ponzio* plaintiffs," and asserted that "they have already attempted to do" so. Doc. 48-1 at 16.

23. On April 28, 2020, this Court appointed Garrison, McDonough, and Bartlett as Interim Lead Counsel (hereafter *Pinon* Interim Class Counsel) "for the Plaintiffs and putative classes they purport to represent."  Doc. 49 at 2.  In its order, this Court specified that "Interim Lead Counsel … shall be charged with coordinating with" Interim Class Counsel in *Ponzio*.[17]

24. At various points in time, *Pinon* Interim Class Counsel amended their complaint. Of particular relevance here is the Third Amended Complaint, Doc. 55, filed on June 22, 2020—the operative complaint at the time the Settlement at issue was reached.  Doc. 55.  Encompassed within the complaint were numerous "Class Vehicles," *i.e.,* numerous years of a variety of Mercedes models.  Doc. 55 ¶ 3.  The class was defined to be a nationwide class, although there were only six class representatives (one each from Alabama, Arkansas, Florida, Louisiana, North Carolina, and Tennessee). Doc. 55 ¶ 227.

25. According to the Third Amended Complaint, repairing and repainting the vehicles would cost at least $7,000 and as much as $11,300.  Doc. 55 ¶¶ 53, 93, and 122.  Moreover, sanding and repainting the vehicle a different color would, according to the complaint, "substantially depreciate the value of the vehicle."  Doc. 55 ¶ 53.  The Third Amended Complaint repeatedly

---

[16] Whether class counsel in the instant case sought appointment as Interim Class Counsel with respect to the Florida and North Carolina class members is unclear; both *Ponzio* and the instant case encompassed class representatives and class members from Florida and North Carolina.  Doc. 48-1 at 17.

[17] *Pinon* Interim Class Counsel concede that this Court's order required them to "'coordinat[e]' with *Ponzio* counsel" not just for discovery but "generally." Doc. 76 at 26.

alleges that repainting the vehicle would not be adequate.  For instance, the complaint alleges that Mercedes had already "agreed to repaint [class representative Gary] Klein's car," but that such a remedy was "insufficient" for at least seven reasons: "1) the new paint is not 'Mars Red' but a lesser quality different looking 'red,' 2) repainting a car substantially decreases its value, 3) the repainting is done by hand and not by robots in a sterile environment at the factory thus preventing the same finish originally promised, 4) the bumpers are not repainted to match which leaves their color different from the repainted metal, 5) the repair process takes at least one month to complete, 6)  Klein is substantially inconvenienced, and 7) Klein will be unable to resell his Class Vehicle at fair market value as it will be branded forever as 'repainted.'"  Doc. 55 ¶ 73.  *See also, e.g.,* Doc. 55 ¶ 105 (allegation that "Mercedes had agreed to repaint [then-class representative] Pearsall's car" but that such remedy was "insufficient" for the same seven reasons); ¶ 138 ("Defendants … offer lower values for cars with paint problems such as those on the Class Vehicles.").

26. Indeed, the Third Amended Complaint has an entire section, consisting of 10 paragraphs (¶¶ 202-211), explaining that repainting is an "inadequate remedy" and "does not remedy the diminution of value that occurs as a result of the repainting."  ¶ 202 (all caps heading omitted).  The complaint notes that "[e]ven if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint," and because "there is a stigma associated with a repainted vehicle, especially from a luxury brand like Mercedes …." ¶ 205.  Moreover, "anticipated car purchasers often shy away from a vehicle that has been repainted …." ¶ 206.  And the complaint notes that "the Kelley Blue Book (KBB) value of vehicles depends, *inter alia,* on whether a vehicle has been repainted."  ¶

210. The complaint thus concludes that all class members suffered "a diminution in value, whether [their cars] are re-painted or not." ¶ 219.[18]

27. Finally, the Third Amended Complaint contains numerous detailed allegations, spread out over 50 paragraphs, supporting the claim that Mercedes knew about the flaws concerning Mars Red paint but willfully concealed the problem.  Doc. 55 ¶¶ 151-201.

28. According to *Pinon* Interim Class Counsel, "[t]he *Pinon* Plaintiffs first broached the topic of settlement in February 2020," Doc. 70 at 20, two months before seeking appointment as Interim Class Counsel. According to those attorneys, "Defendants did not express a corresponding interest until September 2020, when settlement negotiations began in earnest."  Doc 70 at 20.  *See also* Doc. 92 at 11 ("intensive discussions" with Mercedes began "two months before the mediation"). On November 9 and 12, 2020, *Pinon* Interim Class Counsel and Defendants participated in mediation sessions before retired Federal District Judge James Holderman. Doc. 70 at 20-21. The parties reached agreement on the terms of the settlement, and Mercedes agreed not to oppose attorneys' fees of "up to $4,750,000[.]" Doc. 70-1 ¶ 5.3.

29. *Pinon* Interim Class Counsel do not dispute that at no time during the months of settlement negotiations (including the mediation sessions) did they notify *Ponzio* Interim Class Counsel of these negotiations, even though the negotiations encompassed states in which only

---

[18] This is not the only case in which class counsel have emphasized the importance of a diminution in value remedy.  For instance, in the pending case of *Callen v. Daimler AG et al.* No. 1:19-cv-01411 (N.D. GA. 2020), plaintiffs alleged breach of contract and deceptive trade practices involving Mercedes' interior burled walnut veneer wood finish trim. First Am. Compl. ¶ 2. (ECF No. 16). The primary relief sought by class counsel (from Heninger Garrison Davis) was diminution of value, and the complaint explained why repairing or replacing the interior trim would not suffice.  *See, e.g.,* ¶¶ 201, 203, 216 of the *Callen* complaint.

class counsel in *Ponzio* had been designated as Interim Class Counsel. *See* ¶ 16 above. Although *Pinon* Interim Class Counsel maintain that they could not do so because of a protective order that was in place that did not include *Ponzio* Interim Class Counsel, Doc. 76 at 6, I have seen nothing to suggest that *Pinon* Interim Class Counsel sought assistance from this Court so they could involve *Ponzio* Interim Class Counsel in the negotiations or that they asked the mediator, Judge Holderman, to assist with this Court to ensure that *Ponzio* Interim Class Counsel could sit at the settlement table.

30. In December 2020, Mercedes and *Pinon* Interim Class Counsel executed a Class Settlement Agreement and Release (hereafter, the Settlement), which was filed with this Court on December 21, 2020. Doc. 70-1.  The agreement defined the "Settlement Class" as (with certain narrow exclusions) "all current owners, former owners, current lessees, and former lessees of Subject Vehicles who purchased or leased their Subject Vehicle in the United States." ¶ 1.30. "Settlement Class Member" is defined as "any Person who falls within the definition of the Settlement Class who has not timely and properly elected to opt out pursuant to Section 8.12 …." Heninger Garrison Davis, LLC. ¶ 1.31. "Subject Vehicle," in turn, is defined by ¶ 1.35 as "any Mercedes-Benz originally painted with 590 Mars Red paint and purchased or leased in the United States." That paragraph elaborates that "590 Mars Red paint was offered as an option for the following Mercedes-Benz vehicle types in the United States: C-Class (model years 2004-2015); GLK-Class (model years 2010-2015); CLS-Class (model years 2006-2007, 2009, 2014); CLK-Class (model years 2004-2009); S-Class (model years 2008, 2015, 2017); SL-Class (model years 2004-2009, 2011-2017); CL-Class (model years 2005-2006, 2013-2014); SLS-Class (model years 2014-2015); E-Class (model years 2005-2006, 2010-2017); G-Class (model years 2005, 2011-

17

2017); GT-Class (model years 2016-2018); SLC-Class (model years 2017); SLK-Class (model years 2005-2016); and Maybach 57 (model year 2008)."

31. Because the Settlement includes not only current owners and lessees of qualifying Mercedes vehicles, but also former owners and lessees, the class is much larger than the 69,115 Subject Vehicles involved. Doc. 92-2 at 17. For example, assuming that a qualifying 2004 Mercedes C-Class exchanged hands every six years, [19] at least two former owners (as well as the current owner) would be class members for that given vehicle. Thus, the Settlement, and the remedies it purports to provide, will impact well over 100,000 class members. Doc. 92 at 13.

32. In exchange for class members' release of all claims relating to Mars Red paint, *see* Doc. 70-1 ¶¶ 6.1-6.8 (release provisions for class members who do not opt out), class members are potentially eligible for certain benefits. First, the Settlement provides reimbursement for certain qualified repainting jobs previously performed on Subject Vehicles. Doc. 70-1 ¶¶ 4.1-4.3.  Second, the Settlement provides for reimbursement in some circumstances for some or all of the costs for repainting work on Subject Vehicles to be performed in the future. The Settlement contains a tiered structure that considers both the number of years and the number of miles on the vehicle since its "in-service date," which is "the date that the Subject Vehicle was first purchased or leased by any customer from an authorized Mercedes-Benz dealership." *Id.* at ¶ 1.16. Some class members will be covered for 100 percent of the cost of repainting, which (as noted in ¶ 25 above) can amount to

---

[19] *See How long do people keep different car brands?*, Cartelligent, https://cartelligent.com/blog/how-long-do-people-keep-different-car-brands/ (stating that the average Mercedes owner keeps their vehicle for 5.6 years); *Passing the Test of Time: Cars Owners Keep for a Decade or Longer*, Forbes, https://www.forbes.com/sites/jimgorzelany/2017/01/04/passing-the-test-of-time-cars-owners-keep-for-a-decade-or-longer/?sh=142af91b5263 (stating that the average car owner keeps their vehicle for 6.5 years).

more than $10,000.  Some will receive 50 percent coverage (and must absorb the other 50 percent). Some will receive 25 percent coverage (and must absorb the other 75 percent).  And some will receive *nothing*, even though they will be bound by the judgment and will release any and all claims relating to Mars Red paint and the Subject Vehicles unless they affirmatively opt out.

