**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

*Pinon v. Mercedes-Benz USA, LLC*

*Case No. 1:18-cv-03984*

## DECLARATION OF BRIAN T. FITZPATRICK

Brian T. Fitzpatrick, under penalty of perjury, declares as follows:

I.  BACKGROUND AND QUALIFICATIONS

1.          I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.          My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, the Fordham Law Review, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and the Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, and 2019; the Annual Conference of the ABA's

Litigation Section in 2021; and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the membership of the American Law Institute. Earlier this year, my colleague Randall Thomas and I became the editors of *The Cambridge Handbook of Class Actions: An International Survey*.

3.        In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010).  This article is still what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007).  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  Since then, this study has been relied upon regularly by courts, scholars, and testifying experts.[1]

---

[1] *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Kuhr v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments*

*Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020) (same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp., No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15–3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09–cv–00938–JLK–KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod. Liab. Litig.*, No. 11–1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07–CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033

4.     In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009). Much of this work was discussed in a book I recently published with the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019).  The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively and that courts should provide proper incentives to encourage such private attorney general behavior.

5.     I have been asked by Ponzio's counsel to opine on whether the Court should give heightened scrutiny to the proposed class action settlement in this case because there is a greater likelihood that it is deficient due to the pressure of a so-called "reverse auction."   In order to formulate my opinion, I reviewed a number of documents; I have attached a list of these documents in Exhibit 2.

6.     A summary of my opinions are as follows:

- First, the pressure of a reverse auction can lead any rational counsel to accept an inferior or premature settlement offer in order to be the first among parallel actions to reach settlement.  In my opinion, this pressure exists any time parallel actions are litigated in rivalrous competition rather than in cooperation.  Because the settlement here arose from competition rather than cooperation, this alone should lead the Court

---

(N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

to apply heightened scrutiny to the proposed settlement.  The Eleventh Circuit calls its heightened class action scrutiny "careful scrutiny."  *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1265 (11th Cir. 2021) (quoting *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983)).

- Second, even more scrutiny is called for if there are indications—what commentators call red or yellow "flags"—that the reverse auction pressure was especially likely to lead to an inferior or premature settlement.  In my opinion, these flags are present here as well and this should lead the Court to apply even more heightened and even more careful scrutiny to the proposed settlement.

## II. WHAT IS A REVERSE AUCTION?

7.      A reverse auction occurs in class action litigation when a defendant uses the pressure of rivalrous, competing class actions to drive down the price at which class counsel in one of the actions is willing to settle.  *See* Federal Judicial Center, Manual for Complex Litigation §21.61 (4th ed. 2004) ("[A] reverse auction [is where] a defendant selects among attorneys for competing classes and negotiates an agreement with the attorneys who are willing to accept the lowest class recovery . . . .").  Courts and commentators have been concerned about them for decades, *see, e.g.*, John C. Coffee, Jr., *The Corruption of the Class Action: The New Technology of Collusion*, 80 Cornell L. Rev. 851, 853 (1995) ("[D]efendants can effectively conduct a reverse auction among plaintiffs' attorneys, seeking the lowest bidder from the large population of plaintiffs' attorneys."), but perhaps the most extensive treatment is Rhonda Wasserman's *Dueling Class Actions*, 80 B.U. L. Rev. 461 (2000).  The reason counsel in rivalrous actions feel pressure to take a low settlement offer is because, once one class action vehicle reaches settlement, the competing class actions will be dismissed and the lawyers representing them will receive no fees.

*See id.* at 472 ("Each attorney understands that once the class member's claims are resolved by judgment or settlement, any other suits pending on their behalf raising the same claim will be dismissed . . . . Class counsel also knows that she will receive nothing if the class she filed is dismissed. Thus, each lawyer for the class realizes that it is in her own self-interest to race toward judgment or settlement before any other lawyer representing the same class on the same claim . . . ."). Thus, even though accepting a lower settlement offer can also lower the winning class counsel's fee award (to the extent that the fee award is tied to the amount of the settlement, as it usually is), it is still rational for either class counsel to accept the lower offer because, if they hold out for more, they can end up with nothing at all; that is, a 25% fee of a smaller settlement is better than 25% of no settlement at all. Defendants are aware of this pressure and use it to induce one of the competitors to accept a settlement that he or she otherwise would not accept. *See id.* at 473 ("The defendant is aware that class counsel is under substantial pressure to settle. Based on this knowledge, the defendant may make a 'low ball' offer in an effort to settle the class claim for far less than it is worth. [T]he pressure on class counsel . . . may be extreme."). The reverse auction is therefore like the famous prisoner's dilemma from game theory: the class is better off if both counsel cooperate with one another and together hold out for a better settlement, but it is rational for each class counsel to defect and strike an inferior deal on his or her own. *Id.* at 474 (2000) ("[C]lass counsel face a dilemma similar to the classic 'prisoner's dilemma' of game theory.").

