UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **EMILY PINON, GARY C. KLEIN, KIM BROWN, JOSHUA FRANKUM, DINEZ WEBSTER, and TODD BRYAN, on behalf of themselves and all others similarly situated,** | |
| Plaintiffs | Case No. 18-cv-03984-MHC |
| v. | |
| **DAIMLER AG and MERCEDES-BENZ USA, LLC,** | |
| Defendants | |

# EXPERT REPORT OF GARRETT GLASGOW, PH.D.

# Table of Contents

I.     QUALIFICATIONS ...................................................................................... 2

II.    ASSIGNMENT AND SUMMARY OF OPINIONS ................................. 3

III.   FACTS AND DATA CONSIDERED IN FORMING MY OPINIONS .................. 4

IV.    BACKGROUND ............................................................................................ 5

V.     CHOICE-BASED CONJOINT ANALYSIS ............................................. 7

    A.   Choice-Based Survey Methods ...................................................................... 7

    B.   Survey Population ............................................................................................ 8

    C.   Sampling of the Relevant Population .......................................................... 9

    D.   Design of the Choice Tasks ......................................................................... 11

    E.   Survey Pre-Test .............................................................................................. 14

    F.   Additional Quality Control Measures for the Survey ............................. 15

VI.    REPAINTED CLASS VEHICLES ARE DIMINISHED IN VALUE .................... 17

    A.   Estimating the Effect of Repainting on Consumer Choice ................... 17

    B.   Consumer Willingness to Pay for Repainted Used Luxury Vehicles .............. 19

    C.   The Diminution in Value Applies on a Class-Wide Basis ....................... 20

VII.   THE PRICE PREMIUM ASSOCIATED WITH THE DEFECT ........................ 23

VIII.  CONCLUSIONS ............................................................................................ 25

# I.    QUALIFICATIONS

1.      I am an Associate Director in the San Francisco office of NERA Economic

Consulting, Inc. ("NERA"), where I participate in the Intellectual Property, Product Liability,

Antitrust, and Environmental Economics Practices.  NERA provides expert economic and

financial analysis to clients on a variety of issues.  My business address is 4 Embarcadero Center,

Suite 400, San Francisco, CA, 94111.

2.      I received B.A. degrees in Economics and Political Science from the University of

California, Los Angeles in 1995.  In 1999, I received a Ph.D. in Social Sciences from the

California Institute of Technology (in 1998, I received an M.A. in Social Sciences from the same

institution).  From 1999 to 2000, I was a postdoctoral fellow at the Center for Basic Research in

the Social Sciences at Harvard University.

3.      From 2000 to 2014, I was an Assistant Professor (2000-2006) and Associate

Professor (2006-2014) of Political Science at the University of California, Santa Barbara (UCSB),

where I taught numerous courses on statistics-based research methods at both the undergraduate

and graduate level.  I was also an invited instructor at the Essex Summer School in Social Science

Data Analysis from 2008 through 2013, where I taught a course on discrete choice methods.

4.      Since 2014, I have been a Senior Consultant (2014-2020) and Associate Director

(2020-present) at NERA.  I have testified as an expert witness on damages in a class action case

involving a product defect, in which I applied methods similar to those I describe below.  In

addition, I have developed or critiqued damage calculations in a variety of class action cases.

5.      **Exhibit A** of this declaration contains my resume.  NERA is being compensated

for my services in this matter at a rate of $695 per hour. Members of the staff at NERA have

worked at my direction to assist me in this engagement, and NERA is compensated for their services at their normal and customary rates.  No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.  ASSIGNMENT AND SUMMARY OF OPINIONS

6.     I have been retained by Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Gordon & Partners, P.A., and Robbins Geller Rudman & Dowd LLP, on behalf of one set of Plaintiffs (the "*Ponzio* Plaintiffs") in the matter of *Emily Pinon, Gary C. Klein, Kim Brown, Joshua Frankum, Dinez Webster, and Todd Bryan v. Daimler AG and Mercedes Benz USA, LLC.*

7.     I have been asked by *Ponzio* Plaintiffs to determine whether Class Vehicles that have been repainted to address an alleged paint defect have been diminished in value on a class-wide basis.  I have also been asked to determine whether the amount by which Class Members were overcharged for the Class Vehicles with the alleged paint defect could be calculated on a class-wide basis, and if so, whether additional information would be required from the Defendants in order to undertake such a calculation.