33. Specifically, ¶ 4.4 provides:

a) For a Subject Vehicle needing a Qualified Future Repair fewer than 7 years (84 months) or 105,000 miles from the Subject Vehicle's original In-Service Date, whichever occurs first, a Settlement Class Member presenting his or her Subject Vehicle at an Authorized Service Center with a qualifying claim will be covered for **100%** of the cost to perform the repair defined in LI98.00-P058914 (report of painting instructions for repainting vehicles with 590 Mars Red, Doc. 70-1, at 15);

b) For a Subject Vehicle needing a Qualified Future Repair that does not fall within Section 4.4(a) and that is fewer than 10 years (120 months) or 150,000 miles after the Subject Vehicle's original In-Service Date, whichever occurs first, a Settlement Class Member presenting his or her vehicle at an Authorized Service Center with a qualifying claim will be covered for **50%** of the cost to perform the repair defined in LI98.00-P058914;

c) For a Subject Vehicle needing a Qualified Future Repair that does not fall within Sections 4.4(a) or 4.4(b) and that is fewer than 15 years (180 months) or 150,000 miles after the Subject Vehicle's original In-Service Date, whichever occurs first, a Settlement Class Member presenting his or her vehicle at an Authorized Service Center with a qualifying claim will be covered for **25%** of the cost to perform the repair defined in LI98.00- P058914;

d) For a Subject Vehicle needing a Qualified Future Repair that, at the time of the Settlement Notice Date, is more than 15 years (180 months) or 150,000 miles after the Subject Vehicle's original In-Service Date, whichever occurs first, a Settlement Class Member may submit documentary evidence showing that (i) he or she presented the Subject Vehicle to an Authorized Service Center for a qualifying repair or provided notice to Defendants at a time when the vehicle had less than 15 years (180 months) and 150,000 or fewer miles (the "Presentment Date"), and (ii) that he or she was denied warranty or goodwill coverage for such repair at the time. Such Settlement Class Member shall be entitled to submit to the Settlement Administrator by mail or through electronic version on the settlement website a completed and signed Qualified Future Repair Claim Form with supporting documentation to determine future coverage eligibility within the Claims Period set forth in Section 9.4, using the mileage and years in service (from the In-Service Date) the Subject Vehicle had on the Presentment Date. In the event such claim is approved, the Settlement Class Member shall arrange for a Qualified Future Repair

to be performed within 90 days of said approval, subject to the Requirements of Section 9.B. The percentage of coverage provided by Defendants shall be determined by the age and mileage of the Subject Vehicle at the time it was originally presented for the qualifying repair or notice was given to Defendants as shown by the documentary evidence submitted by the Settlement Class Member, using the sliding scale set forth in Section 4.4(a), 4.4(b) and 4.4(c).

e) **For a Subject Vehicle needing a Qualified Future Repair that does not fall within Section 4.4(d) and that is more than 15 years (180 months) or 150,000 miles after the Subject Vehicle's original In-Service Date, whichever occurs first, Defendants shall not be required to offer any coverage.** (Bold type added.)

34. Thus, under the Settlement, the only class members who receive 100 percent reimbursement are those whose Subject Vehicle have both less than seven years and less than 105,000 miles from the vehicle's original in-service date. Even aside from mileage restrictions, many of the Subject Vehicles will not qualify—the Subject Vehicles include cars as old as 2004, and thus were originally put into service well over seven years ago. *See* ¶ 30 above. The second period, which allows 50 percent reimbursement, is limited to in-service period of between seven and ten years, or less than 150,000 miles from the original in-service date, whichever occurred first. *See* ¶ 33 above. Again, even putting aside mileage limitations, many of the Subject Vehicles—which date back to 2004—will not qualify. The third period, which provides only 25 percent reimbursement of the cost of repainting, is limited to the period of between ten and fifteen years, or 150,000 miles or more, from the original in-service date. *See* ¶ 33 above. Again, many Subject Vehicles—which date back to 2004—will not qualify based on in-service date alone, and many will separately not qualify because of the mileage limitations.[20] And assuming average yearly miles of 12,000,[21] a typical vehicle would be ineligible on mileage grounds alone

---

[20] I suspect that relatively few class members with otherwise disqualified vehicles will be able to prove, pursuant to Section 4.4(b), that they made a claim and were denied relief *during* the time their vehicles still qualified for relief.

[21] *See, e.g., What is Good Mileage on a Used Car?*, Mercedes-Benz of Charleston, https://www.mercedesbenzofcharleston.com/finance/car-buying-tips/good-used-car-mileage/

approximately 12.5 years after the original in-service date, and vehicles driven more than 12,000 miles per year would be disqualified even sooner. No doubt, there are a significant number of Mercedes owners who put more than 12,000 miles per year on their vehicles. [22]   For instance, a vehicle driven 25,000 miles per year would have been excluded on mileage grounds alone shortly after six years from the in-service date.

35. In connection with those class members who currently own a Subject Vehicle but are not entitled to any relief under the Settlement, the Settlement says that "Defendants shall not be required to offer any coverage" to such class members, Part E. This language suggests that Defendants might voluntarily offer a remedy to class members who do not qualify for one under the Settlement.  But a remedy that is entirely at the mercy of Mercedes is not a reliable remedy. Indeed, the Long Form Notice to class members makes clear that, absent presentment prior to 15 years or 150,000 miles after in-service, **"[t]he cost for future repairs occurring after the end of Period Three [coverage at 25 percent] will not be covered …."** Doc. 70-7 at 70 (emphasis added).

36. Moreover, it cannot be reasonably be said that even close to all class members in Period Three (those reimbursed for 25 percent of the cost of the repainting under ¶ 4.4(c)) will realistically receive any benefits.  In many instances, the Bluebook value of the vehicles will be less than the amount that the class member must pay out-of-pocket (75 percent out-of-pocket for the repainting).

---

(Mercedes dealership noting that the average driver puts on 12,000 miles/year); U.S. Department of Transportation, *Average Annual Miles per Driver by Age Group*, Federal Highway Administration (March 29, 2018), https://www.fhwa.dot.gov/ohim/onh00/bar8.htm (study from U.S. Department of Transportation as of 2018, for drivers generally (not just Mercedes), citing average yearly mileage of 13,476).

[22] Indeed, accruing high mileage on a Mercedes is a badge of honor that entitles the owner to corporate recognition. C*lassic Car Events & Community*, Mercedes Benz USA https://www.mbusa.com/en/classic-center/events-and-communities (noting the Mercedes-Benz "High Mileage Award" given to owners who have driven at least 155,000 miles in their vehicles).

As noted in ¶ 25, the cost of the repainting may exceed $10,000, meaning that the class member's out-of-pocket portion may exceed $7,500, an amount greater than the Bluebook value of many of the Subject Vehicles.  Some examples will illustrate the point:[23]

- A 2010 Mercedes GLK-Class 350 4Matic Sport would qualify for 25 percent of the repainting cost if its in-service date is 2010 or later and it has less than 150,000 miles. But the Bluebook value of such a vehicle in "good" condition would only be $6,904.

- A 2010 Mercedes C-Class 350 Sport Sedan would qualify for 25 percent of the repainting cost if its in-service date is 2010 or later and it has less than 150,000 miles. But the Bluebook value of such a vehicle in "good" condition would only be $5,796.

- A 2009 Mercedes CLK-Class 350 Coup 2D would qualify for 25 percent of the repainting cost if its in-service date is 2009 or later and it has less than 150,000 miles. But the Bluebook value of such a vehicle in "good" condition would only be $3,640.

- A 2010 Mercedes E-Class 350 Coup 2D would qualify for 25 percent of the repainting cost if its in-service date is 2010 or later and it has less than 150,000 miles. But the Bluebook value of such a vehicle in "good" condition would only be $6,486.

37. As I discuss in ¶¶ 58-59 below, no reasonable consumer would pay out-of-pocket more money to repaint a vehicle than the vehicle is worth.

38. Indeed, even for class members who would be entitled to 50 percent of the cost of repainting, or around $5,000, there are many instances in which no reasonable consumer would spend that amount of money. For instance, assume a 2012 Mercedes C-Class 250 Sport Sedan 4D

---

[23] All of the Bluebook figures in these bullet points and in ¶¶ 38 and 43 and are based on calculations from https://www.kbb.com. For simplicity, the zip code for the federal courthouse in Atlanta (30303) was used to calculate the value of each figure. The calculations assume 12,000 miles of driving per year and vehicle pricing with standard equipment. The option of "good" condition is used herein based on ¶ 211 of the Third Amended Complaint: "According to KBB's online Condition Quiz, vehicles that have extensive paint work and no paint damage are considered to be, at most, in 'Good' condition, while vehicles that have no paintwork and extensive prior damage are considered to be, at most, in 'Fair' condition."

with 120,000 miles, which would be eligible for 50 percent of the repainting cost. A car that has not been repainted (and thus would be in "fair" condition) would be worth $5,197, while a repainted car would be in "good" condition and thus worth $5,810, a difference of only $613. Even if the repainted vehicle was considered to be in "very good" condition, and thus worth $6,343, the difference in value would only be $1,146. No reasonable consumer would invest approximately $5,000 to increase the value of his vehicle by a maximum of only $1,146. *Accord* Richard Eichmann Declaration ¶¶ 11-13.

39. A similar problem exists for current lessees. No reasonable lessee would spend $7,500—or even $5,000—to repaint a vehicle that must be turned in at the end of the lease (absent purchase of the vehicle by the lessee).

40. *Former* owners and *former* lessees are also in a disadvantageous situation. Given that the parties to the Settlement have the burden of justifying its fairness under Rule 23(e), it is reasonable to assume, in the absence of contrary evidence from Mercedes and plaintiffs' counsel, that very few class members will be able to qualify for benefits under ¶¶ 4.1-4.3 of the Settlement.[24] Those benefits come into play only when class members previously paid to repaint their vehicles. Surely, if the parties had evidence that a large number of class members fall into this category, they would have offered it at the preliminary approval stage.  And if former owners and lessees do not qualify for prior payments to repaint their vehicle, they have no remedy:  They are not eligible to recover for *future* repainting because they no longer possess the Subject Vehicle to repaint. *See* Doc. 70-7 at 70 ("Coverage for Qualified Future Repairs applies only to current owners and lessees.") (long-form notice).

---

[24] *Pinon* Interim Class Counsel provided no data at the preliminary approval stage regarding how many class members would qualify under ¶¶ 4.1-4.3 of the Settlement for repainting costs previously incurred by the class member.

41. The Settlement does not include any cash payouts or other relief (not even coupons) for class members who do not qualify for prior or future repainting coverage. Moreover, despite the allegations in the Third Amended Complaint about the critical need for a diminution in value remedy, the Settlement provides no relief to any class member for diminution in value.

42. Under the Settlement, therefore, many thousands of class members will almost certainly obtain no relief whatsoever even though (unless they affirmatively opt out) they are releasing their claims against Mercedes pursuant to ¶ 6 of the Settlement Agreement.[25] Given the potentially large number of former owners and lessees, and given that (according to *Pinon* Interim Class Counsel's own expert) a large percentage of the Subject Vehicles are from 2010 or older, *see* Doc. 92-2 at 17, it is quite possible that well over 50 percent of the class are ineligible for benefits.[26] As a result, *Pinon* Interim Class Counsel are simply wrong in representing to this Court that "[t]he Settlement Agreement provides direct benefits to current and former owners and lessees of over *72,500 covered vehicles*, which likely includes *over 100,000 individuals*." Doc. 92 at 13 (emphasis in original).