8.     There are two bad outcomes that can result from the pressure of a reverse auction. The first is that the pressure may lead the class to receive less relief than it could have received. *See id.* at 473 ("[T]he defendant may make a 'low ball' offer in an effort to settle the class claim for far less than it is worth."). The second is that the pressure may lead counsel to rush to settle before really knowing how much the class's claims are even worth. This makes it hard for counsel

and for courts to even know whether the class has received less relief than it could have received. As Professor Wasserman explains, "[b]ecause class counsel in dueling class actions are under such enormous pressure to settle with the defendant quickly, they often begin negotiations before they have undertaken substantial discovery and therefore are not well-positioned to assess the strength and value of the class's claim." *Id*. at 474-475. This can put "the court at a grave informational disadvantage" when trying to assess the adequacy of the settlement. *Id*. at 481.

9.      It is important to note that, although the term "reverse auction" conjures up images of parties "bidding" against one another in a transparent manner, this is in no way necessary for defendants to use rivalrous actions to obtain inferior or premature settlements. So long as the competing counsel are aware of each other and so long as the defendant is aware of them, then the pressure to be the first to settle will always exist. Moreover, although we sometimes refer to reverse auctions as "collusion" between counsel and the defendant, nothing intentionally sinister need take place for the pressure of a reverse auction to manifest itself in an inferior or premature settlement for the class. Everyone involved is simply acting rationally: the defendant wants the best deal and both competing counsel want to avoid being the one left holding the bag. In other words, the reverse auction is just one of many ways in which rational self interest in class action litigation can lead to bad outcomes if there is insufficient oversight and correction by courts. *See Briseno v. Henderson*, 998 F.3d 1014, 1025 (9th Cir. 2021) ("'[T]he profit motive will give class action lawyers incentives to do sneaky things, just like it gives businesses incentives to do sneaky things.'" (quoting Fitzpatrick, The Conservative Case for Class Actions 72 (2019))). In my opinion, courts should not fight this self-interest; rather, they should harness it for the good of the class and of society. The way courts do that is by giving class action settlements and fee awards the scrutiny they deserve. *See id*. ("[W]e can put rules in place to channel profit motives in the

right direction.").  In my opinion, the greater the danger that self-interest may have gone awry, the greater the scrutiny that courts need to apply to class action settlements.

10.     In this vein, commentators have identified a number of circumstances—often referred to as red or yellow "flags"—that should lead courts to apply heightened scrutiny of proposed class action settlements due to the dangers of reverse auctions.  *See, e.g.*, Jonathan Macey & Geoffrey Miller, *Judicial Review of Class Action Settlements*, 1 J. L. Analysis 167, 191 (2009) ("When a . . . flag . . . is present . . . the justification for heightened judicial scrutiny correspondingly increase[s].").  I list these flags below, but in order to map them onto the discussion above, I divide them into three categories.  First, some of the flags help courts identify when parallel litigation created reverse auction pressure to begin with.  Second, other flags help courts identify when that reverse auction pressure was especially likely to lead to an inferior settlement.  Third, other flags help courts identify when that reverse auction pressure was especially likely to lead to a settlement without sufficient information about the value of the class's claims.  I will discuss each of these categories in turn,[2] but I should stress that these factors are just "flags"; they are not roadblocks. Their presence does not mean that a settlement invariably should be rejected; they only mean that courts should be more cautious because we are in a danger zone.