8.     On the basis of my research described in this report, I have formed the following opinions:

a.   Consumers are less willing to pay for repainted used luxury vehicles in comparison to equivalent used luxury vehicles with original, non-defective paint. The median discount a seller would need to offer in order to make a repainted used luxury vehicle as attractive to potential buyers as an equivalent vehicle with original, non-defective paint is $8,148.  This reduced willingness to pay for

repainted used luxury vehicles in turn reduces the market price of these vehicles. That is, repainted Class Vehicles are diminished in value relative to an equivalent vehicle with original, non-defective paint on a class-wide basis. The proposed *Pinon* class settlement does not compensate Class Members for the diminished value of the Class Vehicles due to repainting.

    b.   Compensation for Class Members can be calculated as the amount by which Class Members were overcharged for the Class Vehicles with the alleged paint defect (the "price premium"). The price premium can be calculated on a class-wide basis through a market simulation that takes into account both the reduction in demand for Class Vehicles due to the defect and supply-side factors in the luxury vehicle market. Market simulations of this type have been undertaken in academic research and previous product defect class actions. Some of the information needed to undertake this market simulation would need to be obtained from the Defendants through discovery.

## III.   FACTS AND DATA CONSIDERED IN FORMING MY OPINIONS

    9.    In conducting my analysis, I have reviewed the complaints and proposed settlement in this matter as well as other materials. A list of the specific materials I reviewed when writing this report can be found in **Exhibit B**. Should I receive new or additional information relevant to my opinions expressed below, I may supplement or revise this report as permitted by the Court.

## IV.   BACKGROUND

10.     There are two sets of Plaintiffs in this case.  The *Pinon* Plaintiffs represent the interests of five state subclasses (Alabama, Florida, Arkansas, Tennessee, and Louisiana),[1] while the *Ponzio* Plaintiffs represent the interests of four state sub-classes (New Jersey, New York, California, and Kansas).[2]  Both sets of Plaintiffs represent the interests of the North Carolina sub-class.

11.     Both *Pinon* and *Ponzio* Plaintiffs allege that certain vehicles sold by Mercedes with 590 Mars Red paint (the "Class Vehicles" or "Subject Vehicles") have a defect that causes the exterior surfaces of the vehicles to peel, flake, and bubble.[3]

12.     The *Pinon* Plaintiffs and Defendants have proposed a nationwide class action settlement under which Class Members would be reimbursed for a percentage of certain out-of-pocket costs related to repainting to address the defect, and a warranty extension in the form of a discount would be established to cover certain future costs related to repainting to address the defect.[4]

---

[1] Third Amended Class Action Complaint and Demand for Jury Trial, *Emily Pinon, Gary C. Klein, Kim Brown, Joshua Frankum, Nancy Pearsall, Dinez Webster, and Todd Bryan v. Daimler AG and Mercedes Benz USA*, United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:18-cv-03984-MHC, filed June 22, 2020 ("*Pinon*").

[2] Class Action Complaint and Demand for Jury Trial, *Robert Ponzio, Karina Kloczko, Jessica Irene Miller, Thomas Hayes, Alex Acuna, Brian Madsen, Vanessa M. Montgomery, Robert Mull, Hadiya Nelthrope, and Samual Salgado v. Mercedes-Benz USA, LLC and Daimler AG*, United States District Court for New Jersey, Case No. 1:18-cv-12544-JHR-JS, filed August 18, 2018 ("*Ponzio*").

[3] *Pinon* ¶ 4; *Ponzio* ¶ 1.

[4] Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement Agreement and Preliminary Certification of Nationwide Settlement Class and Incorporated Memorandum of Law, *Emily Pinon, Gary C. Klein, Kim Brown, Joshua Frankum, Dinez Webster, and Todd Bryan v Mercedes-Benz USA and Daimler AG*, United States District Court for the Northern

13.     The *Ponzio* Plaintiffs contend that repainting the Class Vehicles to address the paint defect does not restore the vehicles to the same value as if they had original, non-defective paint.  That is, repainted Class Vehicles are diminished in value in comparison to equivalent vehicles with original, non-defective paint, and the proposed settlement does not compensate Class Members for this diminution in value.  Thus, the *Ponzio* Plaintiffs contend that the proposed settlement does not provide fair, reasonable, and adequate compensation for the Class Members.

14.     To evaluate the *Ponzio* Plaintiffs' claim that repainted Class Vehicles are diminished in value relative to equivalent vehicles with original, non-defective paint, I undertook a survey experiment, which is described in detail in the following section.

15.     I then explain how the results of this survey experiment demonstrate that repainted Class Vehicles are diminished in value relative to an equivalent vehicle with original, non-defective paint on a class-wide basis.

16.     Finally, I describe a methodology which establishes the amount Class Members were overcharged for the Class Vehicles with the alleged paint defect could be calculated on a class-wide basis, provided the necessary information is obtained from the Defendants through discovery.  The *Ponzio* Plaintiffs contend that this price premium would provide fair, reasonable, and adequate compensation for Class Members.

---

District of Georgia, Atlanta Division, Case No. 1:18-cv-03984-MHC, filed December 21, 2020 ("*Proposed Class Action Settlement*").