43. The fact that most former owners and former lessees of Subject Vehicles will receive nothing from the Settlement, but must still release their claims (if they do not opt out), is

---

[25] According to *Pinon* Interim Class Counsel's expert, Lee Bowron, 7,353 of the 69,115 vehicles at issue are from model years 2004 and 2005, Doc. 92-2 at 17, and thus are almost certainly disqualified based on age, high mileage, or both. In addition, many (if not most) of the 15,616 vehicles from model years 2006, 2007, and 2008 are disqualified based on high mileage (assuming 12,000 miles per year). Thus, it is almost certain that roughly 20,000 current owner class members (excluding those who opt out) will get nothing from the Settlement but will release their claims against Mercedes. And these numbers do not even consider the tens of thousands of former owners or lessees who will get nothing but will release their claims.

[26] I do not have the data necessary to make precise calculations, and *Pinon* Interim Class Counsel did not provide such data at the preliminary approval stage for the Court and the class to evaluate.

particularly significant considering the financial losses these class members may have experienced because of the defective paint at issue. For example, assume that a class member purchased a new Mercedes SL 550 Roadster with Mars Red paint in 2017 (qualifying him as a class member), and that he then resold the vehicle in 2021 with visible peeling, rust, and corrosion. If this class member's vehicle had been in "excellent" condition, and assuming 12,000 miles of driving per year, he would have been able to resell his vehicle at a Bluebook value of $54,124. However, because the paint damage at issue reduces a Mercedes vehicle to "fair" condition, *see* ¶ 36 n.23 above, this class member would have only been able to resell his vehicle at a Bluebook value of $48,707. Thus, this class member lost $5,417 by reselling his car with the defective paint. And yet, because he does not qualify for a future repair (because he no longer has a vehicle to repair), he will receive no compensation under the Settlement for this significant injury, but must still release his claim absent an opt out.

44. It appears that none of the six class representatives in the final Settlement were in either the 25 percent or zero percent category for current owners, and none is a former owner or former lessee. Rather, it appears that all of the current class representatives are current owners, *see* Doc. 55, ¶¶ 53, 73, 84, 94, 125, 131; Doc. 70-4 at 2, 5, 8, 11, 14, 17, who will receive coverage for either 50 or 100 percent of the cost of the repainting:

- Pinon: 2015 Mercedes C 250
  - In-service date: April 29, 2015 (6 years)
  - Mileage since in-service date: 111,257 (as of 9/28/2020)
  - Period 1 (100% covered)
- Klein: 2014 Mercedes E 350
  - In-service date: March 1, 2014 (7 years)
  - Mileage since in-service date: 47,335 (as of 8/19/2020)
  - Period 1 (100% covered)
- Brown: 2011 Mercedes C 300
  - In-service date: March 18, 2011 (10 years)
  - Mileage since in-service date: 105,359 (as of 5/22/2021)

- o Period 2 (50% or 100% covered)[27]
- Frankum: 2014 Mercedes GLK 250
  - o In-service date: July 9, 2014 (7 years)
  - o Mileage since in-service date: 121,961 (as of 4/21/21)
  - o Period 2 (50% or 100% covered)
- Webster: 2014 Mercedes GLK 350
  - o In-service date: November 15, 2013 (7 years)
  - o Mileage since in-service date: 78,263 (as of 1/22/21)
  - o Period 1 (100% covered)
- Bryan: 2013 Mercedes SLK 250
  - o In-service date: December 31, 2012 (8 years) [28]
  - o Mileage since in-service date: 75,046 (as of 4/11/21)
  - o Period 1 (100% covered)

45. The composition of the class representatives meant that, during the settlement negotiations, there was *no* class representative speaking on behalf of those who would end up receiving nothing under the Settlement, and no class representative speaking on behalf of those who are required to pay 75 percent of the cost of repainting a vehicle with a Bluebook value that does not justify such a large expenditure. Nor was there any class representative speaking on behalf of the thousands of former owners or former lessees of Subject Vehicles who receive nothing under the Settlement. The interest of all six class representatives was in maximizing the recoveries for current owners with newer, lower mileage vehicles, even if that meant providing no (or no realistic) benefits to thousands of other class members.

46. On December 21, 2020, *Pinon* Interim Class Counsel filed a Motion for Preliminary Approval of the Proposed Class Action Settlement Agreement and Preliminary Certification of Nationwide Settlement Class and Incorporated Memorandum of Law (Doc. 70). In their filing,

---

[27] Both Brown and Frankum could be eligible for 100 percent coverage if they presented their claims before 84 months and 105,000 miles and were denied relief at that point.

[28] Bryan notified Mercedes in late 2018 about the defective paint and was subsequently denied coverage. Doc. 55 ¶ 130. This notice date to Mercedes presumably qualifies Bryan for Period 1 (because it is seven years from the in-service date) despite his vehicle now being eight years from its in-service date. *See* Doc. 70-7 at 70 (long-form notice).

*Pinon* Interim Class Counsel do not defend the terms of the Settlement by claiming that they had little chance of prevailing at trial. Rather, they concede that the class is giving up "strong claims" by settling. *Id.* (initial capitalization deleted). Doc. 70 at 37. Yet, as noted in ¶ 41 above, the Settlement does not include the remedy of diminution in value, even though *Pinon* Interim Class Counsel and the class representatives alleged in the Third Amended Complaint that this was an essential remedy. Nonetheless, *Pinon* Interim Class Counsel claim that the Settlement provides "significant benefits," Doc. 70 at 37 (initial capitalization deleted), and is "outstanding." Doc. 70 at 47.[29] *See also* Doc. 92 at 25 (motion for attorneys' fees characterizing the Settlement as "exceptional"). And although many class members receive no benefits (as noted above), *Pinon* Interim Class Counsel insist that class members are treated "'equitably relative to each other.'" Doc. 70 at 42 (quoting Fed. R. Civ. P. 23(e)(2)(D)).

47. *Pinon* Interim Class Counsel argued to this Court that "'the bar [for obtaining preliminary approval] is low," Doc. 70 at 32 (quoting 2001 case); *see id.* (citing authority from 1994), even though the 2018 Amendments to Rule 23 changed the rule to make clear that exactly the opposite is true. Amended Rule 23—drafted by the Civil Rules Committee during my tenure as the academic member of the Committee—adopts a "frontloading" process that now makes the preliminary approval process a rigorous one. *See, e.g., Day v. AMC Corp.*, No. 5:17-CV-183-CHB-MAS, 2019 WL 3977253, at \*3 (E.D. Ky. July 26, 2019), *report and recommendation adopted sub nom. Day v. Air Methods Corp.*, No. 5:17-CV-183-CHB, 2019 WL 3976511 (E.D. Ky. Aug. 22, 2019) ("[A] court must 'frontload' its analysis by considering many of the same factors at the

---

[29] Although *Pinon* Interim Class Counsel use these glowing terms to describe the Settlement, they cite cases approving "even a minimal settlement," and even a settlement "'amount[ing] to a hundredth or even a thousandth of a single percent of the potential recovery.'" Doc. 70 at 47 (citing and quoting cases). This is hardly the case law that one would normally cite to support a truly robust result.

initial notice stage that it will consider at the later approval stage."); *Ward v. Flagship Credit Acceptance LLC*, No. CV 17-2069, 2020 WL 759389, at *4 (E.D. Pa. Feb. 13, 2020) ("As amended, Rule 23 (e)(1)(B)(i)-(ii) now provides specific requirements that a district court must ensure are satisfied prior to granting preliminary approval.")

48. On March 29, 2021, this Court granted preliminary approval of the Settlement and scheduled a final approval hearing for August 30, 2021. Doc. 90. The Court preliminarily found that a class could be certified and that the Settlement "appears to be fair, reasonable, and adequate …." Doc. 90 at 3-6. The Court also approved "the content, format, and method of disseminating the Notice Plan," as proposed by the Settlement Administrator. Doc. 90 at 6.

49. On April 28, 2021, *Pinon* Interim Class Counsel filed a motion for attorneys' fees, relying on an "estimated … value of the relief provided to the Class at between $32.12M (on the low end) and $56.01M (on the high end). Doc. 92 at 13. *Pinon* Interim Class counsel's motion did not cite the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) (CAFA), let alone address the possibility that (at least for those who only receive 25 or 50 percent reimbursement) the settlement is a "coupon" settlement under CAFA and that fees under a percentage-of-the-fund method can only be based on actual benefits claimed by class members. *Id.* § 1712.

50. The instant Declaration is filed on behalf of eight objector/class members. Importantly, I am advised by objectors' counsel that four of those objectors would receive nothing under the proposed Settlement. Objector Alex Acuna, a former lessee of a 2012 Mercedes SLK 250, would receive no recovery because he traded in his vehicle in 2018 and had not previously paid to repaint the vehicle. Objector Vanessa Montgomery, a former owner of a 2014 Mercedes C 250W, would receive no recovery because her car was stolen and totaled in 2019 and, in any event, had a last-

reported mileage of 156,073. Objector Fredrick Parker, a former owner of a 2013 Mercedes SLK 250, would receive no recovery because he sold his vehicle in 2020 and had not previously paid to repaint it. And objector Samuel Salgado, a current owner of a 2012 Mercedes C 250, would receive no recovery because his vehicle has over 175,000 miles.

## V.  SUMMARY OF OPINIONS

51. *Pinon* Interim Class Counsel tout this Settlement as "exceptional." *See* ¶ 46 above.  In fact, however, it provides no relief (or no meaningful relief) to thousands of class members (possibly the vast majority of the class).  Those who receive no relief (or no realistic relief) include: (1) class members who currently own Subject Vehicles but are disqualified from receiving a future repair because the vehicle is too old or has too many miles; (2) class members who currently own Subject Vehicles but who must spend an amount close to (or even over) the Bluebook value of the Subject Vehicle to receive relief—something no rational class member would do; (3)  class members who currently lease a Subject Vehicle but who have no economic motivation to spend as much as $7,500 repainting a vehicle that will be turned in at the end of the lease; and (4) class members who formerly owned or leased Subject Vehicles and who did not pay out-of-pocket to repaint those vehicles before selling or turning them in (likely, the vast majority of former owners and former lessees).  Yet, all of these thousands of class members will release all of their claims against Mercedes regarding the Mars Red paint unless they affirmatively opt out.

52. This deficient Settlement should not be given final approval for three reasons.  First, because the settlement provides no relief (or no meaningful relief) to thousands of class members, it does not satisfy Rule 23(e)(2)'s requirement that a class action settlement be "fair, reasonable, and adequate." Numerous courts have made clear that a class settlement is improper if it releases claims but offers no benefits whatsoever in exchange.  Second, the class representatives (all of

whom will receive at least 50 percent of the repainting cost (*see* ¶ 44 above)) had a conflict of interest: ensuring an acceptable recovery for themselves at the expense of former owners and former lessees as well as class members who currently own older, higher mileage vehicles.  Thus, they fail the adequacy of representation requirement of Fed. R. Civ. P. 23(a)(4).  Third, *Pinon* Interim Class Counsel—who negotiated this fundamentally flawed settlement—are inadequate under Fed. R. Civ. P. 23(a)(4) and (g) for securing *no* recovery for thousands of class members who must release their claims unless they opt out.