11.     First, consider the flags that help courts identify when parallel litigation created reverse auction pressure to begin with.  As I explained above, reverse auction pressure occurs when there is competition between counsel litigating parallel class actions; it does not occur when

---

[2] Commentators have identified other flags that, in my opinion, are not as probative, and, for this reason, I will not consider them further here.  For example, some commentators list "settlement discussions initiated by the defendant" as a flag, *e.g.*, Macey & Miller, *supra*, at 191, but reverse auction pressure and its ill effects can exist just as easily when settlement negotiations are initiated by plaintiffs as by defendants.

there is cooperation between these counsel.  Thus, these flags are based on behavior that suggests counsel litigated as rivals rather than cooperatively:

- *The settlement suddenly expanded the scope of the case to include class members or claims already represented by other counsel.  See, e.g.,* Macey & Miller, *supra*, at 191 ("sudden expansion of the scope of the settled case"); Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges 21 (3d ed. 2010) ("settlement . . . with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance").

- *The defendant conducted preferential or exclusive settlement negotiations with the counsel who settled.  See, e.g.,* Macey & Miller, *supra*, at 191 ("settlement bargaining limited to one of the competing groups of plaintiffs' attorneys"); Sean Griffith & Alexandra Lahav, *The Market for Preclusion in Merger Litigation*, 66 Vand. L. Rev. 1053, 1097 n.211 (2013) ("preferential negotiations with one set of plaintiffs' attorneys").

- *Settling counsel failed to inform the court of parallel class litigation during the settlement approval process.  See, e.g.*, William Rubenstein, 4 Newberg on Class Actions §13.60 (5th ed. 2021) ("[C]ourts are wary when they are not informed of pending related cases during the settlement approval process.").

12.     Second, consider the flags that help courts identify when the reverse auction was especially likely to lead to an inferior settlement.  These flags are based on indications that the defendant selected the lowest expected trial value action to settle.  This increases the likelihood of

an inferior settlement because it should be easier to get counsel in a weaker case to accept an inferior settlement offer than counsel in a stronger case because counsel in the weaker case can accept such an offer by giving a smaller discount on fair value—and, importantly, fees:

- *Settling with the counsel who is least experienced.  See, e.g.*, 4 Newberg, *supra*, at §13.60 ("settlement with the least experienced plaintiffs' counsel").

- *Settling with the counsel who was in the more precarious or less threatening litigation position.  See, e.g.*, Macey & Miller, *supra*, at 191 ("settlement with the group of attorneys who present a less substantial threat of carrying the case forward to trial"); Class Action Pocket Guide, *supra*, at 21 ("[T]he defendant 'selected counsel confronted with a most precarious position' . . . .").

13.     Third, consider the flags that help courts identify when reverse auction pressure is especially likely to lead to settlement without sufficient information about the value of the class's claims.  These flags are based on indications that settlement was rushed:

- *Settlement negotiations were abbreviated.  See, e.g.*, Macey & Miller, *supra*, at 191 ("lack of an extended process of settlement bargaining"); 4 Newberg, *supra*, at §13.60 ("quick settlement").

- *Settling with the counsel who was the least far along in the litigation.  See, e.g.*, Newberg, *supra*, at §13.60 ("settlement of the least well-developed case"); Griffith & Lahav, *supra*, at 1097 n. 211 ("document discovery provided only for purposes of settlement").

- *Settling with a counsel who had meetings with the defendant before his or her case was filed.  See, e.g.*, 4 Newberg, *supra*, at §13.60 ("a meeting between defendant's counsel and settling class counsel before the latter had even filed suit").

14.     In my opinion, any time reverse auction pressure is present courts should give heightened scrutiny to a class action settlement because this means there is an additional worry afoot that is not present in other class action litigation.  Thus, any time flags from the first category are present, courts should apply heightened scrutiny.  Heightened class action scrutiny is called "careful scrutiny" in the Eleventh Circuit, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d at 1265 (quoting *Holmes v. Cont'l Can Co.*, 706 F.2d at 1147), and I will use that term hereafter.  But if flags from the second or third category are present as well, it is my opinion that this scrutiny should be even more heightened and even more careful.  As I noted above, the greater the danger that self-interest has run awry, the greater the scrutiny should be of class action settlements.

## III. SHOULD THE COURT APPLY HEIGHTENED OR "CAREFUL" SCRUTINY TO THE PROPOSED SETTLEMENT?

15.     In my opinion, the Court should apply heightened scrutiny several times over to the proposed settlement.  Not only are there many, many flags indicating counsel litigated in a rivalrous rather than cooperative manner, but there are also numerous flags indicating that reverse auction pressure was especially likely to lead to an inferior settlement or that settlement was reached without sufficient information about the value of the class's claims.