# V.   CHOICE-BASED CONJOINT ANALYSIS

## A.  Choice-Based Survey Methods

17.     To measure the influence of repainting on consumer preferences for the Class Vehicles, I designed and implemented a choice-based survey known as a conjoint analysis. In a choice-based conjoint analysis, respondents are presented with a series of questions that ask them to select a most preferred product from among several available options with different attributes.[5] Choice-based conjoint analysis is used in economics and market research to examine the extent to which a particular attribute of a product influences consumer preferences.

18.     Choice based surveys (including conjoint methods) are a generally accepted approach and are commonly used in academic and commercial market research to help companies estimate the value of the attributes of a product.[6]

19.     Conjoint surveys have also been used in litigation, and the methodology has been accepted by several Courts, including in consumer class actions.[7]  In this report I adopt this

---

[5] These types of studies are called choice-based conjoint analysis because each question asks respondents to select their preferred option from a set of choice alternatives.  This is in contrast to other conjoint methods that ask respondents to rank or rate all options shown.  Choice-based conjoint surveys are currently the most common type of conjoint analysis conducted.  See Orme, Bryan, 2017. "The CBC System for Choice-Based Conjoint Analysis," https://www.sawtoothsoftware.com/download/techpap/cbctech.pdf, last accessed on July 14, 2021; Alchemer, 2021. "CBC (Choice Based Conjoint) is the Most Common Form of Conjoint Analysis." https://help.alchemer.com/help/conjoint-choice-based, last accessed on July 14, 2021.

[6] Green, Paul E., Abba M. Krieger, and Yoram Wind, 2001. "Thirty Years of Conjoint Analysis: Reflections and Prospects." *Interfaces* 31(3): S56-S73.  Also see Orme, Bryan, 2014. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research.* Third Edition, Madison, WI.: Research Publishers LLC; Ben-Akiva, Moshe, Daniel McFadden, and Kenneth Train, 2019.  "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis."  *Foundations and Trends in Econometrics* 10(1-2): 1-144.

[7] See, for example: *Hadley v. Kellogg Sales Co.,* 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) ("[C]onjoint analysis is widely-accepted as a reliable economic tool for isolating price premia"); *Dzielak v. Whirlpool Corp.,*2017 U.S. Dist. LEXIS 39232, at *17 (D.N.J. Mar. 17, 2017)

accepted methodology for my own survey, and undertake a choice-based conjoint analysis to evaluate the influence of repainting on consumer preferences for used luxury vehicles such as the Class Vehicles.

20.     My survey followed the generally accepted principles for the design of surveys to be used as evidence in litigation.[8]  A detailed explanation of my survey design follows.

## B.  Survey Population

21.     The relevant population for this matter consists of consumers who have recently purchased a used luxury vehicle, or who are in the market for a used luxury vehicle.  This population includes previous and prospective purchasers of all makes and models of used luxury vehicles, not just the Class Vehicles.  This population allows me to understand the full range of consumer preferences within the used luxury vehicle market.

---

("Conjoint analysis has won acceptance from courts and legal commentators."); *In re Dial Complete Marketing & Sales Practices Litigation*, 320 F.R.D. 326, 334 (D.N.H. 2017)  ("Courts have recognized that conjoint analysis can effectively determine the value customers ascribe to a particular product attribute by measuring the 'part worth' of that attribute."); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 996 (S.D. Fla. 2016) (finding conjoint analysis to be a permissible approach "for determining actual damages in the FDUTPA context."); *see also Morales v. Kraft Foods Group, Inc.*, No. 2:14-cv-04387 (C.D. Cal. Jun. 9, 2017); *In re ConAgra Foods, Inc.*, 90 F. Supp.3d 919 (C.D. Cal. 2015), *aff'd* 674 Fed. Appx. 654 (9th Cir. 2017).  Conjoint surveys have also been accepted in patent infringement cases, such as *Apple, Inc. v. Samsung Electronics Co., LTD*, No. 12-cv-00630 (N. D. Cal. 2014); *TV Interactive Data, Corp. v. Sony Corp., et al*, No. 3:10-cv-00475 (N. D. Cal. 2013); *Microsoft Corp. v. Motorola, Inc.* No. C10-1823JLR, (W.D. Wash. 2012); *Convolve, Inc. v. Dell Inc.,* No. 2:08-cv-244. (E.D. Tex. 2014).

[8] Diamond, Shari S., 2011. "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence,* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423.

22.      In order to make the survey experiment as straightforward as possible, I further limited the survey population to recent and prospective purchasers of used luxury coupes and sedans.[9]  Similar surveys could be conducted for other market segments (e.g., SUVs).

23.      A nationwide study is the appropriate population for this survey, as the *Pinon* Plaintiffs have proposed a nationwide Settlement Class.[10]

## C.  Sampling of the Relevant Population

24.      Potential survey respondents were recruited from a large internet panel hosted by Veridata Insights.

25.      Internet-based surveys allow respondents to carefully read and review the information presented and allow for the randomized display of information to respondents (which is useful in avoiding biases based on the order in which information is presented).   An internet panel also allows the researcher to access a broader respondent population than is typically accessible with standard in-person methods, such as intercept surveys conducted in shopping malls.