53. The failure to provide a remedy for thousands of class members is itself a compelling reason to reject the Settlement.  That conclusion is bolstered by applying the 2018 amendments to Rule 23 and the Eleventh Circuit's *Bennett* factors. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  As discussed below, the 2018 amendments and the *Bennett* factors confirm that the Settlement should be rejected.

54. The unfairness and adequacy of representation concerns noted above provide a compelling basis, standing alone, for this Court to reject the Settlement. Those concerns are magnified here because of the secretive process adopted by *Pinon* Interim Class Counsel that shut *Ponzio* Interim Class Counsel out of the settlement negotiations. *Ponzio* Interim Class Counsel were appointed by the federal district court in New Jersey to represent several state-specific subclasses—including for purposes of settlement—and counsel here promised to coordinate with those attorneys.  This secretive process, whereby *Pinon* Interim Class counsel stand to recover substantial attorneys' fees entirely for themselves, bolsters my opinion that those attorneys are inadequate under Rule 23(a)(4) and 23(g).

## VI.  DETAILED DISCUSSION OF OPINIONS

55.  In the remaining paragraphs of this Declaration, I explain in detail my opinions on the Rule 23 issues upon which I was asked to opine.

**A.  The Settlement Deprives a Substantial Portion of the Class of Any Remedy (or Any Realistic Remedy), Requiring Rejection of the Settlement Under Fed. R. 23(e) as Not Being "Fair, Reasonable, and Adequate," and Rendering the Class Representatives and Class Counsel Inadequate**

56. Although *Pinon* Interim Class Counsel characterize this Settlement as "exceptional," *see* ¶ 46 above, the truth is that it provides no relief (or no meaningful relief) to substantial segments of the class, who are required to give up their claims but receive nothing—not one penny—of value in return.  *See* ¶¶ 32-43 above.  These include:

- Class members who currently own Subject Vehicles but are disqualified from receiving a future repair because the vehicle is too old or has too many miles.

- Class members who currently own Subject Vehicles but who must spend an amount close to (or even over) the Bluebook value of the Subject Vehicle to receive relief—something no rational class member would do. *See* ¶¶ 58-59 below. Moreover, a repainting remedy may be economically irrational in many instances even if a consumer is only required to pay 50 (as opposed to 75) percent of the repainting.[30]

- Class members who currently lease a subject vehicle but who have no economic motivation to spend as much as $7,500 to repaint a vehicle that will be turned in at the end of the lease.

- Class members who formerly owned or leased Subject Vehicles but who did not pay money out-of-pocket to repaint those vehicles before selling or turning them in (likely, the vast majority of former owners or lessees).

57. Yet, all of these thousands of class members will release all of their claims against Mercedes regarding the Mars Red paint unless they affirmatively opt out. *See* Doc. 70-1 ¶¶ 6.1-6.8 (release provisions of the Settlement). To use Judge Posner's colorful language, "only a lunatic or a fanatic" would be enthusiastic about a class action settlement that gives him no recovery but requires him to release his claims against Mercedes. *Carnegie v. Household Int'l,*

---

[30] As noted in ¶ 38 above, from a consumer's perspective, even if the consumer's share of the cost of repainting is less than the Bluebook value of the car, a consumer would likely forgo a repainting remedy any time the increase in value of the vehicle through repainting is less than the consumer's out-of-pocket cost.

*Inc.,* 376 F.3d 656, 661 (7th Cir. 2004).  Imagine a similar proposal by Mercedes to an individual consumer: "We will pay you zero if you agree to release all of your claims regarding Mars Red paint." Such a proposal is clearly not fair, reasonable, and adequate.

58. A class member who is *eligible* for genuine benefits but chooses not to submit a claim is not treated unfairly if his claims are released. By contrast, it requires no explanation to understand why a class member who is *ineligible* for benefits but releases his claim is treated unfairly. It is similarly easy to understand why a remedy giving a class member $2,500 *if* the class member spends $7,500 out of pocket to repaint a car worth $5,000 is also no remedy at all. Insurance law recognizes this common sense point.

59. Under the doctrine of "total loss," courts do not require insurers to pay repair costs exceeding the value of the chattel, recognizing that a chattel owner "of ordinary prudence would not go to the expense of repairing a [chattel] if the cost of repair would be greater than the fair market value of the [chattel] after repair." *F.C. Wheat Mar. Corp. v. United States*, 663 F.3d 714, 721 (4th Cir. 2011). Countless courts have applied this doctrine.[31] Just as State Farm or Allstate would not be required to spend $7,500 to repair a car that was worth $5,000 before an accident, no reasonable consumer would spend $7,500 to repaint a car that is worth $5,000.

---

[31] *See, e.g., Hewlett v. Bertie*, 418 F.2d 654, 657 (4th Cir. 1969) ("[I]f the reclamation expense including repairs exceeds the ship's just value at the time of the casualty, or if repairs are not both physically and economically practicable, then it is a constructive total loss, and the limit of compensation is the value plus interest."); *Knox v. Akowskey*, 116 A.2d 406, 408 (D.C. 1955) ("[W]hen it appears that the cost of repairs approaches and perhaps exceeds the value of the chattel prior to injury, there should be proof that the repairs may be reasonably made, *i.e.*, that the cost thereof will neither exceed the diminution in value caused by the injury nor exceed the value prior to the injury."); *Allstate Insurance Co. v. Reep*, 7 Ohio App. 3d 90, 91 (Ohio Ct. App. 1982) ("[T]he cost of repair must not exceed the diminution in market value. Nor may the cost of repair exceed the fair market value of the property before the accident.").

60. Based on the above flaws, it is my opinion that this deficient Settlement should not be given final approval for three separate reasons.  First, because the settlement provides no relief (or no meaningful relief) to thousands of class members, it does not satisfy Rule 23(e)(2)'s requirement that a class action settlement be "fair, reasonable, and adequate." Second, the class representatives (all of whom will receive at least 50 percent of the repainting cost, *see* ¶ 44 above) operated under a conflict of interest—ensuring an acceptable recovery for themselves while not protecting former owners or lessees or class members who currently own older, higher mileage vehicles.  Thus, they fail the adequacy of representation requirement of Fed. R. Civ. P. 23(a)(4).  Third, *Pinon* Interim Class Counsel—who negotiated this fundamentally flawed settlement—are likewise inadequate under Fed. R. Civ. P. 23(a)(4) and (g).

### 1.  This Court Should Not Approve as Fair, Reasonable, and Adequate a Settlement that Provides No Relief (or No Meaningful Relief) to Substantial Segments of the Class

61. Although *Pinon* Interim Class Counsel, at preliminary approval, praised the settlement as "strong," *see* ¶ 46 above, a settlement that requires releases of claims to thousands of class members who are *ineligible* for *any* benefits cannot be deemed fair, reasonable, and adequate for the class as a whole. Indeed, as to those class members who are precluded from recovering anything but who nonetheless release their claims if they fail to opt out, it is hard to imagine a settlement that is more unfair.

62. Numerous courts confirm this obvious point. For example, in *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745 (7th Cir. 2006), the settlement at issue required one class within the agreement to release their claims with no compensation. There, the settlement encompassed two classes: a "telemarketing class" and an "information sharing class." *Id.* at 746. However, the settlement's $243,000 fund only distributed payments to the "telemarketing class" members. Nonetheless, the

district court approved the settlement, attributing the lack of any payment to the "information

sharing class" to challenges associated with this subclass's claims. The Seventh Circuit reversed

and remanded, reasoning:

> [O]ur core concern … is that *the district court failed to consider with adequate*
> *specificity the reasonableness of an entire class receiving a "big fat zero" in the*
> *settlement.*  Specifically, the district court did not canvass all potential avenues of
> recovery to determine whether the information-sharing class's claims were indeed
> essentially hopeless (and thus worthless) under the pertinent controlling law. *Id.* at
> 747 (emphasis added).

Similarly, in *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000), the

settlement at issue awarded the class representative $2,000, while the other class members received

no compensation. The court concluded that "the fact that one class member receives $2,000 and

the other 200,000+ nothing is quite enough to demonstrate that the terms should not have been

approved under Rule 23." *Id.* at 882.[32] ___***As one court has noted: "Independent research has not***___

___***disclosed a case that sanctions a settlement that provides direct economic benefit to 50% of the***___

___***class in exchange for release from 100% of the class."***___ *Petruzzi's, Inc. v. Darling-Delaware Co.*,

880 F. Supp. 292, 299 (M.D. Pa. 1995) (all emphasis added).

63. Surely, *Pinon* Interim Class Counsel cannot contend that the claims of the thousands

of class members who receive no benefits are so frivolous that releasing such claims is harmless.

The example in ¶ 43 above refutes any such contention.  Moreover, it is no answer to say that those

who would receive no benefits can simply opt out.  It is one thing to expect a class member to

---

[32] Numerous other examples can be cited. *See,, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 808 (3d Cir. 1995) ("[T]he fact that the coupon settlement benefits certain groups of the class more than others suggests that the district court did not adequately discharge its duties to safeguard the interests of the absentees."); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979) (rejecting a settlement that released certain class members who received no benefits, noting that as to them, "'the 'settlement' is not a settlement"); *Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 387 (C.D. Cal. 2007) (rejecting a proposed settlement that "sacrifice[d] the claims of some plaintiffs for the sake of others").

weigh genuine benefits offered against the risks and benefits of opting out and litigating separately. In that circumstance, the availability of an opt out right is a relevant consideration in evaluating the fairness of a settlement.[33] It is quite another, however, to put the onus on a class member to opt out of a settlement that is worthless to that class member. This reliance on class members to opt out is particularly concerning here, where the Settlement Agreement is complicated and spans 57 pages. Doc. 70-1 at 2-58. *See also* Doc. 70-7 at 62-91 (postcard notice, long-form notice, and instructions for claiming reimbursement for qualified past and future repairs totaling 26 pages). Many class members who are ineligible for any recovery may not immediately grasp that fact. Accordingly, when a settlement is fundamentally unfair, an opt-out right will not save it. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) (rejecting settlement despite opt-out rights); *True v. American Honda Motor Company*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) (same); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768 (3d Cir. 1995) (same). As one court noted: "[T]he right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class." *Id.* at 809. *Accord, e.g., True v. American Honda Motor Company*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010); *Ross v. Convergent Outsourcing, Inc.*, 323 F.R.D. 656, 660 n.5 (D. Colo. 2018). To salvage this patently deficient Settlement based on the opt out right would mean that even the most egregious and unfair settlements would not be subject to challenge. That approach would render the fairness inquiry of Rule 23(e) meaningless in any opt-out class action.

---

[33] *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011) (class members received tangible benefits; court mentions opt-out right in approving settlement); *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 635-36 (11th Cir. 2015) (same); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *11 (N.D. Ill. Feb. 28, 2012) (same).