16.     First, the proposed settlement clearly arose from rivalrous competition rather than cooperation.  Although there were early attempts by counsel to cooperate, and, indeed, this Court tried to order Georgia counsel to cooperate, *see* Doc. 49 at 5-6, little to no cooperation ultimately

took place.  This is clear from the fact that Defendants' settlement negotiations with Georgia counsel were kept secret from New Jersey counsel.  Georgia counsel believe they had a reason for keeping the negotiations secret, *see* Doc. 76 at 21, but whether they are right or wrong is immaterial here: the secret negotiations simply show there was not cooperation.  Moreover, the proposed settlement is attempting to expand the Georgia case to settle claims by class members that New Jersey counsel had already been appointed to represent.  This is clearly rivalrous rather than cooperative behavior.  In my opinion, this means that reverse auction pressure was present here and for this reason alone the Court should apply heightened or "careful" scrutiny to the proposed settlement.

17.    Second, flags are present suggesting that the reverse auction pressure was especially likely to lead to an inferior settlement.  In particular, there are signs that the Georgia action may have had a lower expected trial value, thereby making it easier to reach an inferior settlement with Georgia counsel than with New Jersey counsel.  Although the claims that survived the motion to dismiss were largely the same in both actions,[3] from my review of the record it appeared to me that counsel in Georgia less vigorously pursued discovery than counsel in New Jersey; this is relevant because the quantity and quality of discovery obviously impacts the ability

---

[3] In the New Jersey action, multiple claims survived on behalf of putative statewide classes, *see Ponzio* Doc. 50 at 45 (New York fraudulent concealment), 53 (New Jersey fraudulent concealment), 65 (North Carolina Unfair and Deceptive Trade Practices Act), 75 (California Unfair Competition Law), 77 & 79 (California Fair Advertising Law), 80 (Florida Deceptive & Unfair Trade Practices Act), 85 (New York General Business Law), as they did on behalf of a putative nationwide class, *see id*. at 30, 94, 99 (ruling that the named plaintiffs had standing to bring "Nationwide Count I and Count II . . . under each of their respective states' law" but later dismissing Count II under each law).  The same was true in the Georgia action.  *See* Doc. at 103-104 (not dismissing several claims brought only on behalf of putative statewide class as well as Earley's Counts II and IV which were additionally brought on behalf of a putative nationwide class).

to survive summary judgment and win at trial.  Moreover, although I do not want to take sides on which team of lawyers was more experienced here, through many years of studying class actions and testifying as an expert witness, I have become very familiar with New Jersey counsel; they are some of the most talented lawyers in the United States, not only in automotive class actions but in class actions generally.  In my opinion, these flags indeed suggest that the Georgia action may have been the action with the lower expected trial value, and, as a result, the Court should apply even more heightened and even more careful scrutiny to the proposed settlement.

18.     Third, flags are present suggesting that reverse auction pressure was especially likely to lead to settlement without sufficient information about the value of the class's claims.  In my experience studying other class actions, these were not long settlement negotiations, especially in a case of this magnitude.  Moreover, although it could be argued that the Georgia case was technically further along than the New Jersey case, a major reason for this appears to be that, as I noted, Georgia counsel did not fight the Defendants' discovery objections as vigorously.  Yet, discovery is where counsel can learn a great deal about the value of the class's claims.  Thus, for the purposes of this flag, the pace of the Georgia action makes it more rather than less concerning. Indeed, it is not clear to me from the record that Georgia counsel even attempted to seriously quantify the value of the class's claims before they agreed to the settlement.  In particular, Georgia counsel have not shown the Court its pre-settlement analysis of what it believed the class would have won if it had gone to trial and prevailed on all of its arguments, as is typical (and arguably required) before a court is asked to approve a settlement.  *See* 2018 Advisory Committee's Note to Fed. R. Civ. P. 23(e)(2) ("Often, courts may need to forecast the likely range of possible classwide recoveries . . . .  That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.").  If this analysis does not in fact exist, it

confirms the concern that counsel may have rushed to settlement before knowing what the case was really worth.   In my opinion, these flags mean that the Court should apply still more heightened and still more careful scrutiny to the proposed settlement.