26.      Potential survey respondents were sent a generic invitation to participate in a survey.  Interested respondents were then asked a series of screening questions to ensure that they were part of the relevant population as defined for this case.

27.      Only respondents who met a set of qualifying conditions were allowed to continue on to the main survey. To qualify for the survey, respondents had to:

---

[9] A complete list of the makes and models used to qualify respondents for the survey is provided in **Exhibit E**, p. 5.

[10] *Proposed Class Action Settlement*, p. 1.

    a.   Indicate that they understood and were willing to adhere to the survey instructions;

    b.   Correctly answer a CAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey;[11]

    c.   Enter a gender, age, state of residence, and zip code that match the respondent information on file with Veridata Insights;

    d.   Be 18 years of age or older;

    e.   Live in the U.S.;

    f.   Report that neither they, nor anyone in their households, are employed in any of the following: an advertising company, a market research firm, a company that manufactures, distributes, or sells motor vehicles, an automobile body shop, or an insurance or appraisal company;[12]

    g.   Report that they have a driver's license, or expect to get a driver's license in the next twelve months;

    h.   When presented with a list of products they have purchased or plan to purchase, report that they have purchased a used luxury coupe or sedan within the past two years, or report that they are considering purchasing a used luxury coupe or sedan within the next twelve months;

---

[11] The acronym CAPTCHA stands for "Completely Automated Public Turing Test to Tell Computers and Humans Apart."  For more information on how CAPTCHA works, see Carnegie Mellon University, 2010. "The Official CAPTCHA Site." http://www.captcha.net/, last accessed on June 29, 2021.  Veridata Insights also has an automated "bot" detection process.

[12] It is standard to exclude respondents who are likely to have specialized knowledge about the survey topic or the survey methodology.

      i.   For those that reported purchasing a used luxury coupe or sedan within the past two years, report purchasing a make, model, and model year that in fact exists; and

      j.   Report that they are or would be the primary driver, or one of the primary drivers, of the used luxury vehicle they recently purchased or are considering purchasing.

28.     Respondents who qualified for the survey were then taken to the choice-based exercise portion of the survey.

## D.  Design of the Choice Tasks

29.     Prior to beginning the choice-based portion of the questionnaire, respondents were asked to imagine that they were shopping for a used luxury vehicle.  If they already owned a used luxury vehicle, they were asked to imagine they were replacing it.  Respondents were then informed they would be shown a number of different used luxury vehicle attributes that they might wish to consider when determining which vehicle to buy, and were instructed to review the features carefully.

30.     Once past this screen, respondents were shown eight used luxury vehicle attributes along with descriptions of the options within each attribute (the "levels"). Six of the attributes included in the survey were identified through a review of advertisements for used luxury cars.  The reviewed advertisements are presented in **Exhibit C**.  These six attributes were: make and model, model year, mileage, exterior color, interior color, and price.  The two remaining attributes were whether or not the vehicle had been repainted (to test the influence of this attribute on demand for used luxury vehicles) and whether or not the vehicle had ever been in a minor accident (in order to distinguish repainting from the repair of accident damage).  Each attribute was described on a separate screen. Respondents saw the first seven attributes in a

randomized order such that the attributes appeared in different orders for different respondents. Price, the eighth attribute, was always shown last.

31.     To avoid overwhelming respondents with information I followed the standard rule of thumb of not exceeding eight attributes in total.[13]  Following common practice, the attributes were described with realistic images rather than text wherever possible,[14] and survey respondents were asked to assume that all attributes other than those that vary in the survey were equivalent across vehicles.[15]

32.     The description of the "repainted" attribute was designed to match the offer of repair described in the Proposed Settlement, under which the entire vehicle would be repainted at an Authorized Service Center.[16]  Specifically, this attribute was described to respondents as follows:

> In this survey you will see used luxury vehicles that either have their original paint or have been repainted:
> - The vehicle has its original paint
> - The vehicle has been repainted
>
> For repainted vehicles assume the entire vehicle has been repainted at a dealership or other authorized service center.

33.     Price was the eighth feature included in the survey. It is common practice when conducting a choice-based survey to select a range of prices which will be realistic for consumers

---

[13] Orme 2014, pp. 53-54; Rao, Vithala R., 2014.  *Applied Conjoint Analysis*, New York, NY: Springer, p. 43.

[14] Orme, Bryan K. and Keith Chrzan, 2017.  *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*.  Orem, UT: Sawtooth Software, Ch. 2.

[15] Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, 2014. "Valuation of Patented Product Features," *The Journal of Law & Economics*, 57(3): 629-663, at p. 642.