64.   I am well aware of a handful of district court cases approving of recovery cutoffs in automobile cases, even though class members who must release their claims are disqualified from obtaining any recovery.  Some of the courts rely on the ability of any class member to opt out of the settlement as the answer to any claim of unfairness.[34] And some of the courts assert that settlements are by their nature compromises, and therefore those who end up with nothing cannot complain.[35]  In my opinion, the reasoning of such cases cannot be sustained, and I know of no federal appellate court that has endorsed the flawed approach of those cases. A settlement that releases the claims of thousands of class members who are ineligible to recover is contrary to the cases cited in ¶¶ 62 and 63 above and to basic due process.  As those cases make clear, an opt out remedy cannot save a fundamentally flawed settlement.  Nor is it persuasive to defend a settlement that is worthless to thousands of class members on the ground that all settlements are compromises. It is one thing to compromise; it is another to give Mercedes issue and claim preclusion in exchange for zero benefits. I realize that lines have to be drawn, but the way to do that is either to (1) provide *some* benefits to all class members, or (2) exclude from the class those who are ineligible for any benefits. *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. 112, 158 (E.D. La.

---

[34] *See, e.g., Asghari v. Volkswagen Grp. of Am., Inc.*, No. CV1302529MMMVBKX, 2015 WL 12732462, at *28 (C.D. Cal. May 29, 2015); *Seifi v. Mercedes-Benz USA, LLC,* No. 12-CV-05493 (TEH), 2015 WL 12964340, at *2 (N.D. Cal. Aug. 18, 2015); *Aarons v. BMW of N. Am., LLC*, No. CV 11-7667 PSG CWX, 2014 WL 4090564, at *13 (C.D. Cal. Apr. 29, 2014), *objections overruled*, No. CV 11-7667 PSG CWX, 2014 WL 4090512 (C.D. Cal. June 20, 2014); *Henderson v. Volvo Cars of N. Am., LLC*, No. CIV.A. 09-4146 CCC, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013); *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 RS, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012).

[35] *Berman v. Gen. Motors LLC,* No. 2:18-CV-14371, 2019 WL 6163798, at *7 (S.D. Fla. Nov. 18, 2019) ("[T]he law recognizes that [automobile] manufacturers must draw a line somewhere" and that "there must be reasonable limits in any settlement"); *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 RS, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012). ("[S]ettlement involves some line-drawing[.]").

2013) (noting, in approving a medical benefits settlement involving the BP oil spill, that those claiming exposures after a certain date were "not Class Members, and thus do not release those claims"); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 942 (E.D. La. 2012) (finding a settlement involving the BP oil spill fair even though non-class member property owners outside of certain geographic boundaries were not being compensated, noting that "[b]ecause the Settlement Agreement does not affect these persons' legal rights, their claims remain viable and they may continue to litigate their cases"), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). It would have been simple to create a settlement in which those who are excluded from recovery do not release their claims. *See, e.g., In re Nissan Radiator/Transmission Cooler Litigation.*, No. 10 CV 7493 VB, 2013 WL 4080948, at *11 (S.D.N.Y. May 30, 2013) ("Class members with more than 100,000 miles on their vehicles as January 7, 2013, the date notice of settlement was sent, are not releasing their claims. That means they may pursue claims for damages against Nissan even though this action has been settled.").  In short, a settlement should either provide genuine benefits to all segments of the class or exclude those who are ineligible for benefits from having to release their claims.

65. In the extensive briefing on the *Ponzio* plaintiffs' motion to intervene, there was much discussion about whether the Settlement was deficient because it did not adopt a diminution in value remedy. In opining that the Settlement is unfair under Rule 23(e), I am not contending that only a diminution in value remedy would suffice. A class settlement can take myriad forms and still be fair, reasonable, and adequate.

66. Nonetheless, the absence of a diminution in value remedy here is puzzling given *Pinon* Interim Class Counsel's and the class representatives' own contentions that repainting is an inadequate remedy and that only a recovery for diminution in value will suffice. The raison d'être

of the Third Amended Complaint was that only a diminution in value remedy would fairly compensate the class for their harm. *See* ¶¶ 25-26 above.[36] Post-settlement, however, the same class counsel disparage diminution in value, saying that a repainting remedy amounts to a "more robust" remedy for the class than diminution in value, Doc. 76 at 27. *Pinon* Interim Class Counsel also say that "diminution in value claims face *immense* risks in class certification," despite previously pleading that "[t]his action [seeking diminution in value] has been brought and may properly be maintained as a class action pursuant to the provisions of the Federal Rules of Civil Procedure …." Doc. 55 at 71 ¶ 229 (emphasis added). *See id*. at 65-73, ¶¶ 220-29. The fact that *Pinon* Interim Class Counsel—anticipating millions of dollars in attorneys' fees—have moved from saying that repainting is a terrible remedy—so bad that Klein sued *after* being offered it—to essentially calling repainting the gold standard is cause for concern about the fairness of the proposed Settlement.

67. Moreover, *Pinon* Interim Class Counsel are simply wrong in arguing (in defending the settlement) that diminution in value claims are all but impossible to litigate or settle on a class-wide basis. *See* Doc. 76 at 27-29. While *Pinon* Interim Class Counsel are correct that some courts have declined to certify diminution claims as class actions, numerous examples can be found of courts approving diminution in value class actions for litigation or settlement purposes.[37]

---

[36] Indeed, class representative Klein was *offered* repainting and still chose to sue in order to achieve a diminution in value recovery. *See* ¶ 25 above.

[37] *See, e.g.*, *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) ("[The damage theory] is that every purchaser of [the product] is injured … by delivery of [the product] that does not meet the quality standard represented by the manufacturer. Damages reflect the difference in market price between a [product] as represented and a [product] that does not satisfy the [quality]. This remedy could be applied to every member of the class."); *In re: Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426, at *17 (N.D. Cal. Oct. 25, 2016) ("[T]he Settlement allocates the diminution in value caused by the defeat device to Volkswagen[.]")*, aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018), *and aff'd sub*

68. In all events, the diminution in value debate is a red herring. As noted, I am not arguing that the Settlement needed to adopt a specific remedy. Rather, I am arguing that a settlement that affords *no* relief to a substantial portion of the class should not be approved. Class members do not necessarily need to be awarded diminution of value in a settlement, but they need to be eligible for *some* relief to make the Settlement even marginally fair.

69. An instructive case is *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part, In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 20-10249, 2021 WL 2250845 (11th Cir. June 3, 2021). There, class members were given the option to receive free credit monitoring service, worth $24.99 per month, as part of a $380.5 million minimum settlement fund. But some class members already had credit monitoring service, so that remedy had no value to them. Thus, the settlement allowed class members to accept a modest cash payment, subject to a $31 million cap, in lieu of free credit monitoring. *Id.* at \*2-\*3. *See also In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1259 (11th Cir. 2021) (also describing cash benefit in lieu of free credit monitoring). Here,

---

*nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 741 F. App'x 367 (9th Cir. 2018); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 966 (N.D. Cal. 2018) ("If a jury ultimately concludes that the warranty failed its essential purpose because all Class Members attempted unsuccessful repairs, then damages will be measured by the diminution in value between the vehicles as warranted and the vehicles as sold."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 810ML02151JVSFMOX, 2013 WL 12327929, at \*8 (C.D. Cal. July 24, 2013) ("This [settlement] fund consists of a $250 million allocated to cash payments for diminished value for class members who took certain actions in a sixteen-month period of time[.]"); *Date v. Sony Elecs., Inc.,* No. 07-15474, 2013 WL 3945981, at \*5 (E.D. Mich. July 31, 2013) (the terms of the settlement agreement were "derived from a measure of the difference in value between a television with 1080p display capabilities and a television with 1080p native input capabilities, *i.e.,* the diminished value of an upconverted picture"); *Meyer v. Am. Fam. Mut. Ins. Co.*, No. 3:14-CV- 05305-RBL, 2015 WL 5156594, at \*3 (W.D. Wash. Sept. 2, 2015). ("[The class representative] seeks the same relief as the other class members—adequate compensation for his diminished value claim. ... Thus, [the plaintiff] has satisfied the Rule 23(a) prerequisites to class certification.").

the Settlement should have provided at least some cash payment for those who receive nothing under the current proposal (or, alternatively, should have excluded them from the class).

## 2. The Class Representatives and Class Counsel Fail the Adequacy Requirement

70. It is not difficult to understand how this deficient Settlement came about: There were no class representatives or class counsel at the bargaining table advocating for those class members who ended up recovering nothing under the proposed settlement. As a result, the class representatives and class counsel are inadequate.

### a. The Class Representatives are Inadequate

71. As noted above (¶ 44), every class representative at the time of Settlement was a current Subject Vehicle owner who receive at least 50 percent (and, in some cases, 100 percent) of the cost of repainting their vehicles under the proposed Settlement. None of the class representatives at the time of Settlement was a *former* owner or lessee; none was disqualified from recovery based on the age or mileage of their vehicle; and none was being offered only 25 percent of the repainting cost, with the out-of-pocket portion close to—or even exceeding—the vehicle's Bluebook value.

72. It is fundamental that Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" applies throughout the case, *including at settlement. See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) ("The safeguards provided by the Rule 23(a) … we emphasize, are not impractical impediments—checks shorn of utility—in the settlement-class context."). Class representatives are fiduciaries to the entire class, not just to those whose interests align with their own. *Id.* at 594 ("[The Rule 23(a)(4)] inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995) ("The drafters designed the procedural requirements of Rule 23, especially the requisites of

subsection (a), so that the court can assure, to the greatest extent possible, that the actions are prosecuted on behalf of the actual class members in a way that makes it fair to bind their interests."). As the Eleventh Circuit has stated, class representatives suffer a disabling conflict when their "'economic interests and objectives … differ significantly from the economic interests and objectives of unnamed class members.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021), *quoting Valley Drug Co. v. Geneva Pharms., LLC.*, 350 F.3d 1181, 1189-90 (11th Cir. 2003).

73. Here, the class representatives all have later model (2011 or newer), lower mileage vehicles. *See* ¶ 44 above.  Their goal is to secure a robust remedy for themselves and similarly situated class members.  But there was no representation to ensure that class members with older and/or higher mileage vehicles—such as those with vehicles as old as 2004—would also receive at least some recovery if they were releasing their claims. And there was no class representative who, as a *former* owner or lessee, receives nothing under the Settlement.

74. No doubt Mercedes had a limit as to how much it would be willing to spend on this Settlement. *See* Doc. 77 at 21 (Mercedes advised the Court that it has "no intention of renegotiating the current settlement agreement to their own disadvantage"). Thus, any money given to the excluded categories would take money away from the six class representatives and those similarly situated. *Cf. Amchem*, 521 U.S. at 595 ("[F]or the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."). That is precisely why the various subgroups needed separate representation.