19.     My compensation for this declaration was $950 per hour and in no way dependent on any outcome in this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me:

Nashville, TN

July 26, 2021

Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present
- *Professor of Law*, 2012 to present
- *FedEx Research Professor*, 2014-2015; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (Cambridge University Press 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019)

## ACADEMIC ARTICLES

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORD. L. REV. 1151 (2021)

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORD. L. REV. 437 (2020)

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*How Many Class Actions are Meritless?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, University of California Hastings College of the Law, San Francisco, CA (Nov. 3, 2020)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, The Judicial Role in Professional Regulation, Stein Colloquium, Fordham Law School, New York, NY (Oct. 9, 2020)

*Objector Blackmail Update: What Have the 2018 Amendments Done?,* Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions,* National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement*, Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* Twenty Third Annual National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

4

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*:  Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*, Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?,* NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, Louisiana (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Member, American Law Institute
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet, 2011-2017 & 2019-present; Board of Directors, Beacon Center, 2018-present; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

<u>Documents reviewed in this case:</u>

- Docket as of 5/26/21

- Second Amended Class Action Complaint (document 16, filed 1/31/19)

- Defendants' Memorandum of Law in Support of Motion to Dismiss Second Amended Complaint (document 18-1, filed 5/1/19)

- Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (document 22, filed 6/17/19)

- Defendants' Reply Brief in Support of their Motion to Dismiss Second Amended Complaint (document 24, filed 7/17/19)

- Order (on motion to dismiss) (document 25, filed 11/4/19)

- Order (on appointment of interim counsel) (document 49, filed 4/28/20)

- Third Amended Class Action Complaint (document 55, filed 6/22/20)

- Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement Agreement and Preliminary Certification of Nationwide Settlement Class and Incorporated Memorandum of Law (document 70, filed 12/21/20)

- *Ponzio* Plaintiffs' Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement and Incorporated Memorandum of Law (document 72, filed 12/31/20)

- Plaintiffs' Opposition to *Ponzio* Plaintiffs' Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement (document 76, filed 1/14/21)

- Defendants' Brief in Opposition to *Ponzio* Counsel's Motion to Intervene and Continue Hearing Date for Preliminary Approval Motion (document 77, filed 1/14/21)

- *Ponzio* Plaintiffs' Reply Memorandum in Support of Motion to Intervene and Continue Hearing Date for Motion for Preliminary Approval of Settlement (document 81, filed 1/28/21)

- Plaintiffs' Sur-Reply in Support of their Opposition to the *Ponzio* Plaintiffs' Motion to Intervene (document 82-1, filed 2/1/21)

- Order (on motion to intervene) (document 89, filed 3/29/21)

- Order for Preliminary Approval of Class Action Settlement (document 90, filed 3/29/21)

- Amendment to Order for Preliminary Approval of Class Action Settlement (document 91, filed 3/31/21)

- Plaintiffs' Unopposed Motion for Award of Attorneys' Fees, Expenses, and Class Representative Service Awards, and Incorporated Memorandum of Law (document 92, filed 4/28/21) and the attachments thereto

Documents reviewed in *Ponzio* v. *Mercedes-Benz USA, LLC* (D.N.J.):

- Docket as of 5/26/21

- Class Action Complaint (document 1, filed 8/8/18)

- Defendant Mercedes-Benz USA, LLC's Brief in Support of Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or in the alternative, Motion to Transfer (document 22-1, filed 10/15/18)

- Plaintiffs' Corrected Opposition to Defendant Mercedes-Benz USA, LLC's Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or in the alternative, Motion to Transfer (document 31, filed 12/3/18)

- Defendant Mercedes-Benz USA, LLC's Reply in Support of Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or in the alternative, Motion to Transfer (document 35, filed 12/20/18)

- Defendant Daimler AG's Brief in Support of Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or, in the alternative, Motion to Transfer (document 37, filed 1/15/19)

- Plaintiffs' Opposition to Defendant Daimler AG's Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or, in the alternative, Motion to Transfer (document 41, filed 2/28/19)

- Defendant Daimler AG's Reply in Support of Motion to Dismiss Plaintiffs' Class Action Complaint for Lack of Personal Jurisdiction, Lack of Standing, and Failure to State a Claim, or, in the alternative, Motion to Transfer (document 42, filed 3/28/19)

- Opinion (on motion to dismiss) (document 50, filed 3/11/20)

- Transcript of Oral Argument and Opinions Via Teleconference on Defendants' Motion for Discovery and Plaintiffs' Motion to Compel (7/31/20)

- Transcript of Oral Argument on Discovery Disputes (11/10/20)

- Transcript of Telephone Status Conference/Motion Hearing (12/29/20)