[16] *Proposed Class Action Settlement*, p. 16.

and will also provide sufficient variation to allow for an estimate of consumers' willingness to pay for various attribute levels.[17] The prices used in this survey ranged from $10,000 to $25,000, in increments of $5,000. This survey price range is reasonable as it allows for sufficient variation between prices and is comparable to the range of prices at which used luxury vehicles of the types shown in the survey are sold.[18]

34.     The attributes and levels used in the survey are presented in **Exhibit D**.  An orthogonal fractional factorial design was used to combine the attribute levels into hypothetical vehicles and construct the choice tasks.[19]

35.     Once respondents had viewed all of the vehicle attributes and levels, they moved on to a new screen which provided instructions for the choice task. Specifically, respondents were told:

> In the next section, we'll show you some different used luxury vehicles and ask you some questions. On each screen, you will see three different used luxury vehicles which vary on the previously described features.  You will be asked to choose which of these three used luxury vehicles you most prefer.

> Please assume that the **vehicles you see do not vary in any other way beyond the features described** and that all feature descriptions are accurate. For instance, you should assume that all of the vehicles you see have been properly maintained and are in good operating condition, have similar horsepower, the same transmission type, and so on.

> In making your choices, it is important that you answer in the way you would if you were **actually buying a used luxury vehicle**.

36.     After reading the choice exercise instructions, respondents then completed twelve choice tasks. After respondents completed the first choice task, they were asked "Why did you

---

[17] For a description of selecting proper attributes and levels see Orme 2014, Ch. 6.

[18] See **Exhibit C**.

[19] Rao 2014, pp. 44-52.

select this vehicle?" and instructed to type their response.  The responses to this open-ended question give an indication of whether the respondent was attentive and understood the choice task.

37.     After each choice task, respondents were asked whether they would actually purchase the selected vehicle if there were no other used luxury vehicles available at the time they were shopping.  This "dual response" design allows the survey respondents to indicate that none of the vehicles presented in the choice set were acceptable, while not allowing respondents to opt out of difficult trade-offs.[20]

38.     The complete survey questionnaire is provided in **Exhibit E**, and screenshots of the survey as it appeared to respondents are provided in **Exhibit F.**

### E.  Survey Pre-Test

39.     To ensure that respondents properly understood the survey and were able to provide reliable preference data, I conducted a pre-test of the survey instrument.  Veridata Insights recruited ten respondents to take the online survey as they normally would.  These respondents then took the online survey while on a Zoom call with an interviewer, who asked the respondents to convey their impressions as they took the survey.[21]  The interviewer asked respondents if they understood the questions being asked, if the attributes described in the choice sets seemed realistic, and whether any aspects of the survey were confusing or difficult to

---

[20] Orme and Chrzan 2017, Ch. 5; Brazell, Jeff D., Christopher G. Diener, Ekaterina Karniouchina, William L. Moore, Válerie Séverin, and Pierre-Francois Uldry, 2006. "The no-choice option and dual response choice designs," *Marketing Letters*, Vol. 17(4):255-268.

[21] These types of pre-tests are sometimes known as "cognitive interviews." See for example Tourangeau, Roger, Lance J. Rips, and Kenneth Rasinski, 2000.  *The Psychology of Survey Response*.  New York, NY: Cambridge University Press, pp. 326-334.

understand.  The interviewer also asked respondents to describe their understanding of the

"repainted" attribute in their own words.

40.     A member of my NERA research staff and I either listened to or read the

transcripts of all ten of the pre-test interviews.

41.     Based on the results of this pre-test, I adjusted the description of the "repainted"

attribute to clarify that "repainted" meant that the entire vehicle had been repainted at a dealership

or other authorized service center.  I also adjusted the description of the "accident" attribute to

explain that the minor accident described in the survey did not compromise vehicle safety, but did

cause cosmetic damage such as dented bumpers, fenders, grills, or body panels.

42.     As a final quality test, I implemented a "soft launch" of the survey.  I paused data

collection after I obtained 51 responses, and examined the survey data for evidence of respondent

confusion or inattention.  I did not observe anything in the "soft launch" data that led me to make

additional changes to the survey instrument.

## F.  Additional Quality Control Measures for the Survey

43.     Veridata Insights has a series of quality control measures to ensure it recruits

high-quality participants for its studies; these include geo-location and VPN usage checks, digital

fingerprinting to prevent individual respondents from taking the survey multiple times, and other

techniques to identify bad actors and bots.[22]  Veridata Insights' standard quality control measures

were implemented for this survey.

---

[22] Veridata Insights Value Statement, p. 2; https://veridatainsights.com/respondents-you-want/, last accessed on June 29, 2021.