75. Numerous courts have rejected proposed class settlements on adequacy of representation grounds when only certain segments of the class benefit from the settlement.  For

example, in *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768 (3d Cir. 1995), the settlement at issue created an intra-class conflict by offering certificates that gave more value to the named plaintiffs (individual owners of GM trucks) than other class members (fleet owners of GM trucks). The court ruled that the class representatives were inadequate, reasoning:

> [W]e must be concerned that the individual owners … could skew the terms of the settlement to their own benefit. Not surprisingly, the settlement leaves fleet owners with significantly less value than individual owners. At the very least, the class should have been divided into sub-classes so that a court examining the settlement could consider settlement impacts that would be uniform at least within the sub-classes. *Id.* at 801.

Likewise, in *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981), the settlement at issue compelled certain class members to release claims without compensation for those claims, while giving other class members full compensation for their claims. There, the class consisted of two subgroups: class members with only liquidated contracts, and class members with both liquidated and unliquidated contracts. *Id.* at 12. Nonetheless, the settlement only offered compensation only for class members' liquidated contracts. *Id.* at 18. Thus, class members from objector-appellant Dexter Richards's subclass, with both liquidated and unliquidated contracts, received less compensation for their claims. *Id.* at 18. The Second Circuit found the class representatives inadequate, reasoning:

> The inadequacy of the representation provided by the named plaintiffs is apparent from examination of the settlement itself. That agreement requires Richards to release claims based on both liquidated and unliquidated contracts in return for a portion of the settlement proceeds that is determined *solely* on the basis of the contracts he liquidated by May 7 [, 1976]. The formula for allocating the settlement fund does not provide for any additional payment to Richards or persons similarly situated in return for the release of claims based on unliquidated contracts. There is no justification for requiring Richards or persons similarly situated to release claims based on unliquidated contracts as part of a settlement in which payments to class members are to be determined solely on the basis of the contracts they liquidated …. Under the settlement a class member holding one liquidated and one

42

> unliquidated contract receives no more than another class member holding only one liquidated contract. Mere statement suffices to show how far this departs from principles of equity. *Id.* at 18-19.

And in *Clement v. Am. Honda Finance Corp.*, 176 F.R.D. 15 (D. Conn. 1997), the settlement at issue gave the named plaintiffs cash payments, while other class members received only coupons and credits. In finding the class representatives inadequate, the court stated:

> [T]he representative parties *do not* fairly and adequately represent the interests of the class. While the named plaintiffs each secured a $2500 cash payment for themselves and a $140,000 attorney fee award for their attorneys, the individual class members were to receive … a worthless coupon and deficiency credit. *Id.* at 22 (emphasis in original).

76. In my opinion, because the class representatives who brokered this Settlement agreed to an allocation that severely prejudiced significant segments of the class, they cannot satisfy Rule 23(a)(4). There should have been separate representation (and perhaps separate subclasses) for the various categories of class members who would get nothing under this Settlement.

### 3. Class Counsel Fail the Adequacy of Representation Requirement of Rule 23(a)(4) and Rule 23(g)

77. For similar reasons, the Settlement should not be approved because of the inadequacy of class counsel. In my opinion, adequate class counsel would not have embraced a settlement that offers no relief (or no economically realistic relief) to thousands of class members. At a minimum, separate counsel should have been appointed during settlement negotiations (along with separate class representatives) to represent class members with higher mileage, older vehicles, *especially when it became clear in the mediation that the parties and class counsel were close to signing off on a settlement that eliminated the ability of a significant portion of the class to recover anything despite releasing their claims.* While Mercedes was no doubt thrilled to reach an agreement that releases many thousands of claims at no cost, class counsel should have empathetically rejected

any such outcome. And if class counsel genuinely believed that such a settlement was somehow fair, reasonable, and adequate—which is difficult to imagine—they should have been transparent at the preliminary approval stage about the fact that thousands of class members (perhaps a substantial majority) were ineligible for benefits. Instead, they inaccurately represented to the Court that "likely … *over 100,000 individuals*" would receive "direct benefits" under the Settlement. Doc. 92 at 13 (emphasis in original). In my opinion, *Pinon* Interim Class Counsel's inaccurate portrayal of the Settlement independently renders them inadequate under Rule 23(a)(4) and Rule 23(g).

78. Numerous courts have found class counsel inadequate in similar circumstances. For example, in *Holmes v. Cont'l Can Co.*, 706 F.2d 1144 (11th Cir. 1983), the Eleventh Circuit reversed and remanded a class settlement because of the disparity of treatment among class members. There, the settlement distributed half of a $43,775 back pay award to the eight named class members, and distributed the other half to the remaining 118 class members. *Id.* at 1146. Objectors to the settlement argued that they had received inadequate representation, demonstrated, *inter alia*, by the settlement fund's "disparate distribution" among class members. *Id.* at 1148. The court agreed, concluding that "the settlement proponents have not overcome the facial unfairness of the disparate distribution of this back pay award." *Id.* at 1148.

79. Similarly, in *Eubank v. Pella Corp.,* 753 F.3d 718 (7th Cir. 2014), two separate classes were initially certified in actions for defective windows: one class with already-repaired windows seeking damages, and the other class with unrepaired windows who were seeking declaratory relief. The settlement, however, treated those sub groups as a single class, despite their conflicting postures. The Seventh Circuit found class counsel inadequate, reasoning in part:

"[T]he adversity among subgroups requires that the members of each subgroup can be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *Id.* at 721, *quoting In re Joint Eastern & Southern District Asbestos Litigation,* 982 F.2d 721, 743 (2d Cir. 1992).

80. In my opinion, class counsel did not effectively represent those class members who receive no remedy (or no economically viable remedy). This failure to represent the class as a whole not only renders the Settlement invalid but should also disqualify class counsel from any further position in this case as class counsel under Rule 23(g).

## B.   The Class Fares No Better Under the Fairness Criteria of Rule 23(e)(2) or the *Bennett* Factors

81. Rule 23(e) was amended in 2018 to identify several criteria that courts must consider in ruling on the fairness of a class settlement. As explained above, the fact that a substantial portion of the class are ineligible for any relief is itself fatal, without the need to even consider other criteria. But application of the Rule 23(e)(2) criteria further support the argument that the settlement is unfair.

82. Rule 23(e)(2), added in 2018, provides:

(e)(2) *Approval of the Proposal*. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;

> (B) the proposal was negotiated at arm's length;

> (C) the relief provided for the class is adequate, taking into account:

>> (i) the costs, risks, and delay of trial and appeal;

>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-members claims;

>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

These factors confirm that the Settlement should be rejected.

83. First, as discussed above, the class representatives and class counsel are inadequate. They negotiated a settlement that gives zero recovery to thousands of class members.

84. Second, I am concerned that the Settlement was not negotiated at arm's length. The fact that the parties negotiated a settlement that allows Mercedes to secure releases from thousands of people who are ineligible to recover suggests collusion—*i.e.*, a settlement that minimized the total cost to Mercedes but ensured substantial attorneys' fees for class counsel, while many or most class members would receive nothing. The fact that *Ponzio* Interim Class Counsel were shut out of the negotiations further reinforces my concerns about collusion. *See* ¶¶ 91-104 below.

85. Third, as explained above, the relief provided to the class is clearly inadequate; thousands of class members are ineligible for a penny of relief. Moreover, class counsel acknowledged that they were settling a strong case, *see* ¶ 46 above, not a weak one. Thus, plaintiffs likely would have prevailed at trial. And I know of nothing to suggest that the trial or appellate proceedings in this case would have been unduly delayed.

86. Looking at the other factors bearing on adequacy of the relief, I have no serious concern about the method of processing claims of those who qualify for benefits. I am, however, deeply concerned about the fact that, for many class members, there are no claims to process. The attorneys' fees are concerning; class counsel seek them now even though this is arguably a coupon

settlement (for those receiving only 25 or 50 percent of the cost of repainting), raising concerns about collusion.[38]

87. Fourth, because the class includes thousands of individuals who receive no recovery, while others receive substantial benefits, the Settlement is clearly not equitable among class members. *See* ¶¶ 32-45 above.

88. Moreover, in my opinion, the Settlement does not fare better by applying the Eleventh Circuit's *Bennett* factors.  Those factors are:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

89. Here, despite the *Bennett* factors' focus on the range of possible recovery, *Pinon* Interim Class Counsel ignored the issue in their Motion for Preliminary Approval, other than a conclusory assertion that the Settlement offers "significant benefits." Doc. 70 at 37 (initial capitalization deleted). *Pinon* Interim Class Counsel concede that their case is "strong" (which in turn means that the settlement needs to be strong as well), *id.*, but they offer not a clue as to what they could have recovered at trial for the 100,000 plus class members as a whole. As objectors'

---

[38] *See* ¶ 49 above. *See also, e.g., In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 488 (4th Cir. 2020) ("[L]awyers for the class might 'reap the lion's share of the [settlement] benefits' while leaving the class members with little reward.") (citation omitted); *In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018) ("Congress targeted [coupon] settlements for heightened scrutiny out of a concern that the full value of coupons was being used to support large awards of attorney's fees regardless of whether class members had any interest in using the coupons."); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) ("[C]oupon settlements may incentivize lawyers to 'negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorney's fees.'") (citation omitted).

expert, Garrett Glasgow explains, classwide potential recovery for diminution in value can be calculated based on information available to Mercedes. Garrett Glasgow Report at ¶¶ 69-72. Yet the parties offered no such calculation at the preliminary approval stage. Nor do *Pinon* Interim Class Counsel provide any details about the "complexity, expense, and duration of litigation," other than the wholly conclusory and unsupported assertion—true in almost any class settlement—that the Settlement will "[avoid] years of additional litigation" because of class certification, resolution, trial, and possible appeal. Doc. 70 at 40.

90. In short, it is my view that neither the Rule 23(e)(2) factors nor the *Bennett* factors support approval of the Settlement. To the contrary, they only exacerbate the problems for *Pinon* Interim Class Counsel.

### C. Interim Class Counsel Here Are Inadequate Under Federal Rule of Civil Procedure 23(a)(4) and 23(g) Because They Shut Out Interim Class Counsel in *Ponzio* in Reaching a Settlement With Mercedes

91. The unfairness and adequacy of representation concerns I raise in ¶¶ 56-90 provide a compelling basis, standing alone, for this Court to reject the Settlement. In fact, however, those concerns are magnified because of the secretive process orchestrated by *Pinon* Interim Class Counsel that shut out *Ponzio* Interim Class Counsel from the settlement negotiations. This secretive process bolsters my opinion that *Pinon* Interim Class Counsel are inadequate under Rule 23(a)(4) and 23(g).