44.     Further, as is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at Veridata Insights nor any of the respondents were aware of the survey sponsor or the ultimate intention of the survey.[23]

45.     I also implemented additional quality control measures after completing the collection of the survey data:

   a.  I removed respondents who "straight-line," or always select the same option (such as the first option presented in each choice task), since these respondents were unlikely to have attended carefully to the choice tasks;[24]

   b.  I also removed respondents who indicated that they have purchased or were intending to purchase all of the products in at least one of the screening questions, since these respondents may have been attempting to qualify for the survey by selecting all options in the screening question;

   c.  After respondents completed the first choice task, they were asked "Why did you select this vehicle?" and instructed to type their response. At least two NERA staff, myself included, reviewed each verbatim response, and I removed respondents who provided vague or nonsensical answers, since these respondents were unlikely to have attended carefully to the choice task; and

   d.  I evaluated the length of time each respondent took to complete the choice tasks in the survey. Respondents who completed the choice tasks too quickly are unlikely to have put sufficient effort into answering the questions.  I eliminated

---

[23] Diamond 2011, pp. 410-411.

[24] Allenby et al. 2014, p. 653.

any respondents who completed the choice task portion of the survey in less than 3 minutes (an average time of less than 15 seconds per choice task).

46.     Respondents who did not pass these quality checks were removed from the survey data.

# VI.   REPAINTED CLASS VEHICLES ARE DIMINISHED IN VALUE

## A.  Estimating the Effect of Repainting on Consumer Choice

47.     A total of 335 respondents completed the survey and passed all quality checks. Each of these respondents completed twelve choice tasks, yielding a total of 4,020 choices from among 12,060 hypothetical vehicles or the no purchase option, for a total of 16,080 choice options.

48.     The influence of each attribute on the choices made by the survey respondents was estimated with a mixed logit model.[25]  The mixed logit is a statistical model that estimates the probability that an individual would make a particular choice from a set of options, while accounting for heterogeneity in preferences across individuals (e.g., some individuals may be more price sensitive than others, or may have stronger brand preferences than others).[26]  In this case I used a mixed logit model to estimate the probability that a survey respondent would select a

---

[25] This mixed logit model is equivalent to the "hierarchical Bayes" approach popularized by Sawtooth Software.  See Train, Kenneth, 2009.  *Discrete Choice Methods with Simulation*.  Second Edition, New York, NY: Cambridge University Press, Ch. 12.

[26] Cameron, Colin A., and Pravin K. Trivedi, 2005.  *Microeconometrics: Methods and Applications*.  New York, NY: Cambridge University Press, pp. 512-514; McFadden, Daniel, and Kenneth Train, 2000.  "Mixed MNL Models for Discrete Response."  *Journal of Applied Econometrics*, 15(5):447-470; Train, Kenneth, 2009.  *Discrete Choice Methods with Simulation*.  Second Edition, New York, NY: Cambridge University Press, Ch. 3.

given option from among the available options in each choice task (one of the three vehicles offered or the no purchase option).

49.    For each attribute, the mixed logit model estimates the mean and standard deviation of a randomly distributed coefficient, which measures the distribution of preferences for an attribute across the survey respondents.[27]  For continuous attributes (e.g., mileage), a negative coefficient indicates that respondents are less likely to choose a vehicle as the value of that attribute increases, while a positive attribute indicates that respondents are more likely to choose a vehicle as the value of that attribute increases.  For categorical attributes (e.g., brand), a negative coefficient indicates that respondents are less likely to select a vehicle with that attribute level, while a positive coefficient indicates that respondents are more likely to select a vehicle with that attribute level.

50.    I specified the coefficients on all attributes except price as random normal distributions.  For these attributes, it is possible for the randomly distributed coefficient to contain both positive and negative values, indicating that some respondents place a positive value on the attribute, while others place a negative value on the attribute.  Price was specified as the negative of a lognormal distribution, which restricts the random coefficient to only have negative values such that respondents never prefer to pay more for a vehicle, all else equal.[28]

51.    The results of estimating the mixed logit described here are shown in **Exhibit G**. The mean of the randomly distributed coefficient on the "repainted" attribute is negative and statistically significant, indicating that on average respondents are less likely to purchase cars that

---

[27] The coefficient distributions were simulated using 500 Halton draws (Train 2009, Ch. 9).

[28] This is a standard assumption in most mixed logit models of consumer choice in economics (Train 2009, Ch. 6, p. 138).

have been repainted, and it is unlikely that I obtained this result by chance.  The standard deviation of the randomly distributed coefficient on the "repainted" attribute is statistically significant, indicating that there is heterogeneity in the level of consumer distaste for repainted cars.

52.	The results for the other attributes are reasonable.  On average, the survey respondents tended to prefer newer model years, vehicles with lower mileage, vehicles that have never been in an accident, and lower prices.

## B.  Consumer Willingness to Pay for Repainted Used Luxury Vehicles

53.	The mixed logit results presented in **Exhibit G** indicate that consumers are less likely to purchase repainted used luxury vehicles than equivalent used luxury vehicles with original, non-defective paint.

54.	A measure of the drop in demand for used luxury vehicles when they have been repainted is given by the willingness to pay (WTP) for the "repainted" attribute.  A negative WTP on an attribute indicates the price discount the consumer would require in order to be equally satisfied with a good with that attribute relative to an undiscounted good without that attribute.