92. As *Pinon* Interim Class Counsel noted, *see* Doc. 76 at 14 n.6, the district court in *Ponzio* found that the class representatives from the states represented by them—California, Florida, Kansas, New Jersey, New York, and North Carolina—lacked standing to assert claims of class members from other states. *See* Doc. 48-1 at 11; Doc. 76 at 14 n.6. Subsequently, the *Ponzio* Court appointed various attorneys (representing objectors herein) to serve as Interim Class Counsel

under Rule 23(g) for those specific states in which there were class representatives. *See* ¶ 21 above. As *Pinon* Interim Class Counsel acknowledge, the *Ponzio* Court made clear that one of the *Ponzio* Interim Class Counsel's responsibilities was to "conduct settlement negotiations on behalf of Plaintiffs and the putative Classes."  Doc. 48-1 at 12, *quoting Ponzio* Court Order Appointing Interim Counsel.

93. In their motion seeking appointment as Interim Class Counsel in *Pinon*, class counsel did not seek joint appointment as Interim Class Counsel in the specific states for which the *Ponzio* Court designated different Interim Class Counsel. Rather, they sought appointment as Interim Class Counsel only "for the classes represented here; *these are those for which the* Ponzio *Action lacks standing or representation.*"  Doc. 48-1 at 3 (emphasis added). In other words, they were *not* seeking appointment as Interim Class Counsel for California, Kansas, New Jersey, or New York.[39] As to those four subclasses, Interim Class Counsel appointed by the *Ponzio* Court remained as sole Interim Class Counsel. Indeed, in their motion, *Pinon* Interim Class Counsel purportedly sought to "ensure cross-litigation coordination," Doc. 48-1 at 16, and they promised to "happily coordinate efforts with counsel for the *Ponzio* plaintiffs, which they have already attempted to do." Doc. 48-1 at 16.  In its Rule 23(g) order appointing *Pinon* Interim Class Counsel, this Court simply appointed Interim Class Counsel "for the Plaintiffs and putative classes they purport to represent." Doc. 49 at 2. Nonetheless, *Pinon* Interim Class Counsel contend that it was perfectly legitimate for them to settle the claims of class members in California, Kansas, New Jersey, and New York without involving—or even notifying—Interim Class Counsel in *Ponzio*.

---

[39] As noted in ¶ 22 above, it is not clear whether *Pinon* Class Counsel were seeking appointment as Interim Class Counsel for the overlapping Florida and North Carolina subclasses.

94. I acknowledge, and have considered, *Pinon* Interim Class Counsel's assertions that they tried to coordinate with *Ponzio* Interim Class Counsel at earlier stages of the litigation, that *Ponzio* Interim Class Counsel did not make reasonable reciprocal efforts, and that all communications ceased. Doc. 76 at 16-17. *Ponzio* Interim Class Counsel claim that the two groups of attorneys did not fully cut ties but instead agreed to "'stay in touch.'" Doc. 81 at 14 n.2 (quoting declaration of *Ponzio* Interim Class Counsel). I assume for purposes of this Declaration that *Ponzio* Interim Class Counsel had in fact rebuffed earlier efforts by *Pinon* Interim Class Counsel to coordinate. In my opinion, however, any lack of cooperation during earlier stages of the litigation did not give *Pinon* Interim Class Counsel the right to shut out *Ponzio* Interim Class Counsel from settlement discussions that impacted class members in the states in which *Ponzio* counsel had been appointed as sole Interim Class Counsel under Rule 23(g). Indeed, the fact that *Pinon* Interim Class Counsel and *Ponzio* Interim Class Counsel disagreed on how best to litigate against Mercedes would have made the settlement discussions more protective of the class: The mediator would have had the benefit of a variety of viewpoints on how to protect the class as a whole. The deliberate exclusion of *Ponzio* Interim Class Counsel may well explain how Mercedes was able to negotiate a settlement, with full releases, that is worthless to many or most class members.

95. In my opinion, *Pinon* Interim Class Counsel improperly deviated from their own promises to this Court and did an end run around the *Ponzio* Court's Rule 23(g) order. As a result, in my opinion, *Pinon* Interim Class Counsel did not adequately represent class members in California, Kansas, New Jersey, and New York, who were relying on class counsel appointed by the *Ponzio* Court to represent them. I can think of no reason why *Pinon* Interim Class Counsel sought to shut out Interim Class Counsel in *Ponzio* other than to ensure that they (*Pinon* Interim Class Counsel) would not have to share attorneys' fees in the event that a settlement was reached

with Mercedes. Why else would *Pinon* Interim Class Counsel, entrusted to represent the best interests of the class, exclude the very attorneys whom the *Ponzio* Court held should represent class members in California, Kansas, New Jersey, and New York? Surely, contrary to *Pinon* Interim Class Counsel's contentions, *see* Doc. 76 at 6, the fact that *Ponzio* Interim Class Counsel was not included in this Court's protective order could have been easily fixed had *Pinon* Class Counsel raised the issue with this Court or with the mediator, Judge Holderman. And, as noted, the fact that the two groups of lawyers differed in their approaches to discovery and case management, *see* Doc. 76 at 10, was no reason to shut out *Ponzio* Interim Class Counsel from settlement negotiations.

96. Indeed, in their *own* Rule 23(g) motion, *Pinon* Interim Class Counsel quoted at length from the *Manual for Complex Litigation*:

> "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and *negotiating settlement*."

Doc. 48-1 at 14, *quoting Manual for Complex Litigation,* § 21.11 (4th ed. 2004) (emphasis added by me).  By their own authority, *Pinon* Interim Class Counsel essentially concede that when the *Ponzio* Court appointed Interim Class Counsel, *those attorneys* were entrusted to protect class members from the designated states, including negotiating any settlement for those class members. And *Pinon* Interim Class Counsel obtained their appointment by this Court by representing that they would coordinate with Interim Class Counsel in *Ponzio*. Yet, *Pinon* Interim Class Counsel offer no legitimate reason for shutting out *Ponzio* Interim Class Counsel from settlement negotiations.

97. In my opinion, in evaluating the conduct of *Pinon* Interim Class Counsel, no weight should be given to the fact that counsel in *Ponzio* (as in *Pinon*) were appointed interim rather than

permanent class counsel. The same factors apply, and appointed counsel are entrusted with the same responsibilities.[40]

98. The appointment of class counsel under Rule 23(g) – both interim and permanent – "is a sensitive matter." *Martin v. Blessing*, 571 U.S. 1040, 1043 (2013) (statement of Alito, J., respecting denial of certiorari); *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15-CV-208-CRS, 2017 WL 6939338, at *16 (W.D. Ky. Feb. 16, 2017) ("[T]he Court is bound to consider all 'matters which may be germane' under Rule 23(g) … so that [the court's] exercise of judgment in this important regard is fully informed.") (citation omitted). The burden is on counsel seeking the appointment to demonstrate compliance with Rule 23(g). *See, e.g., Riggleman v. Clarke,* No. 5:17-CV-00063, 2019 WL 1903795, at *3 (W.D. Va. Apr. 29, 2019). And the appointment is not a one-shot event. A court must reaffirm the correctness of its Rule 23(g) appointment when it reviews any proposed settlement. *See, e.g., Parker v. City of New York.,* 15 CV 6733 (CLP), 2018 WL 6338775, at *7 (E.D.N.Y. Dec. 4, 2018).

99. Under the approach urged by *Pinon* Interim Class Counsel, a Rule 23(g) appointment can simply be ignored by other attorneys who want to broker a settlement and secure attorneys' fees entirely for themselves. It would mean that any attorney in the country could swoop in after

---

[40] *See, e.g., Azpeitia v. Tesoro Ref. & Mktg. Co. LLC*, No. 17-CV-00123-JST, 2017 WL 4071368, at *2 (N.D. Cal. Sept. 14, 2017) ("'[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, *and negotiating settlement*.'") (citation omitted) (emphasis added); *Yaeger v. Subaru of Am., Inc.,* No. CIV.A. 14-4490 JBS/K, 2014 WL 7883689, at *1 (D.N.J. Oct. 8, 2014) (Rule 23(g), which "'govern[s] the appointment of class counsel once a class is certified, appl[ies] equally to the designation of interim class counsel before certification'") (citation omitted); *Buonasera v. Honest Co., Inc.*, 318 F.R.D. 17, 18 (S.D.N.Y. 2016) ("When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel[.]").

other counsel have been appointed as class counsel under Rule 23(g) and settle the case without so much as giving a head's up to the appointed class counsel.

100. For instance, it is not uncommon for a number of law firms to compete for a Rule 23(g) appointment, with some being accepted and others rejected.[41] Under the view of *Pinon* Interim Class Counsel, the rejected counsel could nullify the appointment by immediately contacting— and negotiating a settlement with—the defendant, all without giving any head's up to the Rule 23(g) class counsel. Such a flagrant evasion of Rule 23(g) could not have been intended by the drafters when Rule 23(g) was added to Rule 23 in 2003. The whole point is that under Rule 23(g), counsel selected by the Court are "'ultimately responsible for representing the interest of the class.'" *Keepseagle v. Vilsack, No.* CV 99-3119 (EGS), 2016 WL 9455764, at *5 (D.D.C. Apr. 20, 2016) (citation omitted), *aff'd sub nom. Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017). And, at least for class members in California, Kansas, New Jersey, and New York, the appointed Rule 23(g) counsel were the *Ponzio* Interim Class Counsel. *Pinon* Interim Class Counsel had to know that failing even to notify *Ponzio* Interim Class Counsel of the pendency of the settlement negotiations raised serious concerns under Rule 23(g).

101. It is notable that, in moving for appointment as *Pinon* Interim Class Counsel, the moving attorneys touted how, in *other* litigation (*In re Nissan CVT Litigation*), they had "worked

---

[41] *See* Fed. R. Civ. P. 23(g)(2) ("If more than one applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class."); *see also, e.g.*, *Haynie v. Cornell Univ.*, 3:20-CV-467, 2020 WL 6043947 (N.D.N.Y. Oct. 13, 2020) (appointing one firm as interim class counsel over two other competing firms); *In re Insulin Pricing Litig.*, No. 3:17-CV-0699-BRM-LHG, 2017 WL 4122437, at *1 (D.N.J. Sept. 18, 2017) (appointing one interim lead counsel over two other applications); *Four In One Co. v. SK Foods, L.P.*, No. 2:08-CV-03017MCEEFB, 2009 WL 747160 (E.D. Cal. Mar. 20, 2009) (accepting some competing firms and rejecting others); *Moore v. Roadway Express, Inc.*, No. CV 09-1588, 2009 WL 10670954, at *6 (C.D. Cal. Oct. 7, 2009) (appointing one interim class counsel over two other competing applications).

together with firms that had independently filed cases in other jurisdictions across the country." Doc. 48-1 at 22. According to that motion, "Working collectively and cooperatively, the firms involved were able to work collaboratively to favorably settle the cases .…" *Id.* But the conduct of the same class counsel here—shutting out *Ponzio* counsel and secretly negotiating with Mercedes—is the polar opposite of "[w]orking collectively and cooperatively[.]"