55.	The WTP for an attribute in the mixed logit is calculated by dividing the distribution of the random coefficient on repainted by the random coefficient on price.[29]  The result is the distribution of the WTP to avoid repainted used luxury vehicles across consumers.

---

[29] Train 2009, Ch. 6; Allenby et al. 2014, p. 648.  For the mixed logit model, a single random draw of the "repainted" coefficient was divided by a single random draw of the price coefficient to create a single simulated WTP.  This procedure was repeated 10,000 times to estimate the distribution of WTPs across all consumers.

56.     Based on the mixed logit results presented in **Exhibit G**, 75% of consumers view repainting as a negative attribute in used luxury vehicles such as the Class Vehicles, indicating that a clear majority of consumers would want to pay less for a repainted vehicle than for an equivalent vehicle with original, non-defective paint.  The median difference in the WTP between a repainted vehicle and an equivalent vehicle with original, non-defective paint is $8,148.  This is the median discount a seller would need to offer in order to make a repainted used luxury vehicle as attractive to potential buyers as an equivalent vehicle with original, non-defective paint.

57.     My survey findings are consistent with statements by Class Members indicating that they view repainted Class Vehicles as diminished in value in comparison to an equivalent vehicle with original, non-defective paint.[30]

## C.  The Diminution in Value Applies on a Class-Wide Basis

58.     The reduced WTP for repainted used luxury vehicles is a measure of the reduction in demand for the Class Vehicles that have been repainted.  This reduced demand in turn decreases the market price at which owners of repainted Class Vehicles could sell them.  Because a reduction in the market price will apply to all repainted Class Vehicles, the value of the repainted Class Vehicles will be diminished in comparison to an equivalent vehicle with original, non-defective paint on a class-wide basis.

59.     Equilibrium market prices are determined by the intersection of supply and demand.[31]  The relationship between a reduction in demand (i.e., a reduction in the WTP for a

---

[30] Declaration of Richard J. Eichmann ("Eichmann Declaration"), filed January 27, 2021, ¶ 7.

[31] See for example, Pindyck, Robert S. and Daniel L. Rubenfeld, 2018.  *Microeconomics*.  Ninth Edition, New York, NY: Pearson, Section 2.2.

product) and market price is depicted in the following figure.[32]  The horizontal axis depicts the

quantity of used Class Vehicles sold, while the vertical axis indicates the price of those vehicles.

The curve D is the demand curve for Class Vehicles with original, non-defective paint in the "but-

for" world where such vehicles exist – this curve is sloping downward, indicating that as price

increases, consumers are less willing to buy these vehicles.  The curve S is the supply curve for

used Class Vehicles – this curve is upward sloping, indicating that as price increases, more Class

Members are willing to sell their vehicles.  The equilibrium market price of a Class Vehicle if it

had original, non-defective paint is determined by the intersection of D and S.



---

[32] This figure is based on Allenby et al. 2014, Figure 2.

21

60.     As demonstrated in the conjoint analysis described above, the demand for used Class Vehicles decreases when they have been repainted.  The demand curve for these vehicles shifts inward from D to D*, indicating that at any given price, the demand for repainted Class Vehicles will be lower than the demand for equivalent vehicles with original, non-defective paint. This shift in demand in terms of price is captured by the difference in the willingness to pay (ΔWTP) between repainted Class Vehicles and equivalent vehicles with original, non-defective paint, which is depicted by the red line in the figure – this is the average discount sellers would need to offer in order to make repainted Class Vehicles as attractive to buyers as equivalent vehicles with original, non-defective paint.

61.     The reduction in the equilibrium market price, and thus the diminution in value, for repainted Class Vehicles is determined both by the reduction in demand for those vehicles described above, and by the number of repainted Class Vehicles the Class Members would be willing to supply at a given market price.

62.     In the case where all Class Members who wish to sell their vehicles do so regardless of price, such that the quantity of Class Vehicles on the market remains at Q, the class-wide diminution in value is captured by ΔWTP.  For the Class Vehicles covered by the survey described above, this diminution in value would be approximately $8,000.

63.     In the case where Class Members who wish to sell their vehicles react to market prices, fewer Class Members will be willing to sell as the market price of the repainted Class Vehicles falls (opting instead to keep driving the vehicle, put it in storage, etc.).  These Class Members will withdraw their vehicles from the used car market, reducing the supply of Class Vehicles from Q to Q*.  A new equilibrium market price for repainted Class Vehicles will be established at P*, determined by the intersection of D* and S.

64.     The difference between P and P* is another class-wide measure of the diminution in value for the Class Vehicles.  Calculating this diminution in value precisely would involve a more detailed study that also considers supply-side factors in the used luxury vehicle market.  However, the reduction in demand for repainted used luxury vehicles revealed by the survey experiment indicates that there is a non-zero diminution in value for repainted Class Vehicles.