102. In analogous circumstances, courts have expressed grave concerns about class negotiations in which class counsel in related litigation are shut out of the negotiation process. For example, in *Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019), the Fourth Circuit reversed the district court's order approving a federal class action settlement because, *inter alia,* the district court "did not meaningfully grapple with" the fact that class counsel in the federal case had shut out class counsel in a corresponding state case from the negotiations. *Id.* at 293. The Fourth Circuit highlighted the state court's finding that "[t]he [federal class counsel's] actions in setting up and conducting the mediation without sufficiently notifying [parallel state] class counsel 'demonstrate a deliberate attempt to exclude [state class counsel] from having any meaningful participation in the settlement of their clients' claims.'" *Id.* (citation omitted). And as the Seventh Circuit has noted in *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979), "settlement negotiations with less than all class counsel weaken the class' tactical position even if the attorney who enters into the negotiations attempts to represent the class' interests vigorously." *Id.* at 1125. The excluded counsel "'might well have improved the settlement terms[.]'" *Id.* at 1126.

103. At bottom, the approach of *Pinon* Interim Class Counsel—promising this Court that they would coordinate with Interim Class Counsel in *Ponzio*, touting their coordinated approach

to settlement in another case, and then shutting out *Ponzio* Interim Class Counsel in brokering a settlement—bears directly on the adequacy of *Pinon* Interim Class Counsel.

104. As discussed above, in my opinion, the proposed Settlement is deeply flawed because it disqualifies a large segment of the class from any recovery. But even if the Settlement had been facially fair, adequacy of representation is a separate requirement that in my view invalidates this Settlement. *See, e.g., Amchem,* 521 U.S. at 621 ("[T]he standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness."); *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.,* 737 F. App'x 457, 465 (11th Cir. 2018) ("[T]he district court could not evaluate whether class counsel adequately advanced the interests of absent class members by looking simply at whether the result of the negotiations seemed fair."). Thus, even if the Settlement was not deeply flawed, and in my opinion it is, final approval should be denied because *Pinon* Interim Class Counsel are inadequate under Rule 23(a)(4) and 23(g).

## VII. CONCLUSION

105. In my opinion, the proposed Settlement should be rejected as contrary to Rule 23(a)(4), 23(g), and 23(e).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

Robert H. Klonoff

July 24, 2021

**EXHIBIT A**

**CURRICULUM VITAE**

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6935 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

**EDUCATION:**

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

**WORK EXPERIENCE:**

**Current Positions:**

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

Panelist, FedArb (dispute resolutions)

**Prior Positions:**

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Recipient, Lewis & Clark Law School's 2020 Leo Levenson Award for Excellence in Teaching

Recipient, 2018 Albert Nelson Marquis Lifetime Achievement Award in the field of law from *Who's Who in America*

Member, 2011-2017, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Elected Member, International Association of Procedural Law

Fulbright Specialist Scholar at the University of Hong Kong Faculty of Law (2016)

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Sustaining Life Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

## **MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

## PUBLICATIONS:

### Books:

Klonoff, *Introduction to the Study of U.S. Law:  Cases and Materials* (West 2d ed. 2021) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 6th ed. 2021)

Klonoff, *Federal Multidistrict Litigation in a Nutshell* (West 2020)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West  2d ed. 2017)

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (with teacher's manual)

Klonoff, *Introduction to the Study of U.S. Law: Cases and Materials* (West 2016) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010) (along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

**Articles and Book Chapters:**

*Francis McGovern: The Consummate Facilitator, Teacher, and Scholar*, 84 Law & Contemporary Problems (2021) (co-author) (also served as a special editor for the entire volume)

Klonoff, *International Handbook on Class Actions,* chapter on the Future of U.S. Aggregate Litigation, Cambridge University Press (2021)

Klonoff, *The Judicial Panel on Multidistrict Litigation:  The Virtues of Unfettered Discretion*, 89 UMKC L. Rev. 1003 (2021)

Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 Fordham L. Rev. 475 (2020)

Klonoff, *Foreword—Class Actions, Mass Torts, and MDLs:The Next 50 Years*, 24 Lewis & Clark Law Review 359 (2020)

*Application of the New Discovery Rules in Class Actions: Much Ado About Nothing,* 71 Vanderbilt L. Rev. 1949 (2018)

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19 Theoretical Inquiries in the Law 151 (2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. 971 (2017)

*The Remedy For Election Fraud Is A New Election,* Law 360 (July 20, 2017) (www.law360.com/whitecollar/articles/946569/the-remedy-for-election-fraud-is-a-new-election)

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for

presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13  J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women:  Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy:  A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts:  The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes:  Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in numerous high profile class action cases, including the *British Petroleum Deepwater Horizon Oil Spill* litigation, the *National Football League*

*Concussion* litigation, the *Syngenta Genetically Modified Corn* litigation, the *Volkswagen Clean Diesel* litigation, the *Wells Fargo Unauthorized Accounts* litigation, and the *Equifax Data Breach* litigation

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Speaker on the Legacy of Justice Ruth Bader Ginsburg (held remotely), Temple Beth Sholom Synagogue, Salem Oregon (June 27, 2021)

Panel Moderator, Mass-Tort MDL Bench-Bar Conference (held remotely), George Washington University Law School, Washington, D.C. (June 10, 2021)

Speaker on Class Actions (held remotely), Oregon Association of Defense Counsel, Portland Oregon (May 20, 2021)

Speaker on Class Actions and Multidistrict Litigation (held remotely), South Ural State University Institute of Law, Chelyabinsk, Russia (April 8, 2021)

Speaker on Class Actions and Multidistrict Litigation (held remotely), Northwestern Pritzker School of Law, Complex Litigation Seminar, Chicago, Illinois (March 31, 2021)

Speaker on Multidistrict Litigation, Class Actions, and the *Volkswagen Clean Diesel* Case (held remotely), Bahcesehir University, Istanbul, Turkey (July 15, 2020)

Speaker, Multidistrict Litigation Conference (held remotely), Emory University School of Law, Atlanta, Georgia (June 19, 2020)

Speaker, Class Action Conference, Fordham Law Review and the Institute for Law & Economic Policy, New York, New York (Feb. 27-28, 2020)

Keynote Speaker, Harold Schnitzer Spirit of Unity Peace Leadership Award Ceremony, Salem, Oregon (Nov. 20, 2019).

Conference Chair and Participant, 2019 Symposium on Class Actions and Aggregate Litigation, Pound Civil Justice Institute and Lewis & Clark Law School, Portland, Oregon (Nov. 1-2, 2019).

Speaker, International Class Actions Conference, Vanderbilt Law School, Nashville, Tennessee (Aug. 23, 2019)

Keynote Speaker, Pound Civil Justice Institute, Aggregate Litigation in State Court: Conference of State Court Appellate Judges, San Diego, California (July 27, 2019)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July, 2019) (faculty member for summer program on Transnational Torts)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May, 2019) (taught Introduction to U.S. Law)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2019)

Speaker, Impact Fund Class Action Conference, San Francisco, California (Feb. 22, 2019)

Speaker on Class Actions, 17th Annual Impact Fund Class Action Conference, San Francisco, California (Feb. 23, 2019)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (December 2018) (taught course on U.S. Class Actions)

Speaker on the National Football League Concussion case, National Taiwan University, Taipei, Taiwan (December 20, 2018)

Speaker on Class Actions, Live Webinar Broadcast, Rule 23 Will Be Amended in Four Days: Are You Ready, American Bar Association (Nov. 27, 2018)

Speaker, American Bar Association's 22d Annual Institute on Class Actions, Chicago, Illinois (Oct. 18, 2018)

Speaker, MDL at 50 –The 50th Anniversary of Multidistrict Litigation, New York University School of Law, New York, New York (Oct. 12, 2018)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2018) (faculty member for environmental law program; lectured on environmental class actions)

Speaker on Class Actions, Freie University Faculty of Law, Berlin, Germany (June 26, 2018)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2018) (taught course on Introduction to United States Law)

Co-Chair, Moderator, and Panelist, Posner on Class Actions, Columbia Law School, New York, New York (March 2, 2018)

Panelist on Civil Discovery, Vanderbilt University School of Law, Nashville, Tennessee (October 13, 2017)

Panelist on the Civil Rules Committee Process, University of Arizona College of Law, Tucson, Arizona (October 7, 2017)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2017) (faculty member for environmental law program; lectured on environmental class actions)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference, New York, New York (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August- September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta,  Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy"  (1990-present)  and advocacy before the U.S. Supreme Court (1988-present)

## OTHER PROFESSIONAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court (reviewed Judge Garland's civil procedure opinions)

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

## **VOLUNTEER WORK:**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

**EXHIBIT B**

**MATERIALS CONSIDERED**

I. *Pinon* Documents

- Class Action Complaint (EFC No. 1)
- First Amended Class Action Complaint (EFC No. 7)
- Second Amended Class Action Complaint (EFC No. 16)
- Order on Motion to Dismiss Second Amended Complaint (EFC No. 25)
- Declaration of Jennifer M. Keough Regarding Proposed Notice Plan (EFC No. 70-7)
- Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Appointment of Interim Class Counsel (EFC No. 48-1)
- Order on Plaintiffs' Unopposed Motion for Appointment of Interim Class Counsel (EFC No. 49)
- Plaintiffs' Unopposed Motion to Substitute Class Representative Through Filing a Third Amended Complaint Pursuant to the Parties' Joint Stipulation (EFC No. 53).
- Third Amended Class Action Complaint (EFC No. 55)
- Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement Agreement and Preliminary Certification of Nationwide Settlement Class and Incorporated Memorandum of Law (EFC No. 70)
- Exhibit 1 to Motion for Preliminary Approval - Class Action Settlement Agreement and Release (EFC No. 70-1)
- Declaration of Emily Pinon in Support of Motion for Final Approval of Class Action Settlement (EFC No. 70-4)
- *Ponzio* Plaintiffs' Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement and Incorporated Memorandum of Law (EFC No. 72)
- Plaintiffs' Opposition to *Ponzio* Plaintiffs' Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement (EFC No. 76)
- Defendants' Brief in Opposition to *Ponzio* Counsel's Motion to Intervene and Continue Hearing Date for Preliminary Approval Motion (EFC No. 77)
- Order on Motion to Intervene and Continue Hearing Date for Preliminary Approval of Settlement (EFC No. 89)
- Order for Preliminary Approval of Class Action Settlement (EFC No. 90)
- Plaintiffs' Unopposed Motion for Award of Attorneys' Fees, Expenses, and Class Representative Service Awards, and Incorporated Memorandum of Law (EFC No. 92)
- Declaration of Lee M. Bowron (EFC No. 92-2)
- Expert Report of Richard Eichmann
- Expert Report of Garrett Glasgow

II. *Ponzio* Documents

- Class Action Complaint (EFC No. 1)
- Order Appointing Interim Class Counsel (EFC No. 57)

- Plaintiffs' Reply Memorandum in Support of Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement (EFC No. 81)