65.     Given the reduction in demand for repainted used luxury vehicles revealed by the survey experiment, and based on the basic economic principles described above, I conclude that repainted Class Vehicles are diminished in value relative to equivalent vehicles with original, non-defective paint on a class-wide basis.  This is consistent with third-party valuations of used vehicles, which typically place lower value on used vehicles that have been repainted.[33]

# VII. THE PRICE PREMIUM ASSOCIATED WITH THE DEFECT

66.     *Ponzio* Plaintiffs allege that as a result of Defendant's failure to disclose the paint defect, Class Members "overpaid for the Class Vehicles because the Paint Defect significantly diminished the value of the Vehicles," and that they "would not otherwise have purchased or leased, or would have paid less for [the Class Vehicles], had they known of the Paint Defect at the point of sale."[34]

67.     That is, *Ponzio* Plaintiffs allege there is a "price premium" associated with the alleged paint defect, which is the amount by which Class Members overpaid for their Class Vehicles due to Defendant's concealment of the defect.

---

[33] Eichmann Declaration, ¶ 8-9.

[34] *Ponzio*, ¶ 10-11.

68.     In terms of the figure presented above, the curve D is the demand curve for Class Vehicles before the defect has been revealed, the curve D* is the demand curve for Class Vehicles after the defect has been revealed, and the curve S is the number of Class Vehicles the Defendants would supply assuming they are a profit maximizing company.  The price premium associated with the defect is then the difference between P and P*.

69.     The price premium associated with the alleged paint defect can be calculated on a class-wide basis through an economic market simulation that combines estimates of changes in demand due to the alleged paint defect, such as those obtained through a conjoint analysis, with supply side information such as market shares, sales prices, and production costs.

70.     There is extensive academic literature that focuses on combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices (including in markets where actual transaction prices can vary, such as vehicle markets), both with and without a particular product feature or defect.[35]  Several Courts have recognized the importance of including supply side information when calculating market equilibrium prices and

---

[35] For example, Allenby, et al., 2014; Berry, Steven, James Levinsohn, and Ariel Pakes, 1995. "Automobile Prices in Market Equilibrium," *Econometrica,* 63(4): 841–890; Nevo, Aviv, 2000. "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand," *Journal of Economic and Management Strategy*, 9(4):513-548; Berry, Steven, James Levinsohn, and Ariel Pakes, 2004.  "Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market," *Journal of Political Economy*, 112(1): 68-105; Petrin, Amil, 2002.  "Quantifying the Benefits of New Products: The Case of the Minivan," *Journal of Political Economy,* 110(4): 705–729.

price premiums in consumer class action lawsuits,[36] and market simulations of this type have been

accepted in previous class actions as a reliable approach to calculating damages.[37]

71.     In order to undertake market simulations of this type, reliable information on

supply-side factors must be gathered or estimated.  Not all of the required information can be

obtained from publicly available sources – for instance, information on the number and type of

Class Vehicles sold during the Class Period is not available through public sources, and the

*Ponzio* Plaintiffs have yet to obtain this information from the Defendants.

72.     Thus, in order to conduct market simulations to calculate a class-wide price

premium associated with the Class Vehicles, additional information would need to be provided by

the Defendant.

# VIII.   CONCLUSIONS

73.     Based on my analysis above, I conclude that repainted Class Vehicles are

diminished in value relative to an equivalent vehicle with original, non-defective paint on a class-

wide basis.  The proposed *Pinon* class settlement does not compensate Class Members for the

diminished value of the Class Vehicles due to repainting.

---

[36] *Oula Zakaria v. Gerber Products Co*., 2017 U.S. Dist. LEXIS 221124, at 56-57  (C.D. Cal. Aug. 9, 2017) (a reliable method for determination of the price premium must "reflect the actual difference, if any, between the amount paid for Good Start Gentle and its value in the market."); *In re NJOY Consumer Class Action Litigation*, 120 F. Supp. 3d 1050, 1120 (C.D. Cal. 2015) (rejecting survey that "completely ignores the price for which NJOY is willing to sell its products, what other e-cigarette manufacturers say about their products, and the prices at which those entities are willing to sell their products. 'The [c]ourt has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell).'")

[37] For instance, see *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 970 (D. Minn. 2020), at 972-973 ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world.").

74.     I further conclude that a price premium associated with the alleged paint defect in the Class Vehicles can be calculated on a class-wide basis through an economic market simulation, provided that the information needed to undertake this market simulation is obtained from the Defendant.

75.     My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. My conclusions have been reached through the consideration of commonly accepted survey and economic methods, and standard methodologies relied upon by experts in the field of economics and survey, market, and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. Should I receive new or additional information relevant to my opinions, I may supplement or revise this report as permitted by the Court.  I declare under penalty of perjury that the foregoing is true and correct.

Garrett Glasgow, Ph.D.

July 21, 2021